# EXHIBIT A

1    UNITED SATES DISTRICT COURT

2    EASTERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - x

4    LORRAINE MASCIARELLI,

5            Plaintiff,
                            INDEX NO. 22-cv-7553
6

7        -against-

8

9    NEW YORK CITY DEPARTMENT OF
     EDUCATION,
10
             Defendant.
11   - - - - - - - - - - - - - - - - x
     (Pages 83 through 87 have been designated
12    confidential in separate booklet)

13                       March 25, 2025
                         10:20 a.m.
14

15       VIRTUAL DEPOSITION of KATHERINE G. RODI, on behalf

16   of the Defendant herein, pursuant to Notice, taken

17   before Ceita Lazar, a Stenographic Reporter and

18   Notary Public within and for the State of New York.

19

20

21

22

23            SANDY SAUNDERS REPORTING
          254 South Main Street, Suite 216
24           New City, New York 10956
                 (845) 634-7561
25

```
 1        A P P E A R A N C E S:

 2

 3        THE SCHER LAW FIRM, LLP
                 Attorneys for Plaintiff
                 600 Old Country Road
 4               Garden City, New York 11530
          BY:  AUSTIN GRAFF, ESQ.
 5
          NEW YORK CITY LAW DEPARTMENT
 6               Attorneys for Defendant
                 100 Church Street, New York
 7               New York 10007
          BY:  KATHLEEN LINNANE, ESQ.
 8                  – and –
                 ANDREA MARTIN, ESQ.
 9

10

11

12

13

14

15

          ALSO PRESENT:
16
                 LORRAINE MASCIARELLI
17

18

19

20

21

22

23

24

25
```

FEDERAL STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between
the attorneys for the respective parties herein,
that filing and sealing be and the same are hereby
waived.

IT IS FURTHER STIPULATED AND AGREED that all
objections, except as to the form of the question,
shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within
deposition may be signed and sworn to before any
officer authorized to administer an oath, with the
same force and effect as if signed and sworn to
before the Court.

```
 1                  K. G. RODI
 2             THE REPORTER:  Ms. Linnane,
 3        would you like to purchase a
 4        copy?
 5             MS. LINNANE:  It's my
 6        understanding that the attorney
 7        taking the deposition shares a
 8        courtesy copy.  That's how we
 9        usually practice.
10             MR. GRAFF:  That's fine.  I
11        will do.
12             MS. LINNANE:  Thank you,
13        Mr. Graff.
14             THE REPORTER:  My name is
15        Ceita Lazar, court reporter.  The
16        parties are present remotely to
17        take the deposition of Katherine
18        Rodi In the Matter of Lorraine
19        Masciarelli versus New York City
20        Department of Education.
21             I ask that everyone please
22        stay close to the microphone so
23        that I can provide the best
24        transcript possible and also so
25        my interruptions will be minimal.
```

```
 1              K. G. RODI
 2          Will counsel please state
 3      their name, who they represent,
 4      and then I will swear in the
 5      witness.
 6          MR. GRAFF:  Austin Graff
 7      from The Scher Law Firm,
 8      representing the plaintiff.
 9          MS. LINNANE:  Kathleen
10      Linnane, New York City Law
11      Department for the defendant in
12      this case.
13          MS. MARTIN:  Andrea Martin,
14      New York City Law Department for
15      defendant.
16
17  KATHERINE G. RODI,
18  having been first duly sworn by the
19  Notary Public (CEITA LAZAR), and stating
20  her address as 65 Court Street,
21  Brooklyn, New York, 11201, was examined
22  and testified as follows:
23          MS. LINNANE:  We would like
24      this to be marked confidential
25      for the record, please.
```

```
 1              K. G. RODI
 2        Actually, no, it's her work
 3        address.
 4
 5   EXAMINATION
 6   BY MR. GRAFF:
 7        Q. Good morning, Ms. Rodi.  My name
 8   is Austin Graff.  I'm the attorney for
 9   Lorraine Masciarelli.  I'm going to ask
10   you a series of questions today.  If
11   there's something you don't understand
12   or can't -- do not have an answer, if
13   you need me to repeat or rephrase the
14   question, please let me know.  If you
15   respond, I'll take it under belief that
16   you understood the question.  Do you
17   understand that?
18        A. Yes.
19        Q. Please make all your responses
20   verbal, because the court reporter
21   cannot take head nods and hand
22   gestures.  Do you understand that?
23        A. Yes.
24        Q. If -- if you need to take a
25   break at any point, as long as there's
```

```
 1                    K. G. RODI

 2    no pending question, I have no problem

 3    taking a break.  Do you understand

 4    that?

 5         A. Yes.

 6         Q. Where are you currently

 7    situated?

 8         A. At my home.

 9         Q. Is there anyone else in the

10    house with you?

11         A. No.

12         Q. Do you have any documents in

13    front of you related to this case?

14         A. No.

15         Q. Is your cell phone nearby?

16         A. Within reach but not in front of

17    me.

18         Q. I just ask if you turn it over

19    or put it further away so you can't see

20    it, so no one can communicate with you.

21         A. Sure.

22         Q. How did you prepare for today's

23    deposition?

24         A. I was prepared by the New York

25    City Law Department.  We met and
```

8

                        K. G. RODI

1

2    reviewed matters that they believe

3    would be addressed today in this

4    deposition.

5        Q. Okay.  I'm going to show you --

6    tell me when you can see the screen?

7        A. I can see the screen.

8        Q. Is this the Notice of Deposition

9    that I've served upon you regarding

10   this deposition?

11       A. Yes.

12       Q. Have you seen this document

13   before?

14       A. Yes.

15       Q. Are you prepared to answer

16   questions regarding some or all of the

17   topics identified on the Notice of

18   Deposition?

19       A. Yes.

20       Q. Okay.

21           MR. GRAFF:  I'm going to

22       mark that Exhibit A.

23           (Plaintiff's Exhibit A,

24           Notice of Deposition, was

25       marked for identification.)

```
 1                    K. G. RODI

 2        Q. Are you currently employed?

 3        A. Yes.

 4        Q. Who is your employer?

 5        A. The New York City Department of

 6   Education in the City of New York.

 7        Q. Are you employed by both

 8   entities or just one of the entities?

 9        A. The Department of Education is

10   under the City of New York.

11        Q. How long have you worked for the

12   New York City Department of Education?

13        A. For 18 years.

14        Q. What is your current title?

15        A. My current title is executive

16   director, Office of Employee Relations.

17        Q. And how long did you have that

18   title?

19        A. Since 2012.

20        Q. What are your duties in that

21   title?

22        A. In that title, I oversee several

23   offices including the Office of

24   Personnel Investigation, the Office of

25   Safety and Health, the employee
```

1                  K. G. RODI

2    relations, the Office of Disability

3    Accommodations, the reassignments and

4    arrest team, and manage other issues

5    related to onboarding, offboarding, and

6    employee relations matters.

7         Q. Since September 21 -- 2021, have

8    you had that same title?

9         A. Yes.

10        Q. Were your job duties in

11   September 2021 similar?

12        A. Yes.

13        Q. Have you ever been a classroom

14   teacher?

15        A. Yes.

16        Q. What did you teach?

17        A. High school history and English.

18        Q. Where did you teach?

19        A. East Rockaway High School.

20        Q. When did you start teaching?

21        A. 1995.

22        Q. How long did you teach?

23        A. For three years.

24        Q. When did you stop teaching?

25        A. 1998.

K. G. RODI

1

2      Q. What made you leave teaching?

3          MS. LINNANE:  Objection.

4          You can answer.

5      A. Decided to try something

6   different.

7      Q. After you stopped teaching, did

8   you immediately begin working for the

9   New York City Department of Education?

10         MS. LINNANE:  Objection.

11         You can answer.

12     A. No.

13     Q. After you ended your teaching,

14  did you go back to school?

15     A. Within a few years, yes.

16     Q. Where did you go back to school?

17     A. I went to law school at American

18  University.

19     Q. What -- where did you graduate

20  high school?

21     A. Sacred Heart Academy in

22  Hempstead, New York.

23     Q. What year did you graduate high

24  school?

25     A. 1990.

```
 1                    K. G. RODI

 2        Q. Where did you go to college?

 3        A. Mount Holyoke College in South

 4   Hadley, Massachusetts.

 5        Q. What year did you graduate?

 6        A. 1994.

 7        Q. What was your major?

 8        A. American Studies.

 9        Q. And you said you went to

10   American University for law school?

11        A. Yes.

12        Q. What year did you graduate

13   American University?

14        A. 2003.

15        Q. Are you a licensed attorney?

16        A. Yes.

17        Q. Are you licensed in New York?

18        A. Yes.

19        Q. In law school, did you take any

20   classes in labor law?

21             MS. LINANNE:  Objection.

22             You can answer.

23        A. I believe so, yes.

24        Q. In law school, did you take any

25   classes in employment law?
```

```
 1                    K. G. RODI
 2              Ms. LINNANE:  Objection.
 3              You can answer.
 4         A. Yes.
 5         Q. Do you have any training in
 6    human resources?
 7         A. Yes.
 8         Q. What type of training do you
 9    have in human resources?
10         A. I have worked with human
11    resources for the past 18 years.
12    I've attended numerous professional
13    development courses, and I have
14    attended -- and numerous trainings
15    within the DOE.
16         Q. Have you trained employees in
17    human resources?
18         A. Yes.
19         Q. What topics have you trained
20    employees?
21         A. Let's see.  Discipline
22    accommodations, hiring, onboarding,
23    offboarding, all progressive
24    discipline, elements of tenure,
25    elements of -- of leaves, parts about
```

```
 1                    K. G. RODI

 2    the FMLA laws and policies related to

 3    human resources, and a lot more.

 4         Q. Did you have any training on

 5    Title VII issues?

 6         A. Yes.

 7         Q. Have you trained employees on

 8    Title VII issues?

 9         A. Yes.

10         Q. Do you have any training

11    regarding -- well, do you have any

12    training regarding religious

13    discrimination?

14         A. Yes.

15         Q. What type of training do you

16    have on religious discrimination?

17         A. I went to law school.  I took

18    classes in the First Amendment; I took

19    classes regarding discrimination.  I've

20    also taken numerous professional

21    development courses regarding

22    discrimination, accommodation.  At one

23    point, I oversaw the Office of Equal

24    Opportunity within the DOE.  So I

25    actually have extensive training in --
```

```
 1                    K. G. RODI
 2   related to religious discrimination.
 3        Q. When did you oversee the
 4   Department of Education's Equal
 5   Employment Office?
 6        A. From 2019 -- no, 2018 to 2020 --
 7   2020, about there.
 8        Q. Were you the director -- were
 9   you in charge of the equal employment
10   opportunity during the COVID vaccine
11   mandate implementation?
12        A. No. If the vaccine mandate
13   started in '21, I was no longer
14   overseeing it.
15        Q. Overseeing the Equal Employment
16   Office?
17        A. Correct.
18        Q. Okay.  What role did you play in
19   the implementation of the vaccine
20   mandate?
21        A. I was on the general committee.
22        Q. What does it mean,
23   "the general committee"?
24        A. There was a group of people from
25   HR, the chancellor's office, the health
```

K. G. RODI

1

2    office, the superintendent's office,

3    the legal office that joined together

4    when we made decisions to -- regarding

5    the -- anything related to the vaccine.

6        Q. What type of decisions did the

7    committee make?

8        A. The -- one of the decisions was

9    the process of how employees would

10    apply for exemptions.  One was the

11    determination that -- that providing

12    exemptions would be an undue burden for

13    the agency, the determination of how

14    just elements of how the exemption

15    process would take place.

16        Q. With respect to determining

17    providing exemptions were undue

18    burdens, was that a decision across the

19    board, or was it an individualized

20    decision made by the committee based

21    upon a person's application?

22        A. It was both.  First, the -- when

23    we were making a decision on how to

24    approach reviewing the applications, we

25    already had thousands of applications.

K. G. RODI

1

2  So, from the start, we knew that we

3  would have to review them or consider

4  them on a whole.  And we realized that

5  having 2,000 or more, and eventually it

6  was over three thousand applications,

7  if we granted those exemptions, that

8  that would be an undue burden.

9         However, we also believed that

10  each applicant deserved the right to

11  have an individual review to make sure

12  that there was nothing that we hadn't

13  considered, that they had appropriately

14  applied to the right place, and that

15  there was -- that there was nothing

16  that we had overlooked.  So while it

17  was a decision overall based on the

18  numbers that we already had, it was

19  every person's application was looked

20  at individually.

21     Q. When did the general committee

22  determine that providing exemptions was

23  an undue burden?

24     A. I don't remember exactly when,

25  but it was -- we had -- if the

```
 1                    K. G. RODI
 2    exemption applications were due in, I
 3    think, it was early September, it was
 4    sometime during that period where we
 5    already -- by the time we met and
 6    talked about how we were going to
 7    approach it, we already had several
 8    thousand applications.
 9        Q. Did the general committee --
10    were there notes taken regarding the
11    general committee meetings?
12        A. Not that I'm aware of.
13        Q. Was there -- were there minutes
14    made of the general committee meeting?
15        A. Not that I'm aware of.
16        Q. Did you take notes regarding the
17    general committee meeting?
18        A. No.
19        Q. So the determination regarding
20    undue burdens was made September,
21    October, would you say, of 2021?
22            MS. LINNANE:  Objection.
23            You can answer.
24        A. Probably -- probably sometime in
25    September.
```

K. G. RODI

1

2    Q. Did you have a role to play in

3    determining whether to grant or deny

4    exemptions?

5    A. Yes.

6    Q. Did you review specific

7    applications for exemptions?

8    A. Yes.

9    Q. And when I talk about

10   exemptions, I'm talking about

11   exemptions from the COVID-19 mandate.

12   Do you understand that?

13   A. Yes.

14   Q. Okay.  Were you able to

15   unilaterally decide on whether to grant

16   or deny an exemption?

17           MS. LINNANE:  Objection.

18           You can answer.

19   A. No. Yes and no.  Yes, if there

20   was something that was for some reason,

21   I had the ability to do it.  I don't

22   think I did it due to the nature of how

23   we were discussing all of the -- all of

24   the applications.  But we -- and I

25   physically denied them in terms of in

```
 1                    K. G. RODI
 2    the SOLAS.  But in terms of making the
 3    decision that -- that all religious
 4    exemption applications would be an
 5    undue burden, that was a group of us.
 6        Q. And that group was the general
 7    committee?
 8        A. Yes.
 9        Q. And that was a decision that all
10    religious exemptions were an undue
11    burden?
12        A. Yes.
13        Q. And you said you reviewed them
14    at the time you were discussing
15    applications.  And you said "we."
16    Who's "we" that were discussing
17    applications?
18        A. My deputy, Mallory Sullivan; my
19    boss at the time, Vicki Bernstein; and
20    occasionally the law department.
21        Q. And your deputy, Mallory
22    Sullivan, she -- is she currently
23    working for the New York City
24    Department of Education?
25        A. Yes.
```

K. G. RODI

1

2      Q. And Vicki Bernstein, who you

3   said was your supervisor, does she

4   currently work for the Department of

5   Education?

6      A. No.

7      Q. And you said she was your

8   supervisor.  What title did she have?

9      A. The chief human resource

10   officer.

11      Q. What role did Ms. Bernstein have

12   in the determinations of whether to

13   grant or deny exemptions?

14      A. Similar to mine.

15      Q. Did she have a final say on yes

16   or no whether to grant an exemption?

17      A. No one really had a final say.

18      Q. If no one had a final say, how

19   was someone either granted or denied an

20   exemption?

21      A. Meaning, no one person had a

22   final say.  It was that -- that there

23   was the determination from the general

24   committee that these were an undue

25   burden.  So it wasn't that Vicki made

1                    K. G. RODI

2       that decision, or I made that decision.

3       It was that the decision had been made.

4           Q. And did the general committee

5       review applications of people who

6       sought exemptions before they decided

7       that providing an exemption was an

8       undue burden?

9           A. No.

10          Q. So regardless of what religious

11      belief the person had, it was going to

12      be denied no matter what?

13                  MS. LINNANE:  Objection.

14                  You can answer.

15          A. Yes.

16          Q. Was there any discussions when

17      examining an application about Catholic

18      applicants?

19          A. No.

20          Q. Was there any discussion

21      regarding the pope's statements

22      regarding the vaccine in -- used to

23      determine whether Catholic applicants

24      received an exemption?

25          A. No.

```
 1              K. G. RODI
 2        Q. Was there a financial incentive
 3   granted to you to deny vaccine mandate
 4   exemptions?
 5              Ms. LINNANE:  Objection.
 6              You can answer.
 7        A. No.
 8        Q. What was the basis for the
 9   general committee's decision that
10   determined that providing exemptions
11   was an undue burden to all applicants?
12        A. Because we had a school system
13   to run, and kids needed to be back in
14   school.  And kids were not vaccinated
15   at the time, and we needed to protect
16   those children that came back to
17   school.  And we -- particularly on the
18   lower level grades -- we needed
19   teachers to be in the classroom, and we
20   needed people to do their jobs.  And we
21   received applications from every title.
22   We received it from teachers, from
23   custodians, from school food workers,
24   from principals, from assistant
25   principals, from, you know, name the
```

1                  K. G. RODI

2    person, name the job.  And the fact is

3    that we needed to run a school system,

4    and we did not have the staffing

5    resources to have people not in school

6    buildings or not be able to go into

7    school buildings, because, at that

8    time, if you weren't vaccinated, you

9    weren't permitted into school

10   buildings.

11        So we didn't have the ability to

12   put people in remote places, because we

13   had kids physically in buildings.  You

14   can't -- you can't do online learning

15   with little kids.  You can't do

16   plumbing remotely.  You can't do school

17   food remotely.  So it was absolutely

18   necessary for us to return kids to

19   school, to return to education, to have

20   people in person.  And to have three

21   thousand people or -- or that not

22   working would've been an undue burden

23   to the agency.

24        Q. Did the general committee

25   consider testing and masking as an

```
 1                     K. G. RODI

 2     accommodation for those who had

 3     religious objections?

 4               MS. LINNANE:  Objection.

 5               You can answer.

 6          A. It wasn't an option, because

 7     they -- the -- there was a mandate from

 8     the Department of Health that if you

 9     were not vaccinated, you were not

10     permitted in buildings.  So it didn't

11     matter if you masked and tested.  You

12     still weren't allowed in the buildings.

13          Q. Were employees of that three

14     thousand or how many sought exemptions

15     granted accommodations?

16               MS. LINNANE:  Objection.

17               You can answer.

18          A. Of the three thousand religious?

19          Q. Religious.

20          A. Not by the DOE.

21          Q. Who granted them?

22               MS. LINNANE:  Objection.

23               You can answer.

24          A. If any of them received an

25     exemption, it was from the arbitrator.
```

```
 1                    K. G. RODI
 2        Q. The arbitrator, meaning
 3   Scheinman Arbitration Mediation
 4   Service?
 5        A. Yes, correct.
 6        Q. Do you know what basis those
 7   employees received an accommodation
 8   from Scheinman Arbitration Mediation
 9   Service?
10             MS. LINNANE:  Objection.
11             You can answer.
12        A. I have no idea.
13        Q. Was there an opinion within the
14   Department of Education regarding those
15   people who did not take the vaccine?
16             MS. LINNANE:  Objection.
17             You can answer.
18        A. No.
19        Q. Did the Department of Education
20   believe that people who did not take
21   the vaccine should've been terminated?
22             MS. LINNANE:  Objection.
23             You can answer.
24        A. I don't understand the question.
25        Q. In your position, was it proper
```

K. G. RODI

2  for the employees who did not take the

3  vaccine to be terminated from their

4  employment?

5            MS. LINNANE:  Objection.

6            You can answer.

7      A. At that time, they couldn't

8  work, and they were suspended for a

9  period.  And then there was a point

10  where we couldn't do anything with

11  them, and the mandate was still in

12  place.  And the only option was had was

13  to resign them from the system without

14  any bias so that we could hire other

15  teachers.  Because, again, we had a

16  school to run.  We have schools to run,

17  agency to run.  But that was because we

18  could not bring them into the building.

19  And there's a point where you can't

20  keep them on a suspension forever.

21            A lot of people went and got

22  other jobs, to our understanding.  But

23  in terms of, you know -- it was the

24  option that we had at the time.

25      Q. When you say you resigned them

```
 1                    K. G. RODI
 2   from the system, do you mean terminate
 3   them?
 4       A. No. We -- it's treated as a
 5   resignation in that if they apply to
 6   come back, we don't treat them as
 7   though they've been terminated.  We
 8   treat them as though they resigned.
 9       Q. If there's an application to
10   return to work from someone who was --
11   who was resigned from the system, do
12   they have to start at the bottom level
13   of employment, or can they start where
14   they left off?
15               MS. LINANNE:  Objection.
16               You can answer.
17       A. It wholly depends on what
18   agreement they signed.  Everybody left
19   in a different way.  Some people signed
20   forms so that they could be reinstated.
21   Other people just walked away.  Some
22   people resigned on their own before we
23   did a group resignation.  So it's very
24   individual.  If anyone is rehired, we
25   have to, like, basically look for their
```

```
 1                    K. G. RODI
 2    -- if there's an agreement on them and
 3    then act appropriately.
 4        Q. What about those employees that
 5    were resigned from the system in
 6    September of 2022 after the one year
 7    period of receiving benefits and being
 8    suspended?
 9              MS. LINANNE:  Objection.
10              You can answer.
11        A. Again, it depends on what they
12    signed.  It's individual.
13        Q. Do you think the people who had
14    sincere and genuine religious beliefs
15    should've been fired from their
16    employment from the New York City
17    Department of Education?
18              MS. LINANNE:  Objection.
19              You can answer.
20        A. I -- the best option at the time
21    was for us to run an agency.  We could
22    not have unvaccinated employees come
23    into our buildings.  That was not
24    permitted at the time.  And we kept
25    them on with benefits for as long as we
```

                        K. G. RODI

1

2    could.  And there was a certain point

3    where we had to hire new people,

4    because we needed teachers in the

5    classrooms and custodians and school

6    food and all of that.  And we had no

7    other choice.

8        Q. At some point during the

9    process, the City changed its rules

10   regarding entertainers and athletes.

11   How did that affect the Department of

12   Education?

13             MS. LINNANE:  Objection.

14             You can answer.

15       A. I don't recall any effect.

16       Q. Were you provided any training

17   regarding whether to determine whether

18   to grant or deny an application for an

19   exemption?

20       A. What do you mean?

21       Q. Well, did anyone tell you --

22   strike that.

23             When an application came for a

24   religious exemption, was it

25   automatically denied without review?

```
 1                    K. G. RODI

 2            MS. LINNANE:  Objection.

 3            You can answer.

 4        A. Sorry.  No.

 5        Q. Okay.  So when you received an

 6    application for religious exemption,

 7    what did you review to make a

 8    determination whether to grant or deny?

 9        A. We made sure that the person had

10    appropriately applied in the right

11    area.  A number of people would check

12    religious exemption, but they were

13    really looking for a medical exemption.

14            We also made sure that they

15    actually submitted something with their

16    application, because some people

17    included blank sheets of paper.  And,

18    then, if it was a medical -- if it was

19    in the wrong place, we -- we

20    immediately advised them so that they

21    could reapply or reapply in the right

22    place.  If it was a blank piece of

23    paper, we immediately advised them so

24    that they could submit appropriate

25    documentation.
```

```
 1                    K. G. RODI
 2          And then, other than that, we
 3     then -- we reviewed to make sure they
 4     had submitted something to support, you
 5     know, that it was religious in nature.
 6     We didn't judge what it was.  And even
 7     if it was just a piece of paper that
 8     they wrote out.  And then we denied
 9     their request.
10        Q. So there was no examination of
11     whether or not the person submitting
12     the application had a bona fide
13     religious belief?
14             Ms. LINANNE:  Objection.
15             You can answer.
16        A. No.
17        Q. No, there was no consideration
18     of whether someone had a bona fide
19     religious belief?
20             MS. LINANNE:  Objection.
21             You can answer.
22        A. No.
23        Q. What were you looking for --
24     strike that.
25             Was there any religious belief
```

```
 1                    K. G. RODI
 2    that would've entitled someone to a
 3    religious exemption?
 4        A. No.
 5        Q. Was it different for a person
 6    who sought a medical exemption or a
 7    medical accommodation?
 8             MS. LINNANE:  Objection.
 9             You can answer.
10        A. There were medical exemptions,
11    and then there were medical
12    accommodations.  Which one are you
13    asking about?
14        Q. Well, let's start with medical
15    exemptions.  Was it any different if
16    anyone sought a medical exemption?
17             MS. LINNANE:  Objection.
18             You can answer.
19        A. Yes.  The medical exemption went
20    to our medical team, which comprised of
21    doctors, and the doctors reviewed those
22    applications.
23        Q. Did the doctors have the right
24    to grant or deny the exemption, or they
25    just made recommendations to someone?
```

```
 1                    K. G. RODI

 2              MS. LINNANE:  Objection.

 3              You can answer.

 4         A. They had the right to approve on

 5    a medical level, and then those were

 6    reviewed by -- by my team.

 7         Q. And, to your memory, were any

 8    medical exemptions that were approved

 9    by a medical doctor denied?

10              MS. LINNANE:  Objection.

11              You can answer.

12         A. Yes.

13         Q. So even though the doctor

14    recommended an exemption, they were

15    still denied?

16              MS. LINNANE:  Objection.

17              You can answer.

18         A. Yes.

19         Q. Now, with respect to medical

20    accommodations, how was that handled?

21              MS. LINNANE:  Objection.

22              You can answer.

23         A. Medical accommodations were

24    handled like we do all accommodations.

25    Medical -- that the person applied
```

```
 1                    K. G. RODI

 2   through the SOLAS system.  They were

 3   given -- they were reviewed by medical

 4   to determine if they had a disability.

 5   They were given the interactive process

 6   to determine what accommodation they

 7   would need, and then that accommodation

 8   was subsequently implemented, if

 9   possible.

10      Q. Do you remember how many medical

11   exemption applications were received?

12           MS. LINNANE:  Objection.

13           You can answer.

14      A. I do not.

15      Q. Do you remember how many medical

16   exemption -- medical exemptions were

17   approved?

18           MS. LINNANE:  Objection.

19           You can answer.

20      A. I do not.

21      Q. Were there any medical

22   exemptions approved?

23           MS. LINNANE:  Objection.

24           You can answer.

25      A. Yes.
```

```
 1                  K. G. RODI

 2       Q. Do you know how many

 3   accommodation requests -- medical

 4   accommodation requests were made?

 5            MS. LINNANE:  Objection.

 6            You can answer.

 7       A. I don't recall.

 8       Q. Do you remember how many were

 9   approved?

10            MS. LINNANE:  Objection.

11            You can answer.

12       A. I don't recall.

13       Q. Were any medical accommodations

14   approved?

15            MS. LINNANE:  Objection.

16            You can answer.

17       A. Yes.

18       Q. Why was there no interactive

19   process for a request for religious

20   exemption?

21            MS. LINNANE:  Objection.

22            You can answer.

23       A. Because there was no requirement

24   for an interactive process.  It was an

25   exemption, not an accommodation.
```

K. G. RODI

1

2      Q. What's the difference between an

3   exemption and an accommodation?

4           MS. LINNANE:  Objection.

5           You can answer.

6      A. An accommodation is outlined

7   under the ADA.  It's also outlined

8   under religious discrimination law,

9   where a person is looking to get an

10   accommodation for either medical or

11   religious reasons in order to access

12   their employment.

13       An exemption is when a person

14   asks to be completely removed from

15   something that is a requirement with no

16   option -- with no other options.

17      Q. Those people who received

18   religious exemptions through Scheinman

19   Arbitration Service, did they receive

20   an exemption or an accommodation?

21           MS. LINNANE:  Objection.

22           You can answer.

23      A. They received an exemption.

24      Q. When they received an exemption,

25   did they -- were they provided another

```
 1                    K. G. RODI

 2    place to work or an accommodation

 3    during that school year?

 4              MS. LINNANE:  Objection.

 5              You can answer.

 6       A. They were then provided an

 7    alternate place to work.

 8       Q. So it was -- so they didn't have

 9    to take the vaccine, but they were

10    entitled to work?

11              MS. LINNANE:  Objection.

12              You can answer.

13       A. That was the determination by

14    the arbitrator.

15       Q. So -- so the person was both --

16    received an exemption and an

17    accommodation for the exemption?

18              MS. LINNANE:  Objection.

19              You can answer.

20       A. No, because the -- an

21    accommodation would mean that because

22    of the medical reason, that we had an

23    interactive process.  We worked with

24    them to find out what would be best.

25    But a medical accommodation would be a
```

```
1                    K. G. RODI

2    person who was able to take the

3    vaccine, so they were vaccinated, but,

4    for whatever reason -- for example,

5    they were immunocompromised.  They

6    still needed some sort of accommodation

7    around the elements of COVID, that they

8    needed, maybe, a plastic wall around

9    them, or they needed to be masked even

10   though, you know -- and have a face

11   shield or something.

12        The -- with the exemptions, it

13   wasn't about accommodating them.  We

14   literally were directed to find an

15   alternate site.  There was no, like --

16   we were able to treat the group

17   unmasked, which you don't do with an

18   accommodation.

19        Q. What was that last thing, you

20   don't --

21        A. You don't treat them unmasked

22   at that site --

23        Q. Oh, unmasked.

24        A. -- so we could -- we found, you

25   know, two or three large sites, and we
```

```
 1                    K. G. RODI
 2    were able to place them in those large
 3    sites.
 4        Q. And those are the people with
 5    the medical exemptions?
 6             MS. LINNANE:  Objection.
 7             You can answer.
 8        A. With medical and religious, the
 9    ones that were granted by the
10    arbitrator.
11        Q. Where were -- what locations
12    were they placed?
13             MS. LINNANE:  Objection.
14        You can answer.
15        A. I'm not familiar with all the
16    exact locations.  I just can't remember
17    anymore.  But I know that DOE rented
18    space, like, one in Brooklyn, one in
19    Queens, one in Manhattan for people to
20    be located.
21        Q. And it was rented specifically
22    for exemptions?
23        A. It was rented specifically for
24    the people who had been granted
25    exemptions by the arbitrator.
```

```
 1                    K. G. RODI

 2       (Reporter requested clarification.)

 3               MS. LINNANE:  I said,

 4       objection.

 5               You can answer.  Thank you.

 6       Q. Were any of the medical

 7    exemptions teachers?

 8               MS. LINNANE:  Objection.

 9               You can answer.

10       A. Yes.

11       Q. Do you know how many were

12    teachers?

13               MS. LINNANE:  Objection.

14               You can answer.

15       A. I don't know.

16       Q. How many people were involved in

17    reviewing applications for exemptions?

18       A. For the DOE?

19       Q. For the DOE.

20       A. Three.

21       Q. And that was the three people --

22    you and the other two people you

23    mentioned?

24       A. Yes.

25       Q. How much time did you spend
```

```
 1                K. G. RODI
 2   reviewing individual applications?
 3        A. It would depend on the
 4   application.  Some people had half a
 5   sheet of paper, some people had pages.
 6   So it would just be reviewing -- we
 7   would review every document they
 8   attached just to make sure there was
 9   nothing in there that was in the wrong
10   place, and then we would move on.
11        Q. Did each of you review each of
12   the applications, or were you given a
13   portion, and each one was given a
14   portion?
15        A. Each of us had a portion.
16        Q. So out of the three thousand,
17   you probably reviewed about a thousand
18   applications?
19        A. No.  I probably did at least
20   half.
21        Q. Did you do more than anyone
22   else, do you think?
23             MS. LINNANE:  Objection.
24             You can answer.
25        A. Probably.
```

```
 1                    K. G. RODI
 2        Q. Was -- from an application, was
 3    there a way of knowing who reviewed the
 4    application?  Were there notations
 5    made?
 6        A. No.
 7        Q. And just to confirm, masking and
 8    testing was never considered as an
 9    accommodation for those who sought
10    religious exemptions?
11            MS. LINNANE:  Objection.
12            You can answer.
13        A. Again, anyone who was not
14    vaccinated was not permitted in
15    buildings.  Period.  So it didn't
16    matter if they were masked and tested.
17    They were not permitted in the
18    buildings.  It was not an option.
19        Q. Okay.  Let me know when you see
20    the screen.
21            MS. LINNANE:  Austin, can
22        you make it a little bigger?
23            MR. GRAFF:  Yeah.  I just
24        needed to know that it came on
25        the screen first.
```

```
 1                K. G. RODI
 2           MS. LINNANE:  Yeah, I see
 3       it.
 4           MR. GRAFF:  Okay.
 5   BY MR. GRAFF:
 6       Q. Ms. Rodi, do you recognize this
 7    document?
 8       A. Not particularly.
 9           MS. LINNANE:  I'm going to
10       ask that we scroll through the
11       whole thing, so we identify
12       whether or not it's been
13       recognized.
14           MR. GRAFF:  Sure.
15   BY MR. GRAFF:
16       Q. Do you recognize this document?
17       A. It looks like many of the
18    documents that were submitted.
19       Q. Do you know if you reviewed
20    Lorraine Masciarelli's application for
21    vaccine mandate -- vaccine exemption?
22       A. I don't know.
23       Q. Is there any way of knowing who
24    reviewed her application?
25       A. No.
```

1              K. G. RODI

2      Q. Once this document came into

3  your office on or about September 10,

4  2021, what was the process?  Where did

5  it go first?

6      A. It first came into the medical

7  office.  Medical made sure that the

8  employee didn't have duplicate

9  applications or that -- and they didn't

10 have a pending leave or anything else

11 that would -- that would automatically

12 disqualify them from submitting an

13 application.  And then it was sent to

14 our office.

15         We would open the application,

16 and we would just make sure that all of

17 the documents were related to the

18 application.

19     Q. So the requests came in on or

20 about September 10, 2021.  When was the

21 meeting with the general committee?

22         MS. LINNANE:  Objection.

23         You can answer.

24     A. We had several meetings.

25     Q. So at the -- when was the

```
 1                    K. G. RODI
 2    meeting where it was determined that
 3    all religious exemptions were going to
 4    be denied based upon an undue burden?
 5              MS. LINNANE:  Objection.
 6              You can answer.
 7       A. I couldn't tell you.
 8       Q. Before the meeting that was held
 9    with the general committee where it was
10    determined that providing an exemption
11    was an undue burden, were applications
12    reviewed?
13              MS. LINNANE:  Objection.
14              You can answer.
15       A. No.  We did not review until we
16    had a conversation with the law
17    department and the general counsel's
18    office as to how -- like, who was going
19    to review them, how they were -- what
20    the approach would be, et cetera.
21       Q. Was that separate or apart from
22    the general committee?
23              MS. LINNANE:  I'm going to
24         caution the witness not to
25         disclose any information that
```

```
 1              K. G. RODI

 2       could be considered privileged,

 3       the discussions of

 4       attorney-client privilege,

 5       please.

 6            Thank you.

 7       A. It was probably -- there were

 8   probably fewer people at some of the

 9   meetings.

10  BY MR. GRAFF:

11       Q. Which meetings?  The general

12   counsel and law department, or the

13   general committee?

14            MS. LINNANE:  Objection.

15            You can answer.

16       A. With the general counsel and the

17   law department.

18       Q. Who from the law department was

19   at those meetings?

20            MS. LINNANE:  Objection.

21       I'm going to caution the witness

22       not to disclose any information

23       that could be considered

24       privileged under the attorney-

25       client privilege.
```

```
 1                   K. G. RODI

 2        A. It varied.  Various lawyers from

 3     the law department.

 4   BY MR. GRAFF:

 5        Q. Were any of the attorneys that

 6     are currently on this Zoom part of the

 7     law department meetings?

 8              MS. LINNANE:  Objection.

 9          I'm going to caution the witness

10          not to disclose any information

11          that could be considered

12          privileged due to attorney-client

13          privilege.

14          A. No.

15   BY MR. GRAFF:

16        Q. When you say "general counsel,"

17     is there a separate legal department

18     within the Department of Education?

19          A. Yes.

20          Q. And who is -- who was the

21     general counsel then?

22          A. Howard Friedman?

23          Q. Is he currently general counsel?

24          A. No.

25          Q. Would you meet with the law
```

```
 1                    K. G. RODI
 2      department and general counsel in one
 3      meeting?
 4              MS. LINNANE:  I'm going to
 5          caution the witness not to
 6          disclose any information that
 7          could be considered privileged
 8          under the attorney-client
 9          privilege.
10          A. Yes.
11      BY MR. GRAFF:
12          Q. And the meetings with the law
13      department and general counsel were
14      different from the meetings of the
15      general committee that you described?
16              MS. LINNANE:  I'm going to
17          caution the witness not to
18          disclose any information that
19          could be considered privileged
20          due to attorney-client privilege.
21          A. Yes.
22      BY MR. GRAFF:
23          Q. Did you participate in the
24      negotiations with the UFT over the
25      implementation of the vaccine mandate?
```

```
 1                      K. G. RODI

 2              MS. LINNANE:  Objection.

 3              You can answer.

 4         A. No.

 5         Q. Do you know who at the UFT --

 6    sorry -- at the New York City

 7    Department of Education represented the

 8    Department of Education in the meetings

 9    with the UFT over the implementation of

10    the vaccine mandate?

11              MS. LINNANE:  Objection.

12              You can answer if you're

13         able.

14         A. I could name maybe one or two,

15    but I couldn't confirm.

16         Q. Do you know -- what are those

17    one or two names that you know of?

18              MS. LINNANE:  Objection.

19              You can answer.

20         A. Vicki Bernstein, my former

21    supervisor, and the general counsel.

22         Q. Howard --

23         A. Howard Friedman, yeah.

24              MR. GRAFF:  I'm just -- this

25         document, dated September 10,
```

```
 1              K. G. RODI

 2        2021, I'm going to mark as

 3        Exhibit B.

 4              (Plaintiff's Exhibit B,

 5              Document dated September 10,

 6        2021, was marked for

 7        identification.)

 8        Q. Let me know when you see the

 9   next document?

10        A. I see it.

11        Q. Okay.  Do you need me to make it

12   larger?

13        A. No.  I can see it.

14              MR. GRAFF:  Okay.  I'm going

15        to mark this Exhibit C.  It's a

16        September 21, 2021, email.

17              (Plaintiff's Exhibit C,

18              Email dated September 21,

19              2021, was marked for

20              identification.)

21        Q. Do you recognize this document?

22        A. Yes.

23        Q. How do you recognize this

24   document?

25        A. This was the document that was
```

                         K. G. RODI

1

2    sent to any person who applied for a

3    religious exemption.

4        Q. Who drafted this language?

5        A. Probably a group of lawyers.

6        Q. Did you participate in the

7    drafting?

8            MS. LINNANE:  Objection.

9        I'm going to direct the witness

10       not to answer any questions with

11       respect to work you did in your

12       representation of the DOE as a

13       DOE attorney.

14   BY MR. GRAFF:

15       Q. Are you not answering because of

16   the privilege?

17       A. Correct.

18            MS. LINNANE:  Yes.

19            MR. GRAFF:  Okay.  I just

20       want to clarify the record.

21   BY MR. GRAFF:

22       Q. It says that the plaintiff

23   failed to meet the criteria for a

24   religious-based accommodation.  It's in

25   the second line of the document.

```
 1              K. G. RODI

 2         How did the plaintiff fail to

 3    meet the criteria for a religious-

 4    based accommodation?

 5              MS. LINNANE:  Objection.

 6              You can answer if you're

 7       able.

 8       A. That was sent to all employees

 9    that all employees could not be able --

10    were not able to enter the building,

11    and, as such, we could not provide them

12    with a religious accommodation, and,

13    therefore, we had to deny their entire

14    application.

15       Q. It says that "to provide an

16    accommodation would impose an undue

17    hardship, ie, more than a minimal

18    burden on the DOE and it's operations."

19    Do you see that?

20       A. Yes.

21       Q. The recent Supreme Court

22    decision in Groff, G-R-O-F-F, was there

23    any analysis after that decision

24    regarding the undue hardship placed on

25    the DOE?
```

```
 1                 K. G. RODI
 2            MS. LINNANE:  Objection.
 3            You can answer if you're
 4       able.
 5       A. I don't recall.
 6       Q. How was it determined that it
 7  would be an undue hardship to place
 8  this plaintiff at a different work
 9  site?
10            MS. LINNANE:  Objection.
11            You can answer.
12       A. It wasn't determined about this
13  plaintiff or your client.  It was
14  determined about all of the three
15  thousand people who we would have to
16  find an alternate site.  And if, you
17  know, your client is a teacher, it
18  would be even more difficult to find a
19  site for them.  That their essential
20  functions of their job would be to
21  teach students and, particularly, if a
22  person is an elementary schoolteacher
23  or pre-k teacher or a gym teacher or
24  someone where it's vitally important
25  that they have to be with children,
```

1                          K. G. RODI

2     it's really hard to say that they're

3     meeting the essential functions of

4     their job or that they're even doing

5     their job if they're sitting in a

6     building someplace else.

7          Q. Who performed the analysis

8     regarding the undue hardship that would

9     be placed on the Department of

10    Education?

11              MS. LINNANE:  Objection.

12              You can answer.

13         A. That was a review with everyone

14    involved, essentially, that looking at

15    the -- the number of people who would

16    need a placement, the roles in which

17    those people -- the roles in which

18    those people performed, the -- the cost

19    at which it would be for the students

20    and, you know, in terms of not getting

21    their primary needs and education.  How

22    much staff we would need to find to

23    cover all of these roles.  And then how

24    much space we would need to find for

25    these people to work.  So that involved

```
 1                    K. G. RODI

 2    doing an analysis from a lot of

 3    different people.  And we determined

 4    that it was the role of the agency was

 5    to provide education and that if these

 6    folks were not able to be in the

 7    building with -- around students, that

 8    it would then become an undue burden on

 9    the agency to provide those exemptions.

10        Q. So those -- do those employees

11    of the Department of Education who

12    decide not to take the vaccine and were

13    placed on leave, there was staff found

14    to fill those roles, correct?

15             MS. LINNANE:  Objection.

16             You can answer.

17        A. Not necessarily.

18        Q. So the teachers that went on

19    leave pursuant to the arbitration

20    award, their roles were not filled by

21    people at the DOE?

22             MS. LINNANE:  Objection.

23             You can answer.

24        A. It depended on the role,

25    depended on what teachers we could
```

```
 1                    K. G. RODI
 2    find.  We may have been filled by a
 3    substitute, but that's not necessarily
 4    the same as a teacher.  And while they
 5    were on suspension, they still had a
 6    right to their jobs.  So we couldn't
 7    replace them with someone who would be
 8    qualified at that time.  So,
 9    unfortunately, students had, you know,
10    like, random subs in there.  And, you
11    know, we couldn't -- if -- at any
12    point, if anybody who was suspended got
13    the vaccination, they were entitled to
14    come right back to their job.  So we
15    kind of just filled in for a while and
16    -- until someone either made the
17    determination to leave.
18       Q. Did the students' education
19    suffer as a result of that, not knowing
20    whether a teacher was coming back or
21    not?
22            MS. LINNANE:  Objection.
23            You can answer.
24       A. I would assume that there would
25    be some sort of effect on students if
```

```
 1                    K. G. RODI
 2    you're not clear as to, like, the
 3    status of your teacher.
 4        Q. So the -- going back to the
 5    exhibit, the plaintiff's application,
 6    which is Exhibit B, was dated
 7    September 10, 2021, and the denial of
 8    the accommodation was dated
 9    September 21, 2021?
10        A. Uh-hum.
11        Q. In those 11 days, was that when
12    the decision was made to -- by the
13    general committee to deny all
14    exemptions?
15            MS. LINNANE:  Objection.
16            You can answer.
17        A. Again, I don't recall the exact
18    date, but that would -- I would assume
19    it would be sometime in that period.
20            MR. GRAFF:  Exhibit D is --
21        I mean, Exhibit C would be the
22        email?
23            Exhibit D is the Julie
24        Torrey arbitration decision.
25            (Plaintiff's Exhibit D,
```

```
 1                    K. G. RODI

 2                Julie Torrey Arbitration

 3           Decision, was marked for

 4           identification.)

 5           Q. Do you recognize this document?

 6  Do you need me to make it bigger?

 7           A. No, I can see it.

 8           Q. Okay.

 9           A. I mean, I've seen other

10  arbitration decisions.  I don't know

11  that I've necessarily seen this one.

12           Q. Did you participate in the

13  arbitration proceedings with the

14  Scheinman Arbitration Mediation

15  Service?

16           A. I did not.

17           Q. Who participated on behalf of

18  the Department of Education in these

19  arbitrations?

20                MS. LINNANE:  Objection.

21                You can answer.

22           A. No one.

23           Q. So it was simply the application

24  and the arbitrator?

25                MS. LINNANE:  Objection.
```

```
 1                 K. G. RODI

 2            You can answer.

 3       A. Yes.

 4       Q. Was there any communications

 5   between the department of education and

 6   the individual arbitrators regarding

 7   the general committee's decision to

 8   deny all exemptions?

 9            MS. LINNANE:  Objection.

10            You can answer.

11       A. Not to my knowledge.

12       Q. Were they aware -- were the

13   arbitrators aware of the decision by

14   the general committee to deny all

15   exemptions?

16            MS. LINNANE:  Objection.

17            You can answer.

18       A. I have no idea.

19       Q. Do you know how many

20   applications for exemptions were

21   granted through the arbitration

22   process?

23            MS. LINNANE:  Objection.

24            You can answer.

25       A. I don't recall.
```

```
 1                   K. G. RODI

 2      Q. Do you know what criteria the

 3   arbitrator used to determine whether to

 4   grant or deny an exemption?

 5             MS. LINNANE:  Objection.

 6             You can answer.

 7      A. I have no idea.

 8      Q. I'll show you what's going to be

 9   marked as Exhibit E. Do you recognize

10   this document?

11             (Plaintiff's Exhibit E,

12             Renewed application, was

13         marked for identification.)

14      A. No.

15      Q. Were you -- did you have any

16   role in the City of New York reasonable

17   accommodations appeals panel?

18             MS. LINNANE:  Objection.

19             You can answer.

20      A. No.

21      Q. Are you aware of the appeals

22   panel process?

23             MS. LINNANE:  Objection.

24             You can answer.

25      A. I'm aware of the panel.  I'm
```

```
 1                    K. G. RODI
 2      aware that we supported the process
 3      by -- by, like, allowing people to
 4      submit part of it through SOLAS.  But
 5      that's where our involvement ended.  We
 6      had nothing else to do with it.
 7          Q. Was there anyone from the
 8      Department of Education on the appeals
 9      panel?
10              MS. LINNANE:  Objection.
11              You can answer.
12          A. I have no idea.
13          Q. I show you what's marked Exhibit
14      F.  Do you recognize this document?
15              (Plaintiff's Exhibit F,
16              Position Statement, was
17          marked for identification.)
18          A. I recognize that it's a position
19      statement.  I don't, like, recognize it
20      unique to your client.
21          Q. Do you know when this document
22      was created?
23          A. No idea.
24          Q. Did you participate in the
25      drafting of the document?
```

```
 1                    K. G. RODI

 2              MS. LINNANE:  Objection.

 3         I'm going to direct the witness

 4         not to answer with respect to any

 5         work that you did in your role as

 6         an attorney with the DOE due to

 7         attorney-client privilege.

 8    BY MR. GRAFF:

 9         Q. And due to the attorney-client

10     privilege, you're not answering the

11     question, correct?

12         A. Correct.

13         Q. Do you know what the purpose of

14     this document was created for?

15         A. I would assume that if a person

16     was appealing a determination by this

17     agency, that we had the right to submit

18     a position statement about our

19     position.  So that's what I would

20     conclude.

21         Q. Do you know if this document was

22     submitted to the appeals panel?

23              MS. LINNANE:  Objection.

24              You can answer.

25         A. I have no idea.
```

```
 1                    K. G. RODI
 2        Q. Do you know if this is the same
 3    document that was submitted for anyone
 4    requesting a religious exemption except
 5    for the top four lines of the document?
 6              MS. LINNANE:  Objection.
 7              You can answer.
 8        A. I have no idea.
 9        Q. So, in this document, it talks
10    about "the DOE granting an exemption to
11    this employee would create an undue
12    hardship for the DOE for the following
13    reasons."  And that's the bottom of the
14    first page, and it has three bullets on
15    to -- the second page.
16         Were these the reasons why the
17    general committee believed it was an
18    undue burden --
19              MS. LINNANE:  Objection --
20        Q. -- to grant the exemption?
21              MS. LINNANE:  Apologies.  I
22         didn't -- I thought you were
23         done.
24              Objection.
25              You can answer.
```

```
 1                  K. G. RODI
 2            MR. GRAFF:  It's fine.  No
 3        problem.
 4        A. Let's see.  "It would result in
 5    the inability of an employee to perform
 6    the essential functions of the job."
 7    Yeah.  I mean, that's one of the
 8    reasons. "State law --
 9      (Reporter requested clarification.)
10        A. Sorry, I'm just reading these
11    paragraphs.  So the first paragraph
12    would be -- I'll speak in generalities,
13    rather.
14            The first paragraph is
15    consistent with our perspective.  The
16    second is consistent with our
17    limitations.  And the third is
18    consistent with the concern that we
19    have regarding the numbers, the ability
20    to find space, the ability to hire
21    appropriate staff, and the cost that it
22    would have that would negatively impact
23    schools.
24            MS. LINNANE:  Can we just
25        mark for the record before you go
```

```
 1              K. G. RODI

 2        to the next question that this is

 3        the bullets on -- it's Bates

 4        stamped DEFS 000554.

 5              MR. GRAFF:  There's no S in

 6        it, but it's DEF as in Frank.

 7              MS. LINNANE:  DEF.  Sorry.

 8        DEF.

 9              MR. GRAFF:  That's fine.

10   BY MR. GRAFF:

11        Q. So with respect to the first

12    bullet, it says, "other mitigation

13    measures provide insufficient

14    protection particularly when

15    transmission rates remain high."

16          Was there any analysis by the

17    Department of Education regarding other

18    mitigation measures regarding COVID-19?

19              MS. LINNANE:  Objection.

20              You can answer.

21        A. There was constant conversations

22    with the Department of Health.  We

23    would have consulted with the

24    Department of Health and, again, they

25    were not permitted in the building.  It
```

1                    K. G. RODI

2    doesn't matter.  Even if you said that

3    if they wore a cone on their head that

4    that would stop, the policy said if you

5    were not vaccinated, you could not

6    enter a school building.  Period.  So

7    it didn't matter if there were other

8    mitigation measures.

9        Q. So it was the policy of the City

10   and then the Department of Education

11   that no matter what religion, religious

12   objection, anything, a person was not

13   going to be able to work in a school

14   building?

15               MS. LINNANE:  Objection.

16               You can answer.

17       A. The policy of the Department of

18   Health was that a person who was not

19   vaccinated was not permitted in a

20   building, whether they worked there or

21   were a parent or were -- they cleaned

22   the basement.  They were not permitted

23   in a school building.  Period.

24       Q. And it didn't matter if they had

25   a religious objection or not?

```
1                      K. G. RODI
2              MS. LINNANE:  Objection.
3              You can answer.
4        A. Again, if they were not
5    vaccinated.  Period.
6        Q. Were you involved in any
7    conversations with the Department of
8    Health regarding the mandate after --
9    strike that.
10             Were you involved in any
11   conversations with the Department of
12   Health regarding the vaccine mandate?
13             MS. LINNANE:  Objection.
14        I'm going to caution the witness
15        not to disclose any information
16        that could be considered
17        privileged due to attorney-
18        client privilege in your role as
19        an attorney with the DOE.
20   MR. GRAFF:
21        Q. Are you not answering?
22        A. Correct.
23        Q. Was there an analysis by the
24   Department of Education regarding the
25   science behind other mitigation
```

```
 1                    K. G. RODI

 2   measures?

 3              MS. LINNANE:  Objection.

 4              You can answer.

 5       A. Again, we have a Department of

 6   Health and health advisers that we were

 7   in regular contact with.

 8       Q. The second bullet says that

 9   "state law and applicable collective

10   bargaining agreements, including the

11   operation of seniority systems,

12   generally limit DOE's ability to

13   transfer staff between schools except

14   in limited circumstances not applicable

15   here."  Do you see that?

16       A. In the second bullet or the

17   third bullet?

18       Q. Second bullet.

19       A. Oh, yeah.  Yeah, yeah.

20       Q. Was there any effort by the DOE

21   to negotiate with the UFT to grant the

22   DOE flexibility to transfer staff?

23              MS. LINNANE:  Objection.

24              You can answer.

25       A. I don't know.
```

```
 1                K. G. RODI
 2       Q. Do you know how many out of the
 3   approximately 3,300 applicants for
 4   religious exemption actually had a bona
 5   fide religious objection?
 6            MS. LINNANE:  Objection.
 7            You can answer.
 8       A. We didn't make that
 9   determination.
10       Q. Were some of the students
11   learning remotely during the '21, '22
12   school year?
13            MS. LINNANE:  Objection.
14            You can answer.
15       A. I believe there were students in
16   special ed programs that remained
17   working remotely -- I mean, studying
18   remotely.
19       Q. And how was it determined who
20   would teach those special ed students
21   studying remotely?
22            MS. LINNANE:  Objection.
23            You can answer.
24       A. They had their same teachers
25   that -- just some of the teachers would
```

                        K. G. RODI

1    come into school and -- because the --

2    some of the kids -- it would depend on

3    the kid and if a kid was vulnerable

4    with their health.  But maybe, like,

5    the teacher had ten kids in their

6    class, and three had health

7    vulnerabilities.  The teacher was still

8    teaching the other seven kids and then

9    was working with the three kids who

10   could not come into the buildings.

11       Q. Were any teachers teaching

12   remotely during the '21, '22 school

13   year?

14              MS. LINNANE:  Objection.

15              You can answer.

16       A. Yes, a few.

17       Q. Were those because of

18   accommodations for health reasons?

19              MS. LINNANE:  Objection.

20              You can answer.

21       A. Yes.

22       Q. How was it decided who received

23   remote teaching positions?

24       A. Each person would apply for an

K. G. RODI

1    accommodation.  They would -- then we

2    would do the interactive process, and

3    if the school could manage them working

4    remotely, that that was a reasonable

5    accommodation for them, then the school

6    would make a decision that they would

7    work remotely.  It would depend on the

8    school; it would depend on the level.

9    It would depend on the job; it would

10   depend on, you know -- in certain

11   situations, the person might be

12   teaching English and social studies in

13   a middle school with a co-teacher.  So

14   that might work.  But then you'd have

15   somebody, say, like, first graders with

16   special needs.  That wouldn't be

17   possible.

18        So it was wholly dependent on

19   the person's program and whether or not

20   the school could figure out a remote

21   accommodation.  And, of course, whether

22   they were -- there was a medical reason

23   that they couldn't come in, not -- that

24   was already determined.

```
 1                   K. G. RODI
 2        Q. Was that -- were those medical
 3    accommodation -- accommodations, were
 4    they made at the school level, or were
 5    they done in your office?
 6              MS. LINNANE:  Objection.
 7              You can answer.
 8        A. They were done at the school
 9    level.
10        Q. The medical accommodation
11    requests, both accommodations and
12    exemptions, were there more of them
13    than religious exemptions --
14              MS. LINNANE:  Objection.
15              You can answer.
16        A. No.
17        Q. -- requests to medical
18    accomodation?
19        A. No.
20      (Reporter requested clarification.)
21        Q. Do you know how many medical
22    accomodation or exemption requests were
23    made?
24              MS. LINNANE:  Objection.
25              You can answer.
```

1              K. G. RODI

2       A. I don't know.  I believe it was,

3    like, half.  In terms of requests, I

4    don't know how many were granted.

5       Q. The second paragraph of page DEF

6    000554, at the bottom of the paragraph

7    saying "allowing such employees to

8    remain in school settings unvaccinated

9    even with other safeguards like masking

10   and testing were presented unacceptable

11   risk to school children, staff, and

12   others."  What is the basis for that

13   statement?

14              MS. LINNANE:  Objection.

15              You can answer.

16      A. I don't know.  I mean we had --

17   they -- they weren't permitted in the

18   building.  And, I mean, you could also

19   say that they -- that, you know -- the

20   argument then was that we had

21   unvaccinated kids.  And we didn't want

22   anyone who wasn't vaccinated around the

23   kids.

24      Q. But why address safeguards like

25   masking and testing would present an

```
 1                    K. G. RODI

 2    unacceptable risk when it didn't matter

 3    if they were masking and testing?

 4              MS. LINNANE:  Objection.

 5              You can answer.

 6        A. Because they were vaccinated.

 7        Q. The letter explains -- this

 8    letter explains why the plaintiff was

 9    denied an exemption.  And one of the

10    reasons that is in this letter is that

11    safeguards like masking and testing

12    would present an unacceptable risk to

13    school children, staff, and others.

14    Did the Department of Education do any

15    research regarding masking and testing

16    and how it would affect school

17    children, staff, and others?

18              MS. LINNANE:  Objection.

19              You can answer.

20        A. I can't speak to that.

21        Q. Are you aware of any studies

22    done regarding masking and testing in

23    schools?

24              MS. LINNANE:  Objection.

25              You can answer.
```

```
 1                      K. G. RODI

 2        A. I'm not.

 3        Q. Are you aware that all other

 4   school districts in New York State had

 5   masking and testing policies?

 6             MS. LINNANE:  Objection.

 7             You can answer.

 8        A. I didn't -- I'm not familiar

 9   with other school policies.

10        Q. The first line on this last

11   paragraph on 554 says, "Our experience

12   in providing exemptions in accordance

13   with the arbitration award has only

14   confirmed that creating such

15   alternative assignments poses an undue

16   hardship."  Do you see that?

17        A. Yes.

18        Q. The Department of Education

19   didn't provide any exemptions, correct?

20             MS. LINNANE:  Objection.

21             You can answer.

22        A. Correct.

23     (Reporter requested clarification.)

24        Q. So you had no experience in

25   providing exemptions, correct?
```

```
 1                    K. G. RODI

 2              MS. LINNANE:  Objection.

 3              You can answer.

 4        A. No, not correct.  Because by the

 5    time it got to the central committee or

 6    the central appeals board or whatever

 7    it was, we had already had -- the

 8    arbitrator had already approved some

 9    that we had denied.  So we were already

10    scrambling to find places for people to

11    be.

12        Q. Was there one particular

13    arbitrator who granted exemptions?

14              MS. LINNANE:  Objection.

15              You can answer.

16        A. No.  I saw several arbitrators

17    sign off.

18        Q. Do you know the names of those

19    arbitrators?

20              MS. LINNANE:  Objection.

21              You can answer.

22        A. I do not.

23        Q. The top of page DEF 000555 says,

24    "There was simply limited work

25    available for employees to support
```

                    K. G. RODI

1

2   their schools long term from outside

3   the school building."  Do you see that?

4       A. Yes.

5       Q. There was work for these

6   employees, though, correct?

7               MS. LINNANE:  Objection.

8       A. No.  No.

9       Q. It says "limited work," so there

10  must have been some kind of work,

11  correct?

12              MS. LINNANE:  Objection.

13              You can answer.

14      A. Again, as I referenced before,

15  it wholly depended on what the person

16  was doing.  So if a person was, like,

17  say, a guidance counselor, and they

18  were a guidance counselor on the high

19  school level, and they had to write

20  high school recommendations for

21  college, yeah, they would have limited

22  work to do outside.  But if you take

23  someone who's, like, a kindergarten

24  teacher, what are they doing outside of

25  a school?  Nothing.  They have to be in

```
 1                    K. G. RODI
 2    the school.
 3            So, yeah, was there limited work
 4    for certain titles?  Sure.  But not --
 5    it doesn't say each employee has
 6    limited work.  It's like there is
 7    simply limited work available for
 8    employees.
 9        Q. So, for example, the guidance
10    counselor that you cited --
11        A. Yeah.
12        Q. -- why wasn't a guidance
13    counselor granted an exemption if there
14    was limited work that they could do?
15            MS. LINNANE:  Objection.
16        You can answer.
17        A. Because on the whole, we needed
18    as many staff as possible, because we
19    had to run a school.  And a guidance
20    counselor, while they may have limited
21    work, that's not their job to just do
22    that.  They have to be available for
23    students.  They have to be available to
24    meet students.  They have to be
25    available to work with students.  They
```

K. G. RODI

1

2    have to be able to have confidential

3    conversations with students.  They

4    have -- the essential functions of

5    their job may -- some of their work may

6    be able to be done remotely but not all

7    of their work.  That's the nature of

8    their job.

9        Q. The second paragraph on page 555

10   at the bottom, it says, "Accordingly,

11   additional resources have been diverted

12   to train the exempted employees and

13   assign supervisors to oversee their

14   work."  What type of training did

15   exempted employees receive?

16            MS. LINNANE:  Objection.

17            You can answer.

18       A. I know that we had a few

19   employees that were exempted who had

20   jobs that were not office-based jobs,

21   so we would have to train them in, like

22   -- like, let's say they -- we had a

23   number of the exempted people

24   supporting the -- I forget the name of

25   it.  There was this team of people that

```
 1                    K. G. RODI
 2   were -- that were basically like a
 3   COVID hotline for principals.  And a
 4   bunch of exempted teachers -- I mean,
 5   employees were trained to answer those
 6   calls.  So I know that they set up a
 7   small phone bank to support that for
 8   the people that we had to find work
 9   for, because none of their work could
10   be remote.
11       Q. Did -- when an employee was
12   granted an exemption through the
13   arbitration process, was there an
14   explanation given to the DOE why this
15   particular employee was granted an
16   exemption?
17            MS. LINNANE:  Objection.
18            You can answer.
19       A. I never saw one.
20            MR. GRAFF:  All right.  I'm
21       going to mark this part of the
22       transcript "Confidential,"
23       because this particular exhibit
24       is confidential.  So we're going
25       to separate this part of the
```

```
 1                    K. G. RODI

 2          transcript out when you produce

 3          it.  Please produce it separately

 4          and apart from the rest of the

 5          transcript.  Is that acceptable?

 6               MS. LINNANE:  We're going to

 7          note our objection.  I don't

 8          think it's essential to produce

 9          it in any respect.  But I will --

10          I know what you're going to show

11          on the screen given your

12          discussions.  But we will note

13          our objection, due to the

14          confidential nature of this

15          document, that it shouldn't be

16          shown or produced.

17               MR. GRAFF:  And, Ms. Lazar,

18          you've signed the confidentiality

19          agreement?

20               THE REPORTER:  Yes.

21               (The following pages 82

22          through 87 have been designated

23          confidential.)

24

25
```

1                K. G. RODI

2

3

4

5        CONFIDENTIAL IN SPARATE BOOKLE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          K. G. RODI

2

3

4

5     CONFIDENTIAL IN SPARATE BOOKLE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            K. G. RODI

2

3

4

5        CONFIDENTIAL IN SPARATE BOOKLE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      K. G. RODI

2

3

4

5          CONFIDENTIAL IN SPARATE BOOKLE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                K. G. RODI

 2

 3

 4

 5       CONFIDENTIAL IN SPARATE BOOKLE

 6

 7

 8     (Conclusion of confidential portion)

 9            MR. GRAFF:  Let's go to this

10        exhibit.  I guess this is Exhibit

11        H --

12        Q. Are you aware that SAMS'

13     arbitrator granted 164 COVID exemptions

14     based on religious reasons?

15            MS. LINNANE:  Objection.

16            You can answer.

17        A. I was not aware of the number.

18        Q. Are you aware that the

19     Department of Education has disclosed

20     that only 145 employees received a

21     religious exemption?

22            MS. LINNANE:  Objection.

23            You can answer.

24        A. I would not know the numbers.

25     To note that the -- the SAMS saying --
```

```
 1                    K. G. RODI
 2    there were SAMS, and then there was the
 3    panel.  So I don't know if anyone got
 4    them from the panel too.
 5        Q. When SAMS granted an
 6    accommodation -- an exemption, excuse
 7    me -- who's role was it to place the
 8    person into a position?
 9              MS. LINNANE:  Objection.
10              You can answer.
11        A. When they received an exemption,
12    their names would be sent to the
13    central -- the team that was handling
14    the placements.  And they would then
15    figure out where they lived, figure out
16    what would be the right place for them
17    to be.  They would call their school
18    and say, hey, this person has an
19    exemption, so they're going to remain
20    on your table of organization.  And
21    you're going to keep doing their
22    attendance and all of that.
23            And then, at that point, if the
24    school said, oh, we have work for them,
25    they would -- they would arrange that.
```

```
1               K. G. RODI
2    But it was all -- there was a central
3    group in the office that handled it.
4         Q. Were you involved in that
5    process?
6         A. I was not.
7         Q. Do you know if any classroom
8    teacher received a religious exemption?
9              MS. LINNANE:  Objection.
10             You can answer.
11        A. I believe so.
12        Q. And that was one of the either
13   school-based or DOE office-based
14   accommodations?
15             MS. LINNANE:  Objection.
16             You can answer.
17        A. Yes.
18        Q. Do you know if any DOE central
19   office employees received a religious
20   exemption?
21             MS. LINNANE:  Objection.
22             You can answer.
23        A. I -- I can't say for sure,
24   because some titles are education
25   titles, but they work in a central
```

                    K. G. RODI

1

2    office.  I will say that, at one point,

3    I saw, like, a list of everybody who

4    had gotten an accommodation, and it was

5    all over the place.  It was teachers,

6    guidance counselors, food service

7    workers, like, custodians, central --

8    like, it was -- but it could be -- for

9    example, it could be, like, a teacher

10   assigned got an exemption.  But a

11   teacher assigned works in a central

12   office, so I couldn't -- I mean, it was

13   -- I looked at the list briefly.

14            MR. GRAFF:  Okay.  I'm going

15        to take a five- minute break.  I

16        think I'm almost done.  But I'm

17        going -- right now, it's 11:54.

18        Let's come back at, like, 12:05.

19            MS. LINNANE:  That's fine.

20        Ten minutes is great.

21            MR. GRAFF:  All right.  See

22        you in a few minutes.

23            MS. LINNANE:  All right.

24        Thanks.

25            (A recess was taken.)

```
 1              K. G. RODI
 2         MR. GRAFF:  I just have one
 3     other question.
 4  BY MR. GRAFF:
 5     Q. Ms. Rodi, do you know if any
 6   religious exemptions were granted by
 7   the appeal panel?
 8         MS. LINNANE:  Objection.
 9         You can answer.
10     A. I have no idea.
11         MR. GRAFF:  I don't have any
12     other questions.
13
14        (Time noted: 12:06 p.m. )
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                      K. G. RODI

 2             INSTRUCTIONS TO WITNESS

 3

 4          Please read your deposition over

 5   carefully and make any necessary

 6   corrections.  You should state the

 7   reason in the appropriate space on the

 8   errata sheet for any corrections that

 9   are made.

10          After doing so, please sign the

11   errata sheet and date it.

12          You are signing same subject to

13   the changes you have noted on the errata

14   sheet, which will be attached to your

15   deposition.

16          It is imperative that you return

17   the original errata sheet to the

18   deposing attorney within thirty (30)

19   days of receipt of the deposition

20   transcript by you.  If you fail to do

21   so, the deposition transcript may be

22   deemed to be accurate and may be used in

23   court.

24

25
```

```
 1                K. G. RODI

 2          A C K N O W L E D G E M E N T

 3     STATE OF NEW YORK)

 4                    :SS

 5     COUNTY OF _____)

 6       I, KATHERINE G. RODI, hereby certify

 7     that I have read the transcript of my

 8     testimony taken under oath on

 9     March 25, 2025, that the transcript is a

10     true, complete and correct record of

11     what was asked, answered and said during

12     my testimony under oath, and that the

13     answers on the record as given by me are

14     true and correct, except for the

15     corrections or changes in form or

16     subsTtance, if any, noted in the

17     attached Errata Sheet.

18              _____

19                    KATHERINE G. RODI

20

21     Signed and subscribed to

22     before me, this _____ day

23     of _____, _____.

24     _____

25        Notary Public
```

```
 1              K. G. RODI

 2          I   N   D   E   X

 3

 4

 5    EXAMINATION                        6

 6    BY MR. GRAFF:

 7

 8

 9    (Plaintiff's Exhibit A,           8

10    Notice of Deposition, was

11    marked for identification.)

12

13    (Plaintiff's Exhibit B,          51

14    Document dated September 10,

15    2021, was marked for

16    identification.)

17

18    (Plaintiff's Exhibit C,          51

19    Email dated September 21, 2021,

20    was marked for identification.)

21

22    (Plaintiff's Exhibit D,          58

23    Julie Torrey Arbitration

24    Decision, was marked for

25    identification.)
```

1                    K. G. RODI

2

3    (Plaintiff's Exhibit E,              61

4    Renewed application, was marked

5    for identification.)

6    (Plaintiff's Exhibit F,              62

7    Position Statement, was marked

8    for identification.)

9

10

11

12

13

14    (Pages 82 through 87 have been

15    designated confidential)

16

17

18

19

20

21

22

23

24

25

1

2                C E R T I F I C A T E

3      I, CEITA LAZAR, a stenographic

4    reporter and Notary Public within and

5    for the State of New York, do hereby

6    certify:

7      That the witness(es) whose testimony

8    is hereinbefore set forth was duly sworn

9    by me, and the foregoing transcript is a

10   true record of the testimony given by

11   such witness(es).

12     I further certify that I am not

13   related to any of the parties to this

14   action by blood or marriage, and that I

15   am in no way interested in the outcome

16   of this matter.

17

18

19

20

21   _____

22   CEITA LAZAR
     Dated:  April 9, 2025

23

24

25

1    Errata Sheet

2

3    NAME OF CASE: LORRAINE MASCIARELLI -against- NEW YORK CITY DEPARTMENT OF EDUCATION

4    DATE OF DEPOSITION: 03/25/2025

5    NAME OF WITNESS: KATHERINE G. RODI

6    Reason Codes:

7        1. To clarify the record.

8        2. To conform to the facts.

9        3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                    _____

**Exhibits**

**Ex A - Katherine Rod i deposition no tice_marked** 8:22,23 94:9

**Ex B - Plaintff's Application_ marked** 51:3,4 58:6 94:13

**Ex C - 9-21- 21 Denial of Ac commodation_ marked** 51:15, 17 58:21 94:18

**Ex D - Torrey Arb aw ard_marked** 58:20,23,25 94:22

**Ex E - 5 - 11- 19-2021 - Renewed appli cation_marked** 61:9,11 95:3

**Ex F - NYC DOE Posi tion Statement -- 553-555_ marked** 62:13, 14,15 95:6

**Ex G - Redact Confid ential List ( just page 1)_ marked**

**0**

**000554** 66:4 74:6

**000555** 77:23

**1**

**10** 45:3,20 50:25 51:5 58:7

**11** 58:11

**11201** 5:21

**11:54** 90:17

**12:05** 90:18

**145** 87:20

**164** 87:13

**18** 9:13 13:11

**1990** 11:25

**1994** 12:6

**1995** 10:21

**1998** 10:25

**2**

**2,000** 17:5

**2003** 12:14

**2012** 9:19

**2018** 15:6

**2019** 15:6

**2020** 15:6,7

**2021** 10:7,11 18:21 45:4,20 51:2,6,16,19 58:7,9

**2022** 29:6

**21** 10:7 15:13 51:16,18 58:9 70:11 71:13

**22** 70:11 71:13

**3**

**3,300** 70:3

**5**

**554** 76:11

**555** 80:9

**6**

**65** 5:20

**8**

**82** 82:21

**87** 82:22

**A**

**A** 90:25

**ability** 19:21 24:11 65:19,20 69:12

**able** 19:14 24:6 39:2,16 40:2 50:13 53:7,9,10 54:4 56:6 67:13 80:2,6

**absolutely** 24:17

**Academy** 11:21

**acceptable** 82:5

**access** 37:11

**accommodatin g** 39:13

**accommodatio n** 14:22 25:2 26:7 33:7 35:6,7 36:3,4,25 37:3, 6,10,20 38:2,17, 21,25 39:6,18 43:9 52:24 53:4, 12,16 58:8 72:2, 6,22 73:3,10 88:6 90:4

**accommodatio ns** 10:3 13:22 25:15 33:12 34:20,23,24 36:13 61:17 71:19 73:3,11 89:14

**accomodation** 73:18,22

**accordance** 76:12

**Accordingly** 80:10

**across** 16:18

**act** 29:3

**actually** 6:2 14:25 31:15 70:4

**ADA** 37:7

**additional** 80:11

**address** 5:20 6:3 74:24

**addressed** 8:3

**advised** 31:20, 23

**advisers** 69:6

**affect** 30:11 75:16

**after** 11:7,13 29:6 53:23 68:8

**again** 27:15 29:11 43:13 58:17 66:24 68:4 69:5 78:14

**agency** 16:13 24:23 27:17 29:21 56:4,9 63:17

**agreement** 28:18 29:2 82:19

**agreements** 69:10

**all** 6:19 8:16 13:23 19:23 20:3,9 23:11 30:6 34:24 40:15 45:16 46:3 53:8,9 54:14 55:23 58:13 60:8,14 76:3 80:6 81:20 88:22 89:2 90:5, 21,23

**allowed** 25:12

**allowing** 62:3 74:7

**almost** 90:16

**already** 16:25 17:18 18:5,7 72:25 77:7,8,9

**also** 4:24 14:20 17:9 31:14 37:7 74:18

**alternate** 38:7 39:15 54:16

**alternative** 76:15

**Amendment** 14:18

**American** 11:17 12:8,10,13

**an** 6:12 16:12,19 17:8,11,23 19:16 20:4,10 21:16,19,24 22:7,17,24 23:11 24:22,25 25:6,24 26:7,13 28:9 29:2,21 30:18,23 31:5 34:14 36:24,25 37:2,3,6,9,13, 20,23,24 38:2,6, 16,20,22 39:14, 17 43:2,8,18 45:12 46:4,10, 11 53:15,16 54:7,16,22 56:2, 8 61:4 63:6 64:10,11,17 65:5 68:19,23 71:25 74:25 75:9,12 76:15 79:13 81:11,12, 13,15 88:5,6,11, 18 90:4,10

**analysis** 53:23 55:7 56:2 66:16 68:23

**Andrea** 5:13

**another** 37:25

**answer** 6:12 8:15 11:4,11 12:22 13:3 18:23 19:18 22:14 23:6 25:5, 17,23 26:11,17, 23 27:6 28:16 29:10,19 30:14 31:3 32:15,21 33:9,18 34:3,11, 17,22 35:13,19, 24 36:6,11,16,

22 37:5,22 38:5,
12,19 40:7,14
41:5,9,14 42:24
43:12 45:23
46:6,14 47:15
50:3,12,19
52:10 53:6 54:3,
11 55:12 56:16,
23 57:23 58:16
59:21 60:2,10,
17,24 61:6,19,
24 62:11 63:4,
24 64:7,25
66:20 67:16
68:3 69:4,24
70:7,14,23
71:16,21 73:7,
15,25 74:15
75:5,19,25 76:7,
21 77:3,15,21
78:13 79:16
80:17 81:5,18
87:16,23 88:10
89:10,16,22

**answering**
52:15 63:10
68:21

**any**  6:25 7:12
12:19,24 13:5
14:4,10,11
22:16,20 25:24
27:14 30:15,16
32:25 33:15
34:7 35:21
36:13 41:6
44:23 46:25
47:22 48:5,10
49:6,18 52:2,10
53:23 57:11
60:4 61:15 63:4
66:16 68:6,10,
15 69:20 71:12
75:14,21 76:19
82:9 89:7,18

**anybody**  57:12

**anymore**  40:17

**anyone**  7:9
28:24 30:21
33:16 42:21
43:13 62:7 64:3
74:22 88:3

**anything**  16:5
27:10 45:10
67:12

**apart**  46:21 82:4

**Apologies**
64:21

**appealing**
63:16

**appeals**  61:17,
21 62:8 63:22
77:6

**applicable**
69:9,14

**applicant**  17:10

**applicants**
22:18,23 23:11
70:3

**application**
16:21 17:19
22:17 28:9
30:18,23 31:6,
16 32:12 42:4
43:2,4 44:20,24
45:13,15,18
53:14 58:5
59:23 61:12

**applications**
16:24,25 17:6
18:2,8 19:7,24
20:4,15,17 22:5
23:21 33:22
35:11 41:17
42:2,12,18 45:9
46:11 60:20

**applied**  17:14
31:10 34:25
52:2

**apply**  16:10
28:5 71:25

**approach**  16:24
18:7 46:20

**appropriate**
31:24 65:21

**appropriately**
17:13 29:3
31:10

**approve**  34:4

**approved**  34:8
35:17,22 36:9,
14 77:8

**approximately**
70:3

**arbitration**
26:3,8 37:19
56:19 58:24
59:2,10,13,14
60:21 76:13
81:13

**arbitrations**
59:19

**arbitrator**  25:25
26:2 38:14
40:10,25 59:24
61:3 77:8,13
87:13

**arbitrators**
60:6,13 77:16,
19

**area**  31:11

**argument**  74:20

**around**  39:7,8
56:7 74:22

**arrange**  88:25

**arrest**  10:4

**ask**  4:21 6:9
7:18 44:10

**asking**  33:13

**asks**  37:14

**assign**  80:13

**assigned**
90:10,11

**assignments**
76:15

**assistant**  23:24

**assume**  57:24
58:18 63:15

**at**  6:25 7:8 11:17
14:22 17:20
20:14,19 23:15
24:7 27:7,24
28:12 29:20,24
30:8 39:22
42:19 45:25
47:8,19 50:5,6
54:8 55:14,19
56:21 57:8,11
73:4,8 74:6
80:10 88:23
90:2,13,18

**athletes**  30:10

**attached**  42:8

**attendance**
88:22

**attended**  13:12,
14

**attorney**  4:6 6:8
12:15 52:13
63:6 68:19

**attorney-**  47:24
68:17

**attorney-client**
47:4 48:12 49:8,
20 63:7,9

**attorneys**  48:5

**Austin**  5:6 6:8
43:21

**automatically**
30:25 45:11

**available**  77:25
79:7,22,23,25

**award**  56:20
76:13

**aware**  18:12,15
60:12,13 61:21,
25 62:2 75:21
76:3 87:12,17,
18

**away**  7:19 28:21

**B**

**back**  11:14,16
23:13,16 28:6
57:14,20 58:4
90:18

**bank**  81:7

**bargaining**
69:10

**based**  16:20
17:17 46:4 53:4
87:14

**basement**
67:22

**basically**  28:25
81:2

**basis**  23:8 26:6
74:12

**Bates**  66:3

**because**  6:20
23:12 24:7,12
25:6 27:15,17
30:4 31:16
36:23 38:20,21
52:15 71:2,18
75:6 77:4 79:17,
18 81:9,23
89:24

**become**  56:8

**been**  5:18 10:13
22:3 24:22
26:21 28:7
29:15 40:24
44:12 57:2
78:10 80:11
82:22

**before**  8:13 22:6
28:22 46:8
65:25 78:14

**begin**  11:8

**behalf**  59:17

**behind**  68:25

**being**  29:7

**belief**  6:15
22:11 32:13,19,
25

**beliefs**  29:14

**believe**  8:2
12:23 26:20
70:15 74:2
89:11

**believed**  17:9
64:17

**benefits**  29:7,
25

**Bernstein**
20:19 21:2,11
50:20

**best**  4:23 29:20
38:24

**between**  37:2
60:5 69:13

**bias**  27:14

**bigger**  43:22
59:6

**blank** 31:17,22

**board** 16:19
77:6

**bona** 32:12,18
70:4

**BOOKLE** 83:5
84:5 85:5 86:5
87:5

**boss** 20:19

**both** 9:7 16:22
38:15 73:11

**bottom** 28:12
64:13 74:6
80:10

**break** 6:25 7:3
90:15

**briefly** 90:13

**bring** 27:18

**Brooklyn** 5:21
40:18

**building** 27:18
53:10 55:6 56:7
66:25 67:6,14,
20,23 74:18
78:3

**buildings** 24:6,
7,10,13 25:10,
12 29:23 43:15,
18 71:11

**bullet** 66:12
69:8,16,17,18

**bullets** 64:14
66:3

**bunch** 81:4

**burden** 16:12
17:8,23 20:5,11
21:25 22:8
23:11 24:22
46:4,11 53:18
56:8 64:18

**burdens** 16:18
18:20

**but** 7:16 17:25
19:24 20:2
27:17,22 31:12
38:9,25 39:3
40:17 50:15
57:3 58:18 62:4

66:6 71:5 72:15
74:24 78:22
79:4 80:6 82:9,
12 89:2,25 90:8,
10,16

---

**C**

**call** 88:17

**calls** 81:6

**came** 23:16
30:23 43:24
45:2,6,19

**can** 4:23 7:20
8:6,7 11:4,11
12:22 13:3
18:23 19:18
22:14 23:6 25:5,
17,23 26:11,17,
23 27:6 28:13,
16 29:10,19
30:14 31:3
32:15,21 33:9,
18 34:3,11,17,
22 35:13,19,24
36:6,11,16,22
37:5,22 38:5,12,
19 40:7,14 41:5,
9,14 42:24
43:12,21 45:23
46:6,14 47:15
50:3,12,19
51:13 53:6 54:3,
11 55:12 56:16,
23 57:23 58:16
59:7,21 60:2,10,
17,24 61:6,19,
24 62:11 63:24
64:7,25 65:24
66:20 67:16
68:3 69:4,24
70:7,14,23
71:16,21 73:7,
15,25 74:15
75:5,19,25 76:7,
21 77:3,15,21
78:13 79:16
80:17 81:18
87:16,23 88:10
89:10,16,22

**can't** 6:12 7:19
24:14,15,16
27:19 40:16
75:20 89:23

**cannot** 6:21

**case** 5:12 7:13

**Catholic** 22:17,
23

**caution** 46:24
47:21 48:9 49:5,
17 68:14

**ceita** 4:15 5:19

**cell** 7:15

**central** 77:5,6
88:13 89:2,18,
25 90:7,11

**certain** 30:2
72:11 79:4

**cetera** 46:20

**chancellor's**
15:25

**changed** 30:9

**charge** 15:9

**check** 31:11

**chief** 21:9

**children** 23:16
54:25 74:11
75:13,17

**choice** 30:7

**circumstances**
69:14

**cited** 79:10

**City** 4:19 5:10,
14 7:25 9:5,6,
10,12 11:9
20:23 29:16
30:9 50:6 61:16
67:9

**clarification**
41:2 65:9 73:20
76:23

**clarify** 52:20

**class** 71:7

**classes** 12:20,
25 14:18,19

**classroom**
10:13 23:19
89:7

**classrooms**

30:5

**cleaned** 67:21

**clear** 58:2

**client** 47:25
54:13,17 62:20
68:18

**close** 4:22

**co-teacher**
72:14

**collective** 69:9

**college** 12:2,3
78:21

**come** 28:6
29:22 57:14
71:2,11 72:24
90:18

**coming** 57:20

**committee**
15:21,23 16:7,
20 17:21 18:9,
11,14,17 20:7
21:24 22:4
24:24 45:21
46:9,22 47:13
49:15 58:13
60:14 64:17
77:5

**committee's**
23:9 60:7

**communicate**
7:20

**communicatio
ns** 60:4

**completely**
37:14

**comprised**
33:20

**concern** 65:18

**conclude** 63:20

**conclusion**
87:8

**cone** 67:3

**confidential**
5:24 80:2 81:22,
24 82:14,23
83:5 84:5 85:5
86:5 87:5,8

**confidentiality**
82:18

**confirm** 43:7
50:15

**confirmed**
76:14

**consider** 17:3
24:25

**consideration**
32:17

**considered**
17:13 43:8 47:2,
23 48:11 49:7,
19 68:16

**consistent**
65:15,16,18

**constant** 66:21

**consulted**
66:23

**contact** 69:7

**conversation**
46:16

**conversations**
66:21 68:7,11
80:3

**copy** 4:4,8

**correct** 15:17
26:5 52:17
56:14 63:11,12
68:22 76:19,22,
25 77:4 78:6,11

**cost** 55:18 65:21

**could** 27:14,18
28:20 29:21
30:2 31:21,24
39:24 47:2,23
48:11 49:7,19
50:14 53:9,11
56:25 67:5
68:16 71:11
72:4,21 74:18
79:14 81:9 90:8,
9

**couldn't** 27:7,
10 46:7 50:15
57:6,11 72:24
90:12

**counsel** 5:2
47:12,16 48:16,

21,23 49:2,13
50:21

**counsel's**
46:17

**counselor**
78:17,18 79:10,
13,20

**counselors**
90:6

**course** 72:22

**courses** 13:13
14:21

**court** 4:15 5:20
6:20 53:21

**courtesy** 4:8

**cover** 55:23

**COVID** 15:10
39:7 81:3 87:13

**COVID-19**
19:11 66:18

**create** 64:11

**created** 62:22
63:14

**creating** 76:14

**criteria** 52:23
53:3 61:2

**current** 9:14,15

**currently** 7:6
9:2 20:22 21:4
48:6,23

**custodians**
23:23 30:5 90:7

———————

**D**

———————

**date** 58:18

**dated** 50:25
51:5,18 58:6,8

**days** 58:11

**decide** 19:15
56:12

**decided** 11:5
22:6 71:23

**decision** 16:18,
20,23 17:17
20:3,9 22:2,3

23:9 53:22,23
58:12,24 59:3
60:7,13 72:7

**decisions** 16:4,
6,8 59:10

**DEF** 66:6,7,8
74:5 77:23

**defendant** 5:11,
15

**DEFS** 66:4

**denial** 58:7

**denied** 19:25
21:19 22:12
30:25 32:8 34:9,
15 46:4 75:9
77:9

**deny** 19:3,16
21:13 23:3
30:18 31:8
33:24 53:13
58:13 60:8,14
61:4

**department**
4:20 5:11,14
7:25 9:5,9,12
11:9 15:4 20:20,
24 21:4 25:8
26:14,19 29:17
30:11 46:17
47:12,17,18
48:3,7,17,18
49:2,13 50:7,8
55:9 56:11
59:18 60:5 62:8
66:17,22,24
67:10,17 68:7,
11,24 69:5
75:14 76:18
87:19

**depend** 42:3
71:3 72:8,9,10,
11

**depended**
56:24,25 78:15

**dependent**
72:19

**depends** 28:17
29:11

**deposition** 4:7,
17 7:23 8:4,8,
10,18,24

**deputy** 20:18,21

**described**
49:15

**deserved** 17:10

**designated**
82:22

**determination**
16:11,13 18:19
21:23 31:8
38:13 57:17
63:16 70:9

**determinations**
21:12

**determine**
17:22 22:23
30:17 35:4,6
61:3

**determined**
23:10 46:2,10
54:6,12,14 56:3
70:19 72:25

**determining**
16:16 19:3

**development**
13:13 14:21

**didn't** 24:11
25:10 32:6 38:8
43:15 45:8,9
64:22 67:7,24
70:8 74:21 75:2
76:8,19

**difference** 37:2

**different** 11:6
28:19 33:5,15
49:14 54:8 56:3

**difficult** 54:18

**direct** 52:9 63:3

**directed** 39:14

**director** 9:16
15:8

**disability** 10:2
35:4

**discipline**
13:21,24

**disclose** 46:25
47:22 48:10
49:6,18 68:15

**disclosed**
87:19

**discrimination**
14:13,16,19,22
15:2 37:8

**discussing**
19:23 20:14,16

**discussion**
22:20

**discussions**
22:16 47:3
82:12

**disqualify**
45:12

**districts** 76:4

**diverted** 80:11

**doctor** 34:9,13

**doctors** 33:21,
23

**document** 8:12
42:7 44:7,16
45:2 50:25 51:5,
9,21,24,25
52:25 59:5
61:10 62:14,21,
25 63:14,21
64:3,5,9 82:15

**documentation**
31:25

**documents**
7:12 44:18
45:17

**DOE** 13:15
14:24 25:20
40:17 41:18,19
52:12,13 53:18,
25 56:21 63:6
64:10,12 68:19
69:20,22 81:14
89:13,18

**DOE's** 69:12

**does** 15:22 21:3

**doesn't** 67:2
79:5

**doing** 55:4 56:2
78:16,24 88:21

**don't** 6:11 17:24
19:21 26:24

28:6 30:15 36:7,
12 39:17,20,21
41:15 44:22
54:5 58:17
59:10 60:25
62:19 69:25
74:2,4,16 82:7
88:3

**done** 64:23
73:5,8 75:22
80:6 90:16

**drafted** 52:4

**drafting** 52:7
62:25

**due** 18:2 19:22
48:12 49:20
63:6,9 68:17
82:13

**duly** 5:18

**duplicate** 45:8

**during** 15:10
18:4 30:8 38:3
70:11 71:13

**duties** 9:20
10:10

———————

**E**

———————

**each** 17:10
42:11,13,15
71:25 79:5

**early** 18:3

**East** 10:19

**ed** 70:16,20

**education** 4:20
9:6,9,12 11:9
20:24 21:5
24:19 26:14,19
29:17 30:12
48:18 50:7,8
55:10,21 56:5,
11 57:18 59:18
60:5 62:8 66:17
67:10 68:24
75:14 76:18
87:19 89:24

**Education's**
15:4

**effect** 30:15
57:25

**effort** 69:20

**either** 21:19 37:10 57:16 89:12

**elementary** 54:22

**elements** 13:24,25 16:14 39:7

**else** 7:9 42:22 45:10 55:6 62:6

**email** 51:16,18 58:22

**employed** 9:2,7

**employee** 9:16, 25 10:6 45:8 64:11 65:5 79:5 81:11,15

**employees** 13:16,20 14:7 16:9 25:13 26:7 27:2 29:4,22 53:8,9 56:10 74:7 77:25 78:6 79:8 80:12,15, 19 81:5 87:20 89:19

**employer** 9:4

**employment** 12:25 15:5,9,15 27:4 28:13 29:16 37:12

**ended** 11:13 62:5

**English** 10:17 72:13

**enter** 53:10 67:6

**entertainers** 30:10

**entire** 53:13

**entities** 9:8

**entitled** 33:2 38:10 57:13

**equal** 14:23 15:4,9,15

**essential** 54:19 55:3 65:6 80:4 82:8

**essentially** 55:14

**et** 46:20

**even** 32:6 34:13 39:9 54:18 55:4 67:2 74:9

**eventually** 17:5

**ever** 10:13

**every** 17:19 23:21 42:7

**everybody** 28:18 90:3

**everyone** 4:21 55:13

**exact** 40:16 58:17

**exactly** 17:24

**examination** 6:5 32:10

**examined** 5:21

**examining** 22:17

**example** 39:4 79:9 90:9

**except** 64:4 69:13

**excuse** 88:6

**executive** 9:15

**exempted** 80:12,15,19,23 81:4

**exemption** 16:14 18:2 19:16 20:4 21:16,20 22:7, 24 25:25 30:19, 24 31:6,12,13 33:3,6,16,19,24 34:14 35:11,16 36:20,25 37:3, 13,20,23,24 38:16,17 44:21 46:10 52:3 61:4 64:4,10,20 70:4 73:22 75:9 79:13 81:12,16 87:21 88:6,11, 19 89:8,20

**exemptions** 16:10,12,17 17:7,22 19:4,7, 10,11 20:10 21:13 22:6 23:4, 10 25:14 33:10, 15 34:8 35:16, 22 37:18 39:12 40:5,22,25 41:7, 17 43:10 46:3 56:9 58:14 60:8, 15,20 73:12,13 76:12,19,25 77:13 87:13

**exhibit** 8:22,23 51:3,4,15,17 58:5,6,20,21,23, 25 61:9,11 62:13,15 81:23 87:10

**experience** 76:11,24

**explains** 75:7,8

**explanation** 81:14

**extensive** 14:25

---

**F**

---

**face** 39:10

**fact** 24:2

**fail** 53:2

**failed** 52:23

**familiar** 40:15 76:8

**few** 11:15 71:17 80:18 90:22

**fewer** 47:8

**fide** 32:12,18 70:5

**figure** 72:21 88:15

**fill** 56:14

**filled** 56:20 57:2,15

**final** 21:15,17, 18,22

90:10

**exemptions** 16:10,12,17 17:7,22 19:4,7, 10,11 20:10 21:13 22:6 23:4, 10 25:14 33:10, 15 34:8 35:16, 22 37:18 39:12 40:5,22,25 41:7, 17 43:10 46:3 56:9 58:14 60:8, 15,20 73:12,13 76:12,19,25 77:13 87:13

**financial** 23:2

**find** 38:24 39:14 54:16,18 55:22, 24 57:2 65:20 77:10 81:8

**fine** 4:10 65:2 66:9 90:19

**fired** 29:15

**Firm** 5:7

**first** 5:18 14:18 16:22 43:25 45:5,6 64:14 65:11,14 66:11 72:16 76:10

**five-** 90:15

**flexibility** 69:22

**FMLA** 14:2

**folks** 56:6

**following** 64:12 82:21

**follows** 5:22

**food** 23:23 24:17 30:6 90:6

**forever** 27:20

**forget** 80:24

**former** 50:20

**forms** 28:20

**found** 39:24 56:13

**four** 64:5

**Frank** 66:6

**Friedman** 48:22 50:23

**from** 5:7 15:6,24 17:2 19:11 21:23 23:21,22, 23,24,25 25:7, 25 26:8 27:3,13 28:2,10,11 29:5, 15,16 37:14 43:2 45:12 46:21 47:18 48:2 49:14 56:2 62:7 78:2 82:4 88:4

**front** 7:13,16

**functions** 54:20 55:3 65:6 80:4

**further** 7:19

---

**G**

---

**G-R-O-F-F** 53:22

**general** 15:21, 23 17:21 18:9, 11,14,17 20:6 21:23 22:4 23:9 24:24 45:21 46:9,17,22 47:11,13,16 48:16,21,23 49:2,13,15 50:21 58:13 60:7,14 64:17

**generalities** 65:12

**generally** 69:12

**genuine** 29:14

**gestures** 6:22

**get** 37:9

**getting** 55:20

**given** 35:3,5 42:12,13 81:14 82:11

**go** 11:14,16 12:2 24:6 45:5 65:25 87:9

**going** 6:9 8:5,21 18:6 22:11 44:9 46:3,18,23 47:21 48:9 49:4, 16 51:2,14 52:9 58:4 61:8 63:3 67:13 68:14 81:21,24 82:6, 10 88:19,21 90:14,17

**Good** 6:7

**got** 27:21 57:12 77:5 88:3 90:10

**gotten** 90:4

**graders** 72:16

**grades** 23:18

**graduate** 11:19, 23 12:5,12

**Graff** 4:10,13 5:6 6:6,8 8:21 43:23 44:4,5,14, 15 47:10 48:4, 15 49:11,22 50:24 51:14 52:14,19,21 58:20 63:8 65:2 66:5,9,10 68:20 81:20 82:17 87:9 90:14,21

**grant** 19:3,15 21:13,16 30:18 31:8 33:24 61:4 64:20 69:21

**granted** 17:7 21:19 23:3 25:15,21 40:9, 24 60:21 74:4 77:13 79:13 81:12,15 87:13 88:5

**granting** 64:10

**great** 90:20

**Groff** 53:22

**group** 15:24 20:5,6 28:23 39:16 52:5 89:3

**guess** 87:10

**guidance** 78:17,18 79:9, 12,19 90:6

**gym** 54:23

**H**

**Hadley** 12:4

**hadn't** 17:12

**half** 42:4,20 74:3

**hand** 6:21

**handled** 34:20, 24 89:3

**handling** 88:13

**hard** 55:2

**hardship** 53:17, 24 54:7 55:8

64:12 76:16

**has** 64:14 76:13 79:5 87:19 88:18

**having** 5:18 17:5

**he** 48:23

**head** 6:21 67:3

**health** 9:25 15:25 25:8 66:22,24 67:18 68:8,12 69:6 71:5,7,19

**Heart** 11:21

**held** 46:8

**Hempstead** 11:22

**her** 5:20 6:2 44:24

**here** 69:15

**hey** 88:18

**high** 10:17,19 11:20,23 66:15 78:18,20

**hire** 27:14 30:3 65:20

**hiring** 13:22

**history** 10:17

**Holyoke** 12:3

**home** 7:8

**hotline** 81:3

**house** 7:10

**how** 4:8 7:22 9:11,17 10:22 16:9,13,14,23 18:6 19:22 21:18 25:14 30:11 34:20 35:10,15 36:2,8 41:11,16,25 46:18,19 51:23 53:2 54:6 55:21, 23 60:19 70:2, 19 71:23 73:21 74:4 75:16

**Howard** 48:22 50:22,23

**However** 17:9

**HR** 15:25

**human** 13:6,9, 10,17 14:3 21:9

**I**

**I'LL** 6:15 61:8 65:12

**I'VE** 8:9 13:12 14:19 59:9,11

**idea** 26:12 60:18 61:7 62:12,23 63:25 64:8

**identification** 8:25 51:7,20 59:4 61:13 62:17

**identified** 8:17

**identify** 44:11

**ie** 53:17

**immediately** 11:8 31:20,23

**immunocompromised** 39:5

**impact** 65:22

**implementation** 15:11,19 49:25 50:9

**implemented** 35:8

**important** 54:24

**impose** 53:16

**inability** 65:5

**incentive** 23:2

**included** 31:17

**including** 9:23 69:10

**individual** 17:11 28:24 29:12 42:2 60:6

**individualized** 16:19

**individually**

17:20

**information** 46:25 47:22 48:10 49:6,18 68:15

**insufficient** 66:13

**interactive** 35:5 36:18,24 38:23 72:3

**interruptions** 4:25

**into** 24:6,9 27:18 29:23 45:2,6 71:2,11 88:8

**Investigation** 9:24

**involved** 41:16 55:14,25 68:6, 10 89:4

**involvement** 62:5

**issues** 10:4 14:5,8

**its** 30:9

**J**

**job** 10:10 24:2 54:20 55:4,5 57:14 65:6 72:10 79:21 80:5,8

**jobs** 23:20 27:22 57:6 80:20

**joined** 16:3

**judge** 32:6

**Julie** 58:23 59:2

**just** 7:18 9:8 16:14 28:21 32:7 33:25 40:16 42:6,8 43:7,23 45:16 50:24 52:19 57:15 65:10,24 70:25 79:21

**K**

**Katherine** 4:17 5:17

**Kathleen** 5:9

**keep** 27:20 88:21

**kept** 29:24

**kid** 71:4

**kids** 23:13,14 24:13,15,18 71:3,6,9,10 74:21,23

**kind** 57:15 78:10

**kindergarten** 78:23

**knew** 17:2

**know** 6:14 23:25 26:6 27:23 32:5 36:2 39:10,25 40:17 41:11,15 43:19,24 44:19, 22 50:5,16,17 51:8 54:17 55:20 57:9,11 59:10 60:19 61:2 62:21 63:13,21 64:2 69:25 70:2 72:11 73:21 74:2,4,16,19 77:18 80:18 81:6 82:10 87:24 88:3 89:7, 18

**knowing** 43:3 44:23 57:19

**knowledge** 60:11

**L**

**labor** 12:20

**language** 52:4

**large** 39:25 40:2

**larger** 51:12

**last** 39:19 76:10

**law** 5:7,10,14
7:25 11:17
12:10,19,20,24,
25 14:17 20:20
37:8 46:16
47:12,17,18
48:3,7,25 49:12
65:8 69:9

**laws** 14:2

**lawyers** 48:2
52:5

**Lazar** 4:15 5:19
82:17

**learning** 24:14
70:11

**least** 42:19

**leave** 11:2 45:10
56:13,19 57:17

**leaves** 13:25

**left** 28:14,18

**legal** 16:3 48:17

**let** 6:14 43:19
51:8

**let's** 13:21 33:14
65:4 80:22 87:9
90:18

**letter** 75:7,8,10

**level** 23:18
28:12 34:5 72:9
73:4,9 78:19

**licensed** 12:15,
17

**like** 4:3 5:23
28:25 34:24
39:15 40:18
44:17 46:18
57:10 58:2 62:3,
19 71:5 72:16
74:3,9,24 75:11
78:16,23 79:6
80:21,22 81:2
90:3,7,8,9,18

**limit** 69:12

**limitations**
65:17

**limited** 69:14
77:24 78:9,21
79:3,6,7,14,20

**LINANNE** 12:21
28:15 29:9,18
32:14,20

**line** 52:25 76:10

**lines** 64:5

**Linnane** 4:2,5,
12 5:9,10,23
11:3,10 13:2
18:22 19:17
22:13 23:5 25:4,
16,22 26:10,16,
22 27:5 30:13
31:2 33:8,17
34:2,10,16,21
35:12,18,23
36:5,10,15,21
37:4,21 38:4,11,
18 40:6,13 41:3,
8,13 42:23
43:11,21 44:2,9
45:22 46:5,13,
23 47:14,20
48:8 49:4,16
50:2,11,18 52:8,
18 53:5 54:2,10
55:11 56:15,22
57:22 58:15
59:20,25 60:9,
16,23 61:5,18,
23 62:10 63:2,
23 64:6,19,21
65:24 66:7,19
67:15 68:2,13
69:3,23 70:6,13,
22 71:15,20
73:6,14,24
74:14 75:4,18,
24 76:6,20 77:2,
14,20 78:7,12
79:15 80:16
81:17 82:6
87:15,22 88:9
89:9,15,21
90:19,23

**list** 90:3,13

**literally** 39:14

**little** 24:15 43:22

**lived** 88:15

**located** 40:20

**locations**
40:11,16

**long** 6:25 9:11,
17 10:22 29:25

78:2

**longer** 15:13

**look** 28:25

**looked** 17:19
90:13

**looking** 31:13
32:23 37:9
55:14

**looks** 44:17

**Lorraine** 4:18
6:9 44:20

**lot** 14:3 27:21
56:2

**lower** 23:18

———

**M**

**made** 11:2 16:4,
20 18:14,20
21:25 22:2,3
31:9,14 33:25
36:4 43:5 45:7
57:16 58:12
73:4,23

**major** 12:7

**make** 6:19 16:7
17:11 31:7 32:3
42:8 43:22
45:16 51:11
59:6 70:8 72:7

**making** 16:23
20:2

**Mallory** 20:18,
21

**manage** 10:4
72:4

**mandate** 15:11,
12,20 19:11
23:3 25:7 27:11
44:21 49:25
50:10 68:8,12

**Manhattan**
40:19

**many** 25:14
35:10,15 36:2,8
41:11,16 44:17
60:19 70:2
73:21 74:4
79:18

**mark** 8:22 51:2,
15 65:25 81:21

**marked** 5:24
8:25 51:6,19
59:3 61:9,13
62:13,17

**Martin** 5:13

**Masciarelli**
4:19 6:9

**Masciarelli's**
44:20

**masked** 25:11
39:9 43:16

**masking** 24:25
43:7 74:9,25
75:3,11,15,22
76:5

**Massachusetts**
12:4

**matter** 4:18
22:12 25:11
43:16 67:2,7,11,
24 75:2

**matters** 8:2
10:6

**may** 57:2 79:20
80:5

**maybe** 39:8
50:14 71:5

**me** 6:13,14 7:17
8:6 43:19 51:8,
11 59:6 88:7

**mean** 15:22
28:2 30:20
38:21 58:21
59:9 65:7 70:17
74:16,18 81:4
90:12

**meaning** 21:21
26:2

**measures**
66:13,18 67:8
69:2

**Mediation** 26:3,
8 59:14

**medical** 31:13,
18 33:6,7,10,11,
14,16,19,20
34:5,8,9,19,23,

25 35:3,10,15,
16,21 36:3,13
37:10 38:22,25
40:5,8 41:6
45:6,7 72:23
73:2,10,17,21

**meet** 48:25
52:23 53:3
79:24

**meeting** 18:14,
17 45:21 46:2,8
49:3 55:3

**meetings** 18:11
45:24 47:9,11,
19 48:7 49:12,
14 50:8

**memory** 34:7

**mentioned**
41:23

**met** 7:25 18:5

**microphone**
4:22

**middle** 72:14

**might** 72:12,15

**mine** 21:14

**minimal** 4:25
53:17

**minute** 90:15

**minutes** 18:13
90:20,22

**mitigation**
66:12,18 67:8
68:25

**more** 14:3 17:5
42:21 53:17
54:18 73:12

**morning** 6:7

**Mount** 12:3

**move** 42:10

**Mr** 4:10,13 5:6
6:8 8:21 43:23
44:4,5,14,15
47:10 48:4,15
49:11,22 50:24
51:14 52:14,19,
21 58:20 63:8
65:2 66:5,9,10
68:20 81:20

82:17 87:9 90:14,21

**Ms** 4:2,5,12 5:9, 13,23 6:7 11:3, 10 12:21 13:2 18:22 19:17 21:11 22:13 23:5 25:4,16,22 26:10,16,22 27:5 28:15 29:9, 18 30:13 31:2 32:14,20 33:8, 17 34:2,10,16, 21 35:12,18,23 36:5,10,15,21 37:4,21 38:4,11, 18 40:6,13 41:3, 8,13 42:23 43:11,21 44:2,6, 9 45:22 46:5,13, 23 47:14,20 48:8 49:4,16 50:2,11,18 52:8, 18 53:5 54:2,10 55:11 56:15,22 57:22 58:15 59:20,25 60:9, 16,23 61:5,18, 23 62:10 63:2, 23 64:6,19,21 65:24 66:7,19 67:15 68:2,13 69:3,23 70:6,13, 22 71:15,20 73:6,14,24 74:14 75:4,18, 24 76:6,20 77:2, 14,20 78:7,12 79:15 80:16 81:17 82:6,17 87:15,22 88:9 89:9,15,21 90:19,23

**much** 41:25 55:22,24

**must** 78:10

**my** 4:5,14,25 6:7 7:8 9:15 20:18 34:6 50:20 60:11

———————

**N**

**name** 4:14 5:3 6:7 23:25 24:2

50:14 80:24

**names** 50:17 77:18 88:12

**nature** 19:22 32:5 80:7 82:14

**nearby** 7:15

**necessarily** 56:17 57:3 59:11

**necessary** 24:18

**need** 6:13,24 35:7 51:11 55:16,22,24 59:6

**needed** 23:13, 15,18,20 24:3 30:4 39:6,8,9 43:24 79:17

**needs** 55:21 72:17

**negatively** 65:22

**negotiate** 69:21

**negotiations** 49:24

**never** 43:8 81:19

**new** 4:19 5:10, 14,21 7:24 9:5, 6,10,12 11:9,22 12:17 20:23 29:16 30:3 50:6 61:16 76:4

**next** 51:9 66:2

**no** 6:2 7:2,11,14, 20 11:12 15:6, 12,13 18:18 19:19 21:6,16, 17,18,21 22:9, 12,19,25 23:7 26:12,18 28:4 30:6 31:4 32:10, 16,17,22 33:4 36:18,23 37:15, 16 38:20 39:15 42:19 43:6 44:25 46:15 48:14,24 50:4 51:13 59:7,22

60:18 61:7,14, 20 62:12,23 63:25 64:8 65:2 66:5 67:11 73:16,19 76:24 77:4,16 78:8

**nods** 6:21

**none** 81:9

**not** 6:12 7:16 18:12,15 23:14 24:4,5,6,21 25:9,20 26:15, 20 27:2,18 29:22,23 32:11 35:14,20 36:25 40:15 43:13,14, 17,18 44:8,12 46:15,24 47:22 48:10 49:5,17 52:10,15 53:9, 10,11 55:20 56:6,12,17,20 57:3,19,21 58:2 59:16 60:11 63:4,10 66:25 67:5,12,18,19, 22,25 68:4,15, 21 69:14 71:11 72:20,24 76:2,8 77:4,22 79:4,21 80:6,20 87:17, 24 89:6

**Notary** 5:19

**notations** 43:4

**note** 82:7,12 87:25

**notes** 18:10,16

**nothing** 17:12, 15 42:9 62:6 78:25

**Notice** 8:8,17,24

**now** 34:19 90:17

**number** 31:11 55:15 80:23 87:17

**numbers** 17:18 65:19 87:24

**numerous** 13:12,14 14:20

60:18 61:7,14,

———————

**O**

**objection** 11:3, 10 12:21 13:2 18:22 19:17 22:13 23:5 25:4, 16,22 26:10,16, 22 27:5 28:15 29:9,18 30:13 31:2 32:14,20 33:8,17 34:2,10, 16,21 35:12,18, 23 36:5,10,15, 21 37:4,21 38:4, 11,18 40:6,13 41:4,8,13 42:23 43:11 45:22 46:5,13 47:14, 20 48:8 50:2,11, 18 52:8 53:5 54:2,10 55:11 56:15,22 57:22 58:15 59:20,25 60:9,16,23 61:5, 18,23 62:10 63:2,23 64:6,19, 24 66:19 67:12, 15,25 68:2,13 69:3,23 70:5,6, 13,22 71:15,20 73:6,14,24 74:14 75:4,18, 24 76:6,20 77:2, 14,20 78:7,12 79:15 80:16 81:17 82:7,13 87:15,22 88:9 89:9,15,21

**objections** 25:3

**occasionally** 20:20

**October** 18:21

**off** 28:14 77:17

**offboarding** 10:5 13:23

**office** 9:16,23, 24 10:2 14:23 15:5,16,25 16:2, 3 45:3,7,14 46:18 73:5 89:3, 19 90:2,12

**office-based** 80:20 89:13

**officer** 21:10

**offices** 9:23

**oh** 39:23 69:19 88:24

**Okay** 8:5,20 15:18 19:14 31:5 43:19 44:4 51:11,14 52:19 59:8 90:14

**on** 8:17 14:4,7, 16 15:21 16:23 17:4,17 19:15 21:15 23:17 27:20 28:17,22 29:2,11,25 34:4 42:3,10 43:24 45:3,19 48:6 53:18,24 55:9 56:8,13,18,24, 25 57:5,25 59:17 62:8 64:14 66:3 67:3 71:3 72:8,9,10, 11,19 76:10,11 78:15,18 79:17 80:9 82:11 87:14 88:20

**onboarding** 10:5 13:22

**Once** 45:2

**one** 7:20 9:8 14:22 16:8,10 21:17,18,21 29:6 33:12 40:18,19 42:13 49:2 50:14,17 59:11,22 65:7 75:9 77:12 81:19 89:12 90:2

**ones** 40:9

**online** 24:14

**only** 27:12 76:13 87:20

**open** 45:15

**operation** 69:11

**operations** 53:18

**opinion** 26:13

**opportunity**

14:24 15:10

**option** 25:6
27:12,24 29:20
37:16 43:18

**options** 37:16

**order** 37:11

**organization**
88:20

**other** 10:4
27:14,22 28:21
30:7 32:2 37:16
41:22 59:9
66:12,17 67:7
68:25 71:9 74:9
76:3,9

**others** 74:12
75:13,17

**our** 27:22 29:23
33:20 45:14
62:5 63:18
65:15,16 76:11
82:7,13

**out** 32:8 38:24
42:16 70:2
72:21 82:2
88:15

**outlined** 37:6,7

**outside** 78:2,22,
24

**over** 7:18 17:6
49:24 50:9 90:5

**overall** 17:17

**overlooked**
17:16

**oversaw** 14:23

**oversee** 9:22
15:3 80:13

**overseeing**
15:14,15

**own** 28:22

**P**

**page** 64:14,15
74:5 77:23 80:9

**pages** 42:5
82:21

**panel** 61:17,22,
25 62:9 63:22
88:3,4

**paper** 31:17,23
32:7 42:5

**paragraph**
65:11,14 74:5,6
76:11 80:9

**paragraphs**
65:11

**parent** 67:21

**part** 48:6 62:4
81:21,25

**participate**
49:23 52:6
59:12 62:24

**participated**
59:17

**particular** 77:12
81:15,23

**particularly**
23:17 44:8
54:21 66:14

**parties** 4:16

**parts** 13:25

**past** 13:11

**pending** 7:2
45:10

**people** 15:24
22:5 23:20 24:5,
12,20,21 26:15,
20 27:21 28:19,
21,22 29:13
30:3 31:11,16
37:17 40:4,19,
24 41:16,21,22
42:4,5 47:8
54:15 55:15,17,
18,25 56:3,21
62:3 77:10
80:23,25 81:8

**perform** 65:5

**performed**
55:7,18

**period** 18:4 27:9
29:7 43:15
58:19 67:6,23
68:5

**permitted** 24:9
25:10 29:24
43:14,17 66:25
67:19,22 74:17

**person** 21:21
22:11 24:2,20
31:9 32:11 33:5
34:25 37:9,13
38:15 39:2 52:2
54:22 63:15
67:12,18 71:25
72:12 78:15,16
88:8,18

**person's** 16:21
17:19 72:20

**Personnel** 9:24

**perspective**
65:15

**phone** 7:15 81:7

**physically**
19:25 24:13

**piece** 31:22 32:7

**place** 16:15
17:14 27:12
31:19,22 38:2,7
40:2 42:10 54:7
88:7,16 90:5

**placed** 40:12
53:24 55:9
56:13

**placement**
55:16

**placements**
88:14

**places** 24:12
77:10

**plaintiff** 5:8
52:22 53:2 54:8,
13 75:8

**plaintiff's** 8:23
51:4,17 58:5,25
61:11 62:15

**plastic** 39:8

**play** 15:18 19:2

**please** 4:21 5:2,
25 6:14,19 47:5
82:3

**plumbing** 24:16

**point** 6:25 14:23
27:9,19 30:2,8
57:12 88:23
90:2

**policies** 14:2
76:5,9

**policy** 67:4,9,17

**pope's** 22:21

**portion** 42:13,
14,15 87:8

**poses** 76:15

**position** 26:25
62:16,18 63:18,
19 88:8

**positions** 71:24

**possible** 4:24
35:9 72:18
79:18

**practice** 4:9

**pre-k** 54:23

**prepare** 7:22

**prepared** 7:24
8:15

**present** 4:16
74:25 75:12

**presented**
74:10

**primary** 55:21

**principals**
23:24,25 81:3

**privilege** 47:4,
25 48:13 49:9,
20 52:16 63:7,
10 68:18

**privileged** 47:2,
24 48:12 49:7,
19 68:17

**probably** 18:24
42:17,19,25
47:7,8 52:5

**problem** 7:2
65:3

**proceedings**
59:13

**process** 16:9,
15 30:9 35:5

**produce** 82:2,3,
8

**produced** 82:16

**professional**
13:12 14:20

**program** 72:20

**programs**
70:16

**progressive**
13:23

**proper** 26:25

**protect** 23:15

**protection**
66:14

**provide** 4:23
53:11,15 56:5,9
66:13 76:19

**provided** 30:16
37:25 38:6

**providing**
16:11,17 17:22
22:7 23:10
46:10 76:12,25

**Public** 5:19

**purchase** 4:3

**purpose** 63:13

**pursuant** 56:19

**put** 7:19 24:12

**Q**

**qualified** 57:8

**Queens** 40:19

**question** 6:14,
16 7:2 26:24
63:11 66:2

**questions** 6:10
8:16 52:10

**R**

**random** 57:10

36:19,24 38:23
45:4 60:22
61:22 62:2 72:3
81:13 89:5

**rates** 66:15

**rather** 65:13

**reach** 7:16

**reading** 65:10

**realized** 17:4

**really** 21:17 31:13 55:2

**reapply** 31:21

**reason** 19:20 38:22 39:4 72:23

**reasonable** 61:16 72:5

**reasons** 37:11 64:13,16 65:8 71:19 75:10 87:14

**reassignments** 10:3

**recall** 30:15 36:7,12 54:5 58:17 60:25

**receive** 37:19 80:15

**received** 22:24 23:21,22 25:24 26:7 31:5 35:11 37:17,23,24 38:16 71:23 87:20 88:11 89:8,19

**receiving** 29:7

**recent** 53:21

**recess** 90:25

**recognize** 44:6, 16 51:21,23 59:5 61:9 62:14, 18,19

**recognized** 44:13

**recommendati ons** 33:25 78:20

**recommended** 34:14

**record** 5:25 52:20 65:25

**referenced** 78:14

**regarding** 8:9, 16 14:11,12,19, 21 16:4 18:10, 16,19 22:21,22 26:14 30:10,17 53:24 55:8 60:6 65:19 66:17,18 68:8,12,24 75:15,22

**regardless** 22:10

**regular** 69:7

**rehired** 28:24

**reinstated** 28:20

**related** 7:13 10:5 14:2 15:2 16:5 45:17

**relations** 9:16 10:2,6

**religion** 67:11

**religious** 14:12, 16 15:2 20:3,10 22:10 25:3,18, 19 29:14 30:24 31:6,12 32:5,13, 19,25 33:3 36:19 37:8,11, 18 40:8 43:10 46:3 52:3 53:12 64:4 67:11,25 70:4,5 73:13 87:14,21 89:8, 19

**religious-** 53:3

**religious-based** 52:24

**remain** 66:15 74:8 88:19

**remained** 70:16

**remember** 17:24 35:10,15 36:8 40:16

**remote** 24:12 71:24 72:21 81:10

**remotely** 4:16

24:16,17 70:11, 17,18,21 71:13 72:5,8 80:6

**removed** 37:14

**Renewed** 61:12

**rented** 40:17,21, 23

**repeat** 6:13

**rephrase** 6:13

**replace** 57:7

**reporter** 4:2,14, 15 6:20 41:2 65:9 73:20 76:23 82:20

**represent** 5:3

**representation** 52:12

**represented** 50:7

**representing** 5:8

**request** 32:9 36:19

**requested** 41:2 65:9 73:20 76:23

**requesting** 64:4

**requests** 36:3,4 45:19 73:11,17, 22 74:3

**requirement** 36:23 37:15

**research** 75:15

**resign** 27:13

**resignation** 28:5,23

**resigned** 27:25 28:8,11,22 29:5

**resource** 21:9

**resources** 13:6, 9,11,17 14:3 24:5 80:11

**respect** 16:16 34:19 52:11 63:4 66:11 82:9

**respond** 6:15

**responses** 6:19

**rest** 82:4

**result** 57:19 65:4

**return** 24:18,19 28:10

**review** 17:3,11 19:6 22:5 30:25 31:7 42:7,11 46:15,19 55:13

**reviewed** 8:2 20:13 32:3 33:21 34:6 35:3 42:17 43:3 44:19,24 46:12

**reviewing** 16:24 41:17 42:2,6

**right** 17:10,14 31:10,21 33:23 34:4 57:6,14 63:17 81:20 88:16 90:17,21, 23

**risk** 74:11 75:2, 12

**Rockaway** 10:19

**Rodi** 4:1,18 5:1, 17 6:1,7 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1,6 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1

**respond** 6:15

72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1

**role** 15:18 19:2 21:11 56:4,24 61:16 63:5 68:18 88:7

**roles** 55:16,17, 23 56:14,20

**rules** 30:9

**run** 23:13 24:3 27:16,17 29:21 79:19

**S**

**Sacred** 11:21

**safeguards** 74:9,24 75:11

**Safety** 9:25

**said** 12:9 20:13, 15 21:3,7 41:3 67:2,4 88:24

**same** 10:8 57:4 64:2 70:24

**SAMS** 87:25 88:2,5

**SAMS'** 87:12

**saw** 77:16 81:19 90:3

**say** 18:21 21:15, 17,18,22 27:25 48:16 55:2 72:16 74:19 78:17 79:5 80:22 88:18 89:23 90:2

**saying** 74:7 87:25

**says** 52:22 53:15 66:12 69:8 76:11 77:23 78:9 80:10

**Scheinman**

26:3,8 37:18
59:14

**Scher** 5:7

**school** 10:17,19
11:14,16,17,20,
24 12:10,19,24
14:17 23:12,14,
17,23 24:3,5,7,
9,16,19 27:16
30:5 38:3 67:6,
13,23 70:12
71:2,13 72:4,6,
9,14,21 73:4,8
74:8,11 75:13,
16 76:4,9 78:3,
19,20,25 79:2,
19 88:17,24

**school-based**
89:13

**schools** 27:16
65:23 69:13
75:23 78:2

**schoolteacher**
54:22

**science** 68:25

**scrambling**
77:10

**screen** 8:6,7
43:20,25 82:11

**scroll** 44:10

**second** 52:25
64:15 65:16
69:8,16,18 74:5
80:9

**see** 7:19 8:6,7
13:21 43:19
44:2 51:8,10,13
53:19 59:7 65:4
69:15 76:16
78:3 90:21

**seen** 8:12 59:9,
11

**seniority** 69:11

**sent** 45:13 52:2
53:8 88:12

**separate** 46:21
48:17 81:25

**separately** 82:3

**September**

10:7,11 18:3,20,
25 29:6 45:3,20
50:25 51:5,16,
18 58:7,9

**series** 6:10

**served** 8:9

**service** 26:4,9
37:19 59:15
90:6

**set** 81:6

**settings** 74:8

**seven** 71:9

**several** 9:22
18:7 45:24
77:16

**shares** 4:7

**she** 20:22 21:3,
7,8,15

**sheet** 42:5

**sheets** 31:17

**shield** 39:11

**should've**
26:21 29:15

**shouldn't** 82:15

**show** 8:5 61:8
62:13 82:10

**shown** 82:16

**sign** 77:17

**signed** 28:18,19
29:12 82:18

**similar** 10:11
21:14

**simply** 59:23
77:24 79:7

**Since** 9:19 10:7

**sincere** 29:14

**site** 39:15,22
54:9,16,19

**sites** 39:25 40:3

**sitting** 55:5

**situated** 7:7

**situations**
72:12

**small** 81:7

**social** 72:13

**SOLAS** 20:2
35:2 62:4

**some** 8:16
19:20 28:19,21
30:8 31:16 39:6
42:4,5 47:8
57:25 70:10,25
71:3 77:8 78:10
80:5 89:24

**somebody**
72:16

**someone** 21:19
28:10 32:18
33:2,25 54:24
57:7,16 78:23

**someplace**
55:6

**something** 6:11
11:5 19:20
31:15 32:4
37:15 39:11

**sometime** 18:4,
24 58:19

**sorry** 31:4 50:6
65:10 66:7

**sort** 39:6 57:25

**sought** 22:6
25:14 33:6,16
43:9

**South** 12:3

**space** 40:18
55:24 65:20

**SPARATE** 83:5
84:5 85:5 86:5
87:5

**speak** 65:12
75:20

**special** 70:16,
20 72:17

**specific** 19:6

**specifically**
40:21,23

**spend** 41:25

**staff** 55:22
56:13 65:21

69:13,22 74:11
75:13,17 79:18

**staffing** 24:4

**stamped** 66:4

**start** 10:20 17:2
28:12,13 33:14

**started** 15:13

**state** 5:2 65:8
69:9 76:4

**statement**
62:16,19 63:18
74:13

**statements**
22:21

**stating** 5:19

**status** 58:3

**stay** 4:22

**still** 25:12 27:11
34:15 39:6 57:5
71:8

**stop** 10:24 67:4

**stopped** 11:7

**Street** 5:20

**strike** 30:22
32:24 68:9

**students** 54:21
55:19 56:7 57:9,
25 70:10,15,20
79:23,24,25
80:3

**students'** 57:18

**studies** 12:8
72:13 75:21

**studying** 70:17,
21

**submit** 31:24
62:4 63:17

**submitted**
31:15 32:4
44:18 63:22
64:3

**submitting**
32:11 45:12

**subs** 57:10

**subsequently**

35:8

**substitute** 57:3

**such** 53:11 74:7
76:14

**suffer** 57:19

**Sullivan** 20:18,
22

**superintendent
's** 16:2

**supervisor**
21:3,8 50:21

**supervisors**
80:13

**support** 32:4
77:25 81:7

**supported** 62:2

**supporting**
80:24

**Supreme** 53:21

**sure** 7:21 17:11
31:9,14 32:3
42:8 44:14 45:7,
16 79:4 89:23

**suspended**
27:8 29:8 57:12

**suspension**
27:20 57:5

**swear** 5:4

**sworn** 5:18

**system** 23:12
24:3 27:13 28:2,
11 29:5 35:2

**systems** 69:11

---

**T**

---

**table** 88:20

**take** 4:17 6:15,
21,24 12:19,24
16:15 18:16
26:15,20 27:2
38:9 39:2 56:12
78:22 90:15

**taken** 14:20
18:10 90:25

**taking** 4:7 7:3

**talk** 19:9

**talked** 18:6

**talking** 19:10

**talks** 64:9

**teach** 10:16,18, 22 54:21 70:20

**teacher** 10:14 54:17,23 57:4, 20 58:3 71:6,8 78:24 89:8 90:9, 11

**teachers** 23:19, 22 27:15 30:4 41:7,12 56:18, 25 70:24,25 71:12 81:4 90:5

**teaching** 10:20, 24 11:2,7,13 71:9,12,24 72:13

**team** 10:4 33:20 34:6 80:25 88:13

**tell** 8:6 30:21 46:7

**ten** 71:6 90:20

**tenure** 13:24

**term** 78:2

**terminate** 28:2

**terminated** 26:21 27:3 28:7

**terms** 19:25 20:2 27:23 55:20 74:3

**tested** 25:11 43:16

**testified** 5:22

**testing** 24:25 43:8 74:10,25 75:3,11,15,22 76:5

**than** 32:2 42:21 53:17 73:13

**Thank** 4:12 41:5 47:6

**Thanks** 90:24

**that's** 4:8,10 57:3 62:5 63:19 64:13 65:7 66:9 79:21 80:7 90:19

**their** 5:3 23:20 27:3 28:22,25 29:15 31:15 32:9 37:12 53:13 54:19,20 55:4,5,21 56:20 57:6,14 67:3 70:24 71:5,6 78:2 79:21 80:5, 7,8,13 81:9 88:12,17,21

**them** 17:3,4 19:25 20:13 25:21,24 27:11, 13,18,20,25 28:3,6,8 29:2,25 31:20,23 38:24 39:9,13,21 40:2 45:12 46:19 53:11 54:19 57:7 72:4,6 73:12 80:21 88:4,16,24

**then** 5:4 27:9 29:3 31:18 32:2, 3,8 33:11 34:5 35:7 38:6 42:10 45:13 48:21 55:23 56:8 67:10 71:9 72:2, 6,15 74:20 88:2, 14,23

**there** 7:9 15:7, 24 17:12,15 18:10,13 19:19 21:22 22:16,20 23:2 25:7 26:13 27:9 30:2 32:10, 17,25 33:10,11 35:21 36:18,23 39:15 42:8,9 43:3,4 44:23 47:7 48:17 53:22 56:13 57:10,24 60:4 62:7 66:16,21 67:7,20 68:23 69:20 70:15 72:23 73:12 77:12,24 78:5,9 79:3,6,13 80:25

81:13 88:2 89:2

**there's** 6:11,25 27:19 28:9 29:2 66:5

**therefore** 53:13

**these** 21:24 55:23,25 56:5 59:18 64:16 65:10 78:5

**they** 5:3 8:2 17:13 22:6 25:7 27:7,8 28:5,8, 12,13,14,18,20 29:11 31:12,14, 20,24 32:3,8 33:24 34:4,14 35:2,3,4,5,6 37:19,23,24,25 38:6,8,9 39:3,5, 7,9 40:12 42:7 43:16,17 45:9 46:19 54:25 57:4,5,13 60:12 66:24 67:3,20, 21,22,24 68:4 70:24 72:2,7,23, 24 73:4,5,8 74:17,19 75:3,6 78:17,19,21,24, 25 79:14,20,22, 23,24,25 80:3, 22 81:6 88:11, 14,15,17,25 89:25

**they're** 55:2,4,5 88:19

**they've** 28:7

**thing** 39:19 44:11

**think** 18:3 19:22 29:13 42:22 82:8 90:16

**third** 65:17 69:17

**those** 17:7 23:16 25:2 26:6, 14 29:4 33:21 34:5 37:17 40:2, 4 43:9 47:19 50:16 55:17,18 56:9,10,14 58:11 70:20 71:18 73:2

77:18 81:5

**though** 28:7,8 34:13 39:10 78:6

**thought** 64:22

**thousand** 17:6 18:8 24:21 25:14,18 42:16, 17 54:15

**thousands** 16:25

**three** 10:23 17:6 24:20 25:13,18 39:25 41:20,21 42:16 54:14 64:14 71:7,10

**through** 35:2 37:18 44:10 60:21 62:4 81:12 82:22

**time** 18:5 20:14, 19 23:15 24:8 27:7,24 29:20, 24 41:25 57:8 77:5

**title** 9:14,15,18, 21,22 10:8 14:5, 8 21:8 23:21

**titles** 79:4 89:24,25

**today** 6:10 8:3

**today's** 7:22

**together** 16:3

**too** 88:4

**took** 14:17,18

**top** 64:5 77:23

**topics** 8:17 13:19

**Torrey** 58:24 59:2

**train** 80:12,21

**trained** 13:16, 19 14:7 81:5

**training** 13:5,8 14:4,10,12,15, 25 30:16 80:14

**trainings** 13:14

**transcript** 4:24 81:22 82:2,5

**transfer** 69:13, 22

**transmission** 66:15

**treat** 28:6,8 39:16,21

**treated** 28:4

**try** 11:5

**turn** 7:18

**two** 39:25 41:22 50:14,17

**type** 13:8 14:15 16:6 80:14

---

**U**

**UFT** 49:24 50:5, 9 69:21

**Uh-hum** 58:10

**unacceptable** 74:10 75:2,12

**under** 6:15 9:10 37:7,8 47:24 49:8

**understand** 6:11,17,22 7:3 19:12 26:24

**understanding** 4:6 27:22

**understood** 6:16

**undue** 16:12,17 17:8,23 18:20 20:5,10 21:24 22:8 23:11 24:22 46:4,11 53:16,24 54:7 55:8 56:8 64:11, 18 76:15

**unfortunately** 57:9

**unilaterally** 19:15

**unique** 62:20

**University**
11:18 12:10,13

**unmasked**
39:17,21,23

**until** 46:15
57:16

**unvaccinated**
29:22 74:8,21

**up** 81:6

**upon** 8:9 16:21
46:4

**used** 22:22 61:3

**usually** 4:9

---

**V**

**vaccinated**
23:14 24:8 25:9
39:3 43:14 67:5,
19 68:5 74:22
75:6

**vaccination**
57:13

**vaccine** 15:10,
12,19 16:5
22:22 23:3
26:15,21 27:3
38:9 39:3 44:21
49:25 50:10
56:12 68:12

**varied** 48:2

**Various** 48:2

**verbal** 6:20

**versus** 4:19

**very** 28:23

**Vicki** 20:19
21:2,25 50:20

**VII** 14:5,8

**vitally** 54:24

**vulnerabilities**
71:8

**vulnerable** 71:4

---

**W**

**walked** 28:21

**wall** 39:8

**want** 52:20
74:21

**wasn't** 21:25
25:6 39:13
54:12 74:22
79:12

**way** 28:19 43:3
44:23

**we're** 81:24 82:6

**well** 14:11 30:21
33:14

**went** 11:17 12:9
14:17 27:21
33:19 56:18

**were** 10:10 15:8
16:17,23 18:2,6,
10,13 19:14,23
20:10,14,16
21:24 23:14
25:9,13 27:8
29:5 30:16
31:12 32:23
33:10,11 34:5,7,
8,14,23 35:2,3,
5,11,16,21 36:4,
8,13 37:25 38:6,
9 39:3,5,14,16
40:2,9,11,12
41:6,11,16
42:12 43:4,16,
17 44:18 45:17
46:3,11,19 47:7
48:5 49:13
53:10 56:6,12,
20 57:5,13
60:12,20 61:15
64:16,22 66:25
67:5,7,21,22
68:4,6,10 69:6
70:10,15 71:12,
18 72:23 73:2,3,
4,8,12,22 74:4,
10 75:3,6 77:9
78:18 80:19,20
81:2,5 88:2 89:4

**weren't** 24:8,9
25:12 74:17

**what** 9:14,20
10:16 11:2,19,
23 12:5,7,12
13:8,19 14:15
15:18,22 16:6

21:8,11 22:10,
12 23:8 26:6
28:17 29:4,11
30:20 31:7 32:6,
23 35:6 38:24
39:19 40:11
45:4 46:19
50:16 56:25
61:2 63:13,19
67:11 74:14
78:15,24 80:14
82:10 88:16

**what's** 37:2
61:8 62:13

**whatever** 39:4
77:6

**when** 8:6 10:20,
24 15:3 16:4,22
17:21,24 19:9
22:16 27:25
30:23 31:5
37:13,24 43:19
45:20,25 48:16
51:8 58:11
62:21 66:14
75:2 81:11 82:2
88:5,11

**where** 7:6 10:18
11:16,19 12:2
18:4 27:10,19
28:13 30:3 37:9
40:11 45:4 46:2,
9 54:24 62:5
88:15

**whether** 19:3,
15 21:12,16
22:23 30:17
31:8 32:11,18
44:12 57:20
61:3 67:20
72:20,22

**which** 33:12,20
39:17 47:11
55:16,17,19
58:6

**while** 17:16
57:4,15 79:20

**who** 5:3 9:4 21:2
22:5 25:2,21
26:15,20 27:2
28:10,11 29:13
33:6 37:17 39:2
40:24 43:3,9,13
44:23 46:18

47:18 48:20
50:5 52:2,4
54:15 55:7,15
56:11 57:7,12
59:17 67:18
70:19 71:10,23
74:22 77:13
80:19 90:3

**who's** 20:16
78:23 88:7

**whole** 17:4
44:11 79:17

**wholly** 28:17
72:19 78:15

**why** 36:18 64:16
74:24 75:8
79:12 81:14

**with** 7:10,20
13:10 16:16
24:15 27:10
29:25 31:15
33:14 34:19
37:15,16 38:23
39:12,17 40:4,8,
15 45:21 46:9,
16 47:16 48:25
49:12,24 50:9
52:10 53:12
54:25 55:13
56:7 57:7 59:13
62:6 63:4,6
65:15,16,18
66:11,22,23
68:7,11,19 69:7,
21 71:5,10
72:14,16 74:9
76:9,13 79:25
80:3

**within** 7:16
11:15 13:15
14:24 26:13
48:18

**without** 27:13
30:25

**witness** 5:5
46:24 47:21
48:9 49:5,17
52:9 63:3 68:14

**wore** 67:3

**work** 6:2 21:4
27:8 28:10 38:2,
7,10 52:11 54:8
55:25 63:5

67:13 72:8,15
77:24 78:5,9,10,
22 79:3,6,7,14,
21,25 80:5,7,14
81:8,9 88:24
89:25

**worked** 9:11
13:10 38:23
67:20

**workers** 23:23
90:7

**working** 11:8
20:23 24:22
70:17 71:10
72:4

**works** 90:11

**would** 4:3 5:23
8:3 16:9,12,15
17:3,8 18:21
20:4 31:11 35:7
38:21,24,25
42:3,6,7,10
45:11,15,16
46:20 48:25
53:16 54:7,15,
18,20 55:8,15,
19,22,24 56:8
57:7,24 58:18,
19,21 63:15,19
64:11 65:4,12,
22 66:23 67:4
70:20,25 71:3,
25 72:2,3,7,8,9,
10 74:25 75:12,
16 78:21 80:21
87:24 88:12,14,
16,17,25

**would've** 24:22
33:2

**wouldn't** 72:17

**write** 78:19

**wrong** 31:19
42:9

**wrote** 32:8

---

**Y**

**yeah** 43:23 44:2
50:23 65:7
69:19 78:21
79:3,11

**year**  11:23 12:5,
  12 29:6 38:3
  70:12 71:14

**years**  9:13
  10:23 11:15
  13:11

**yes**  6:18,23 7:5
  8:11,14,19 9:3
  10:9,12,15
  11:15 12:11,16,
  18,23 13:4,7,18
  14:6,9,14 19:5,
  8,13,19 20:8,12,
  25 21:15 22:15
  26:5 33:19
  34:12,18 35:25
  36:17 41:10,24
  48:19 49:10,21
  51:22 52:18
  53:20 60:3
  71:17,22 76:17
  78:4 82:20
  89:17

**York**  4:19 5:10,
  14,21 7:24 9:5,
  6,10,12 11:9,22
  12:17 20:23
  29:16 50:6
  61:16 76:4

**you'd**  72:15

**you're**  50:12
  53:6 54:3 58:2
  63:10 82:10
  88:21

**you've**  82:18

**your**  6:19 7:15
  9:4,14,20 10:10
  11:13 12:7
  20:21 21:3,7
  26:25 34:7 45:3
  52:11 54:13,17
  58:3 62:20 63:5
  68:18 73:5
  82:11 88:20

―――――――

**Z**

―――――――

**Zoom**  48:6