# EXHIBIT A

UNITED SATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - x

LORRAINE MASCIARELLI,

          Plaintiff,

                    INDEX NO. 22-cv-7553

      -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION,

          Defendant.
- - - - - - - - - - - - - - - - - - - - x
(Pages 83 through 87 have been designated
 confidential in separate booklet)

                  March 25, 2025
                  10:20 a.m.

    VIRTUAL DEPOSITION of KATHERINE G. RODI, on behalf

of the Defendant herein, pursuant to Notice, taken

before Ceita Lazar, a Stenographic Reporter and

Notary Public within and for the State of New York.

            SANDY SAUNDERS REPORTING
        254 South Main Street, Suite 216
          New City, New York 10956
            (845) 634-7561

A P P E A R A N C E S:

          THE SCHER LAW FIRM, LLP
               Attorneys for Plaintiff
               600 Old Country Road
               Garden City, New York 11530
          BY:  AUSTIN GRAFF, ESQ.

          NEW YORK CITY LAW DEPARTMENT
               Attorneys for Defendant
               100 Church Street, New York
               New York 10007
          BY:  KATHLEEN LINNANE, ESQ.
                    - and -
               ANDREA MARTIN, ESQ.

          ALSO PRESENT:

               LORRAINE MASCIARELLI

F E D E R A L   S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

K. G. RODI

THE REPORTER: Ms. Linnane, would you like to purchase a copy?

MS. LINNANE: It's my understanding that the attorney taking the deposition shares a courtesy copy. That's how we usually practice.

MR. GRAFF: That's fine. I will do.

MS. LINNANE: Thank you, Mr. Graff.

THE REPORTER: My name is Ceita Lazar, court reporter. The parties are present remotely to take the deposition of Katherine Rodi In the Matter of Lorraine Masciarelli versus New York City Department of Education.

I ask that everyone please stay close to the microphone so that I can provide the best transcript possible and also so my interruptions will be minimal.

K. G. RODI

Will counsel please state their name, who they represent, and then I will swear in the witness.

MR. GRAFF: Austin Graff from The Scher Law Firm, representing the plaintiff.

MS. LINNANE: Kathleen Linnane, New York City Law Department for the defendant in this case.

MS. MARTIN: Andrea Martin, New York City Law Department for defendant.

KATHERINE G. RODI, having been first duly sworn by the Notary Public (CEITA LAZAR), and stating her address as 65 Court Street, Brooklyn, New York, 11201, was examined and testified as follows:

MS. LINNANE: We would like this to be marked confidential for the record, please.

K. G. RODI

Actually, no, it's her work address.

EXAMINATION
BY MR. GRAFF:

Q. Good morning, Ms. Rodi. My name is Austin Graff. I'm the attorney for Lorraine Masciarelli. I'm going to ask you a series of questions today. If there's something you don't understand or can't -- do not have an answer, if you need me to repeat or rephrase the question, please let me know. If you respond, I'll take it under belief that you understood the question. Do you understand that?

A. Yes.

Q. Please make all your responses verbal, because the court reporter cannot take head nods and hand gestures. Do you understand that?

A. Yes.

Q. If -- if you need to take a break at any point, as long as there's

K. G. RODI

no pending question, I have no problem taking a break.  Do you understand that?

A. Yes.

Q. Where are you currently situated?

A. At my home.

Q. Is there anyone else in the house with you?

A. No.

Q. Do you have any documents in front of you related to this case?

A. No.

Q. Is your cell phone nearby?

A. Within reach but not in front of me.

Q. I just ask if you turn it over or put it further away so you can't see it, so no one can communicate with you.

A. Sure.

Q. How did you prepare for today's deposition?

A. I was prepared by the New York City Law Department.  We met and

K. G. RODI

reviewed matters that they believe would be addressed today in this deposition.

Q. Okay. I'm going to show you -- tell me when you can see the screen?

A. I can see the screen.

Q. Is this the Notice of Deposition that I've served upon you regarding this deposition?

A. Yes.

Q. Have you seen this document before?

A. Yes.

Q. Are you prepared to answer questions regarding some or all of the topics identified on the Notice of Deposition?

A. Yes.

Q. Okay.

MR. GRAFF: I'm going to mark that Exhibit A.

(Plaintiff's Exhibit A, Notice of Deposition, was marked for identification.)

                    K. G. RODI

Q. Are you currently employed?

A. Yes.

Q. Who is your employer?

A. The New York City Department of Education in the City of New York.

Q. Are you employed by both entities or just one of the entities?

A. The Department of Education is under the City of New York.

Q. How long have you worked for the New York City Department of Education?

A. For 18 years.

Q. What is your current title?

A. My current title is executive director, Office of Employee Relations.

Q. And how long did you have that title?

A. Since 2012.

Q. What are your duties in that title?

A. In that title, I oversee several offices including the Office of Personnel Investigation, the Office of Safety and Health, the employee

K. G. RODI

relations, the Office of Disability Accommodations, the reassignments and arrest team, and manage other issues related to onboarding, offboarding, and employee relations matters.

Q. Since September 21 -- 2021, have you had that same title?

A. Yes.

Q. Were your job duties in September 2021 similar?

A. Yes.

Q. Have you ever been a classroom teacher?

A. Yes.

Q. What did you teach?

A. High school history and English.

Q. Where did you teach?

A. East Rockaway High School.

Q. When did you start teaching?

A. 1995.

Q. How long did you teach?

A. For three years.

Q. When did you stop teaching?

A. 1998.

K. G. RODI

Q. What made you leave teaching?

MS. LINNANE: Objection.

You can answer.

A. Decided to try something different.

Q. After you stopped teaching, did you immediately begin working for the New York City Department of Education?

MS. LINNANE: Objection.

You can answer.

A. No.

Q. After you ended your teaching, did you go back to school?

A. Within a few years, yes.

Q. Where did you go back to school?

A. I went to law school at American University.

Q. What -- where did you graduate high school?

A. Sacred Heart Academy in Hempstead, New York.

Q. What year did you graduate high school?

A. 1990.

K. G. RODI

Q. Where did you go to college?

A. Mount Holyoke College in South Hadley, Massachusetts.

Q. What year did you graduate?

A. 1994.

Q. What was your major?

A. American Studies.

Q. And you said you went to American University for law school?

A. Yes.

Q. What year did you graduate American University?

A. 2003.

Q. Are you a licensed attorney?

A. Yes.

Q. Are you licensed in New York?

A. Yes.

Q. In law school, did you take any classes in labor law?

MS. LINANNE: Objection.

You can answer.

A. I believe so, yes.

Q. In law school, did you take any classes in employment law?

K. G. RODI

Ms. LINNANE: Objection.

You can answer.

A. Yes.

Q. Do you have any training in human resources?

A. Yes.

Q. What type of training do you have in human resources?

A. I have worked with human resources for the past 18 years. I've attended numerous professional development courses, and I have attended -- and numerous trainings within the DOE.

Q. Have you trained employees in human resources?

A. Yes.

Q. What topics have you trained employees?

A. Let's see. Discipline accommodations, hiring, onboarding, offboarding, all progressive discipline, elements of tenure, elements of -- of leaves, parts about

K. G. RODI

the FMLA laws and policies related to human resources, and a lot more.

Q. Did you have any training on Title VII issues?

A. Yes.

Q. Have you trained employees on Title VII issues?

A. Yes.

Q. Do you have any training regarding -- well, do you have any training regarding religious discrimination?

A. Yes.

Q. What type of training do you have on religious discrimination?

A. I went to law school. I took classes in the First Amendment; I took classes regarding discrimination. I've also taken numerous professional development courses regarding discrimination, accommodation. At one point, I oversaw the Office of Equal Opportunity within the DOE. So I actually have extensive training in --

K. G. RODI

related to religious discrimination.

Q. When did you oversee the Department of Education's Equal Employment Office?

A. From 2019 -- no, 2018 to 2020 -- 2020, about there.

Q. Were you the director -- were you in charge of the equal employment opportunity during the COVID vaccine mandate implementation?

A. No. If the vaccine mandate started in '21, I was no longer overseeing it.

Q. Overseeing the Equal Employment Office?

A. Correct.

Q. Okay. What role did you play in the implementation of the vaccine mandate?

A. I was on the general committee.

Q. What does it mean, "the general committee"?

A. There was a group of people from HR, the chancellor's office, the health

K. G. RODI

office, the superintendent's office, the legal office that joined together when we made decisions to -- regarding the -- anything related to the vaccine.

Q. What type of decisions did the committee make?

A. The -- one of the decisions was the process of how employees would apply for exemptions. One was the determination that -- that providing exemptions would be an undue burden for the agency, the determination of how just elements of how the exemption process would take place.

Q. With respect to determining providing exemptions were undue burdens, was that a decision across the board, or was it an individualized decision made by the committee based upon a person's application?

A. It was both. First, the -- when we were making a decision on how to approach reviewing the applications, we already had thousands of applications.

K. G. RODI

So, from the start, we knew that we would have to review them or consider them on a whole.  And we realized that having 2,000 or more, and eventually it was over three thousand applications, if we granted those exemptions, that that would be an undue burden.

However, we also believed that each applicant deserved the right to have an individual review to make sure that there was nothing that we hadn't considered, that they had appropriately applied to the right place, and that there was -- that there was nothing that we had overlooked.  So while it was a decision overall based on the numbers that we already had, it was every person's application was looked at individually.

Q. When did the general committee determine that providing exemptions was an undue burden?

A. I don't remember exactly when, but it was -- we had -- if the

K. G. RODI

exemption applications were due in, I think, it was early September, it was sometime during that period where we already -- by the time we met and talked about how we were going to approach it, we already had several thousand applications.

Q. Did the general committee -- were there notes taken regarding the general committee meetings?

A. Not that I'm aware of.

Q. Was there -- were there minutes made of the general committee meeting?

A. Not that I'm aware of.

Q. Did you take notes regarding the general committee meeting?

A. No.

Q. So the determination regarding undue burdens was made September, October, would you say, of 2021?

MS. LINNANE: Objection.

You can answer.

A. Probably -- probably sometime in September.

K. G. RODI

Q. Did you have a role to play in determining whether to grant or deny exemptions?

A. Yes.

Q. Did you review specific applications for exemptions?

A. Yes.

Q. And when I talk about exemptions, I'm talking about exemptions from the COVID-19 mandate. Do you understand that?

A. Yes.

Q. Okay. Were you able to unilaterally decide on whether to grant or deny an exemption?

MS. LINNANE: Objection.

You can answer.

A. No. Yes and no. Yes, if there was something that was for some reason, I had the ability to do it. I don't think I did it due to the nature of how we were discussing all of the -- all of the applications. But we -- and I physically denied them in terms of in

K. G. RODI

the SOLAS.  But in terms of making the decision that -- that all religious exemption applications would be an undue burden, that was a group of us.

Q. And that group was the general committee?

A. Yes.

Q. And that was a decision that all religious exemptions were an undue burden?

A. Yes.

Q. And you said you reviewed them at the time you were discussing applications.  And you said "we." Who's "we" that were discussing applications?

A. My deputy, Mallory Sullivan; my boss at the time, Vicki Bernstein; and occasionally the law department.

Q. And your deputy, Mallory Sullivan, she -- is she currently working for the New York City Department of Education?

A. Yes.

K. G. RODI

Q. And Vicki Bernstein, who you said was your supervisor, does she currently work for the Department of Education?

A. No.

Q. And you said she was your supervisor. What title did she have?

A. The chief human resource officer.

Q. What role did Ms. Bernstein have in the determinations of whether to grant or deny exemptions?

A. Similar to mine.

Q. Did she have a final say on yes or no whether to grant an exemption?

A. No one really had a final say.

Q. If no one had a final say, how was someone either granted or denied an exemption?

A. Meaning, no one person had a final say. It was that -- that there was the determination from the general committee that these were an undue burden. So it wasn't that Vicki made

K. G. RODI

that decision, or I made that decision. It was that the decision had been made.

Q. And did the general committee review applications of people who sought exemptions before they decided that providing an exemption was an undue burden?

A. No.

Q. So regardless of what religious belief the person had, it was going to be denied no matter what?

MS. LINNANE: Objection.

You can answer.

A. Yes.

Q. Was there any discussions when examining an application about Catholic applicants?

A. No.

Q. Was there any discussion regarding the pope's statements regarding the vaccine in -- used to determine whether Catholic applicants received an exemption?

A. No.

K. G. RODI

Q. Was there a financial incentive granted to you to deny vaccine mandate exemptions?

Ms. LINNANE: Objection.

You can answer.

A. No.

Q. What was the basis for the general committee's decision that determined that providing exemptions was an undue burden to all applicants?

A. Because we had a school system to run, and kids needed to be back in school. And kids were not vaccinated at the time, and we needed to protect those children that came back to school. And we -- particularly on the lower level grades -- we needed teachers to be in the classroom, and we needed people to do their jobs. And we received applications from every title. We received it from teachers, from custodians, from school food workers, from principals, from assistant principals, from, you know, name the

K. G. RODI

person, name the job. And the fact is that we needed to run a school system, and we did not have the staffing resources to have people not in school buildings or not be able to go into school buildings, because, at that time, if you weren't vaccinated, you weren't permitted into school buildings.

So we didn't have the ability to put people in remote places, because we had kids physically in buildings. You can't -- you can't do online learning with little kids. You can't do plumbing remotely. You can't do school food remotely. So it was absolutely necessary for us to return kids to school, to return to education, to have people in person. And to have three thousand people or -- or that not working would've been an undue burden to the agency.

Q. Did the general committee consider testing and masking as an

K. G. RODI

accommodation for those who had religious objections?

MS. LINNANE: Objection.

You can answer.

A. It wasn't an option, because they -- the -- there was a mandate from the Department of Health that if you were not vaccinated, you were not permitted in buildings. So it didn't matter if you masked and tested. You still weren't allowed in the buildings.

Q. Were employees of that three thousand or how many sought exemptions granted accommodations?

MS. LINNANE: Objection.

You can answer.

A. Of the three thousand religious?

Q. Religious.

A. Not by the DOE.

Q. Who granted them?

MS. LINNANE: Objection.

You can answer.

A. If any of them received an exemption, it was from the arbitrator.

K. G. RODI

Q. The arbitrator, meaning Scheinman Arbitration Mediation Service?

A. Yes, correct.

Q. Do you know what basis those employees received an accommodation from Scheinman Arbitration Mediation Service?

MS. LINNANE: Objection.

You can answer.

A. I have no idea.

Q. Was there an opinion within the Department of Education regarding those people who did not take the vaccine?

MS. LINNANE: Objection.

You can answer.

A. No.

Q. Did the Department of Education believe that people who did not take the vaccine should've been terminated?

MS. LINNANE: Objection.

You can answer.

A. I don't understand the question.

Q. In your position, was it proper

K. G. RODI

for the employees who did not take the vaccine to be terminated from their employment?

MS. LINNANE: Objection.

You can answer.

A. At that time, they couldn't work, and they were suspended for a period. And then there was a point where we couldn't do anything with them, and the mandate was still in place. And the only option was had was to resign them from the system without any bias so that we could hire other teachers. Because, again, we had a school to run. We have schools to run, agency to run. But that was because we could not bring them into the building. And there's a point where you can't keep them on a suspension forever.

A lot of people went and got other jobs, to our understanding. But in terms of, you know -- it was the option that we had at the time.

Q. When you say you resigned them

K. G. RODI

from the system, do you mean terminate them?

    A. No. We -- it's treated as a resignation in that if they apply to come back, we don't treat them as though they've been terminated.  We treat them as though they resigned.

    Q. If there's an application to return to work from someone who was -- who was resigned from the system, do they have to start at the bottom level of employment, or can they start where they left off?

        MS. LINANNE:  Objection.

        You can answer.

    A. It wholly depends on what agreement they signed.  Everybody left in a different way.  Some people signed forms so that they could be reinstated.  Other people just walked away.  Some people resigned on their own before we did a group resignation.  So it's very individual.  If anyone is rehired, we have to, like, basically look for their

K. G. RODI

-- if there's an agreement on them and then act appropriately.

Q. What about those employees that were resigned from the system in September of 2022 after the one year period of receiving benefits and being suspended?

MS. LINANNE:  Objection.

You can answer.

A. Again, it depends on what they signed.  It's individual.

Q. Do you think the people who had sincere and genuine religious beliefs should've been fired from their employment from the New York City Department of Education?

MS. LINANNE:  Objection.

You can answer.

A. I -- the best option at the time was for us to run an agency.  We could not have unvaccinated employees come into our buildings.  That was not permitted at the time.  And we kept them on with benefits for as long as we

K. G. RODI

could.  And there was a certain point where we had to hire new people, because we needed teachers in the classrooms and custodians and school food and all of that.  And we had no other choice.

Q. At some point during the process, the City changed its rules regarding entertainers and athletes. How did that affect the Department of Education?

MS. LINNANE:  Objection.

You can answer.

A. I don't recall any effect.

Q. Were you provided any training regarding whether to determine whether to grant or deny an application for an exemption?

A. What do you mean?

Q. Well, did anyone tell you -- strike that.

When an application came for a religious exemption, was it automatically denied without review?

K. G. RODI

MS. LINNANE: Objection.

You can answer.

A. Sorry. No.

Q. Okay. So when you received an application for religious exemption, what did you review to make a determination whether to grant or deny?

A. We made sure that the person had appropriately applied in the right area. A number of people would check religious exemption, but they were really looking for a medical exemption.

We also made sure that they actually submitted something with their application, because some people included blank sheets of paper. And, then, if it was a medical -- if it was in the wrong place, we -- we immediately advised them so that they could reapply or reapply in the right place. If it was a blank piece of paper, we immediately advised them so that they could submit appropriate documentation.

K. G. RODI

And then, other than that, we then -- we reviewed to make sure they had submitted something to support, you know, that it was religious in nature. We didn't judge what it was. And even if it was just a piece of paper that they wrote out. And then we denied their request.

Q. So there was no examination of whether or not the person submitting the application had a bona fide religious belief?

Ms. LINANNE: Objection.

You can answer.

A. No.

Q. No, there was no consideration of whether someone had a bona fide religious belief?

MS. LINANNE: Objection.

You can answer.

A. No.

Q. What were you looking for -- strike that.

Was there any religious belief

K. G. RODI

that would've entitled someone to a religious exemption?

A. No.

Q. Was it different for a person who sought a medical exemption or a medical accommodation?

MS. LINNANE: Objection.

You can answer.

A. There were medical exemptions, and then there were medical accommodations. Which one are you asking about?

Q. Well, let's start with medical exemptions. Was it any different if anyone sought a medical exemption?

MS. LINNANE: Objection.

You can answer.

A. Yes. The medical exemption went to our medical team, which comprised of doctors, and the doctors reviewed those applications.

Q. Did the doctors have the right to grant or deny the exemption, or they just made recommendations to someone?

K. G. RODI

MS. LINNANE:  Objection.

You can answer.

A. They had the right to approve on a medical level, and then those were reviewed by -- by my team.

Q. And, to your memory, were any medical exemptions that were approved by a medical doctor denied?

MS. LINNANE:  Objection.

You can answer.

A. Yes.

Q. So even though the doctor recommended an exemption, they were still denied?

MS. LINNANE:  Objection.

You can answer.

A. Yes.

Q. Now, with respect to medical accommodations, how was that handled?

MS. LINNANE:  Objection.

You can answer.

A. Medical accommodations were handled like we do all accommodations. Medical -- that the person applied

K. G. RODI

through the SOLAS system.  They were given -- they were reviewed by medical to determine if they had a disability. They were given the interactive process to determine what accommodation they would need, and then that accommodation was subsequently implemented, if possible.

Q. Do you remember how many medical exemption applications were received?

MS. LINNANE:  Objection.

You can answer.

A. I do not.

Q. Do you remember how many medical exemption -- medical exemptions were approved?

MS. LINNANE:  Objection.

You can answer.

A. I do not.

Q. Were there any medical exemptions approved?

MS. LINNANE:  Objection.

You can answer.

A. Yes.

K. G. RODI

Q. Do you know how many accommodation requests -- medical accommodation requests were made?

MS. LINNANE:  Objection.

You can answer.

A. I don't recall.

Q. Do you remember how many were approved?

MS. LINNANE:  Objection.

You can answer.

A. I don't recall.

Q. Were any medical accommodations approved?

MS. LINNANE:  Objection.

You can answer.

A. Yes.

Q. Why was there no interactive process for a request for religious exemption?

MS. LINNANE:  Objection.

You can answer.

A. Because there was no requirement for an interactive process.  It was an exemption, not an accommodation.

K. G. RODI

Q. What's the difference between an exemption and an accommodation?

MS. LINNANE: Objection.

You can answer.

A. An accommodation is outlined under the ADA. It's also outlined under religious discrimination law, where a person is looking to get an accommodation for either medical or religious reasons in order to access their employment.

An exemption is when a person asks to be completely removed from something that is a requirement with no option -- with no other options.

Q. Those people who received religious exemptions through Scheinman Arbitration Service, did they receive an exemption or an accommodation?

MS. LINNANE: Objection.

You can answer.

A. They received an exemption.

Q. When they received an exemption, did they -- were they provided another

K. G. RODI

place to work or an accommodation

during that school year?

MS. LINNANE: Objection.

You can answer.

A. They were then provided an
alternate place to work.

Q. So it was -- so they didn't have
to take the vaccine, but they were
entitled to work?

MS. LINNANE: Objection.

You can answer.

A. That was the determination by
the arbitrator.

Q. So -- so the person was both --
received an exemption and an
accommodation for the exemption?

MS. LINNANE: Objection.

You can answer.

A. No, because the -- an
accommodation would mean that because
of the medical reason, that we had an
interactive process. We worked with
them to find out what would be best.
But a medical accommodation would be a

K. G. RODI

person who was able to take the vaccine, so they were vaccinated, but, for whatever reason -- for example, they were immunocompromised.  They still needed some sort of accommodation around the elements of COVID, that they needed, maybe, a plastic wall around them, or they needed to be masked even though, you know -- and have a face shield or something.

The -- with the exemptions, it wasn't about accommodating them.  We literally were directed to find an alternate site.  There was no, like -- we were able to treat the group unmasked, which you don't do with an accommodation.

Q. What was that last thing, you don't --

A. You don't treat them unmasked at that site --

Q. Oh, unmasked.

A. -- so we could -- we found, you know, two or three large sites, and we

K. G. RODI

were able to place them in those large sites.

Q. And those are the people with the medical exemptions?

MS. LINNANE: Objection.

You can answer.

A. With medical and religious, the ones that were granted by the arbitrator.

Q. Where were -- what locations were they placed?

MS. LINNANE: Objection.

You can answer.

A. I'm not familiar with all the exact locations. I just can't remember anymore. But I know that DOE rented space, like, one in Brooklyn, one in Queens, one in Manhattan for people to be located.

Q. And it was rented specifically for exemptions?

A. It was rented specifically for the people who had been granted exemptions by the arbitrator.

K. G. RODI

(Reporter requested clarification.)

MS. LINNANE:  I said,
objection.

You can answer.  Thank you.

Q. Were any of the medical
exemptions teachers?

MS. LINNANE:  Objection.

You can answer.

A. Yes.

Q. Do you know how many were
teachers?

MS. LINNANE:  Objection.

You can answer.

A. I don't know.

Q. How many people were involved in
reviewing applications for exemptions?

A. For the DOE?

Q. For the DOE.

A. Three.

Q. And that was the three people --
you and the other two people you
mentioned?

A. Yes.

Q. How much time did you spend

K. G. RODI

reviewing individual applications?

A. It would depend on the application.  Some people had half a sheet of paper, some people had pages. So it would just be reviewing -- we would review every document they attached just to make sure there was nothing in there that was in the wrong place, and then we would move on.

Q. Did each of you review each of the applications, or were you given a portion, and each one was given a portion?

A. Each of us had a portion.

Q. So out of the three thousand, you probably reviewed about a thousand applications?

A. No.  I probably did at least half.

Q. Did you do more than anyone else, do you think?

MS. LINNANE:  Objection.

You can answer.

A. Probably.

K. G. RODI

Q. Was -- from an application, was there a way of knowing who reviewed the application? Were there notations made?

A. No.

Q. And just to confirm, masking and testing was never considered as an accommodation for those who sought religious exemptions?

MS. LINNANE: Objection.

You can answer.

A. Again, anyone who was not vaccinated was not permitted in buildings. Period. So it didn't matter if they were masked and tested. They were not permitted in the buildings. It was not an option.

Q. Okay. Let me know when you see the screen.

MS. LINNANE: Austin, can you make it a little bigger?

MR. GRAFF: Yeah. I just needed to know that it came on the screen first.

K. G. RODI

MS. LINNANE: Yeah, I see it.

MR. GRAFF: Okay.

BY MR. GRAFF:

Q. Ms. Rodi, do you recognize this document?

A. Not particularly.

MS. LINNANE: I'm going to ask that we scroll through the whole thing, so we identify whether or not it's been recognized.

MR. GRAFF: Sure.

BY MR. GRAFF:

Q. Do you recognize this document?

A. It looks like many of the documents that were submitted.

Q. Do you know if you reviewed Lorraine Masciarelli's application for vaccine mandate -- vaccine exemption?

A. I don't know.

Q. Is there any way of knowing who reviewed her application?

A. No.

K. G. RODI

Q. Once this document came into your office on or about September 10, 2021, what was the process? Where did it go first?

A. It first came into the medical office. Medical made sure that the employee didn't have duplicate applications or that -- and they didn't have a pending leave or anything else that would -- that would automatically disqualify them from submitting an application. And then it was sent to our office.

We would open the application, and we would just make sure that all of the documents were related to the application.

Q. So the requests came in on or about September 10, 2021. When was the meeting with the general committee?

MS. LINNANE: Objection.

You can answer.

A. We had several meetings.

Q. So at the -- when was the

K. G. RODI

meeting where it was determined that all religious exemptions were going to be denied based upon an undue burden?

MS. LINNANE:  Objection.

You can answer.

A. I couldn't tell you.

Q. Before the meeting that was held with the general committee where it was determined that providing an exemption was an undue burden, were applications reviewed?

MS. LINNANE:  Objection.

You can answer.

A. No.  We did not review until we had a conversation with the law department and the general counsel's office as to how -- like, who was going to review them, how they were -- what the approach would be, et cetera.

Q. Was that separate or apart from the general committee?

MS. LINNANE:  I'm going to caution the witness not to disclose any information that

K. G. RODI

could be considered privileged, the discussions of attorney-client privilege, please.

Thank you.

A. It was probably -- there were probably fewer people at some of the meetings.

BY MR. GRAFF:

Q. Which meetings?  The general counsel and law department, or the general committee?

MS. LINNANE:  Objection.

You can answer.

A. With the general counsel and the law department.

Q. Who from the law department was at those meetings?

MS. LINNANE:  Objection.

I'm going to caution the witness not to disclose any information that could be considered privileged under the attorney-client privilege.

K. G. RODI

A. It varied. Various lawyers from the law department.

BY MR. GRAFF:

Q. Were any of the attorneys that are currently on this Zoom part of the law department meetings?

MS. LINNANE: Objection. I'm going to caution the witness not to disclose any information that could be considered privileged due to attorney-client privilege.

A. No.

BY MR. GRAFF:

Q. When you say "general counsel," is there a separate legal department within the Department of Education?

A. Yes.

Q. And who is -- who was the general counsel then?

A. Howard Friedman?

Q. Is he currently general counsel?

A. No.

Q. Would you meet with the law

K. G. RODI

department and general counsel in one meeting?

MS. LINNANE:  I'm going to caution the witness not to disclose any information that could be considered privileged under the attorney-client privilege.

A. Yes.

BY MR. GRAFF:

Q. And the meetings with the law department and general counsel were different from the meetings of the general committee that you described?

MS. LINNANE:  I'm going to caution the witness not to disclose any information that could be considered privileged due to attorney-client privilege.

A. Yes.

BY MR. GRAFF:

Q. Did you participate in the negotiations with the UFT over the implementation of the vaccine mandate?

K. G. RODI

MS. LINNANE: Objection.

You can answer.

A. No.

Q. Do you know who at the UFT -- sorry -- at the New York City Department of Education represented the Department of Education in the meetings with the UFT over the implementation of the vaccine mandate?

MS. LINNANE: Objection.

You can answer if you're able.

A. I could name maybe one or two, but I couldn't confirm.

Q. Do you know -- what are those one or two names that you know of?

MS. LINNANE: Objection.

You can answer.

A. Vicki Bernstein, my former supervisor, and the general counsel.

Q. Howard --

A. Howard Friedman, yeah.

MR. GRAFF: I'm just -- this document, dated September 10,

K. G. RODI

2021, I'm going to mark as Exhibit B.

(Plaintiff's Exhibit B, Document dated September 10, 2021, was marked for identification.)

Q. Let me know when you see the next document?

A. I see it.

Q. Okay. Do you need me to make it larger?

A. No. I can see it.

MR. GRAFF: Okay. I'm going to mark this Exhibit C. It's a September 21, 2021, email.

(Plaintiff's Exhibit C, Email dated September 21, 2021, was marked for identification.)

Q. Do you recognize this document?

A. Yes.

Q. How do you recognize this document?

A. This was the document that was

K. G. RODI

sent to any person who applied for a religious exemption.

Q. Who drafted this language?

A. Probably a group of lawyers.

Q. Did you participate in the drafting?

MS. LINNANE: Objection. I'm going to direct the witness not to answer any questions with respect to work you did in your representation of the DOE as a DOE attorney.

BY MR. GRAFF:

Q. Are you not answering because of the privilege?

A. Correct.

MS. LINNANE: Yes.

MR. GRAFF: Okay. I just want to clarify the record.

BY MR. GRAFF:

Q. It says that the plaintiff failed to meet the criteria for a religious-based accommodation. It's in the second line of the document.

K. G. RODI

How did the plaintiff fail to meet the criteria for a religious-based accommodation?

MS. LINNANE: Objection.

You can answer if you're able.

A. That was sent to all employees that all employees could not be able -- were not able to enter the building, and, as such, we could not provide them with a religious accommodation, and, therefore, we had to deny their entire application.

Q. It says that "to provide an accommodation would impose an undue hardship, ie, more than a minimal burden on the DOE and it's operations." Do you see that?

A. Yes.

Q. The recent Supreme Court decision in Groff, G-R-O-F-F, was there any analysis after that decision regarding the undue hardship placed on the DOE?

K. G. RODI

MS. LINNANE: Objection.

You can answer if you're able.

A. I don't recall.

Q. How was it determined that it would be an undue hardship to place this plaintiff at a different work site?

MS. LINNANE: Objection.

You can answer.

A. It wasn't determined about this plaintiff or your client. It was determined about all of the three thousand people who we would have to find an alternate site. And if, you know, your client is a teacher, it would be even more difficult to find a site for them. That their essential functions of their job would be to teach students and, particularly, if a person is an elementary schoolteacher or pre-k teacher or a gym teacher or someone where it's vitally important that they have to be with children,

K. G. RODI

it's really hard to say that they're meeting the essential functions of their job or that they're even doing their job if they're sitting in a building someplace else.

Q. Who performed the analysis regarding the undue hardship that would be placed on the Department of Education?

MS. LINNANE:  Objection.

You can answer.

A. That was a review with everyone involved, essentially, that looking at the -- the number of people who would need a placement, the roles in which those people -- the roles in which those people performed, the -- the cost at which it would be for the students and, you know, in terms of not getting their primary needs and education.  How much staff we would need to find to cover all of these roles.  And then how much space we would need to find for these people to work.  So that involved

K. G. RODI

doing an analysis from a lot of different people.  And we determined that it was the role of the agency was to provide education and that if these folks were not able to be in the building with -- around students, that it would then become an undue burden on the agency to provide those exemptions.

Q. So those -- do those employees of the Department of Education who decide not to take the vaccine and were placed on leave, there was staff found to fill those roles, correct?

MS. LINNANE:  Objection.

You can answer.

A. Not necessarily.

Q. So the teachers that went on leave pursuant to the arbitration award, their roles were not filled by people at the DOE?

MS. LINNANE:  Objection.

You can answer.

A. It depended on the role, depended on what teachers we could

K. G. RODI

find.  We may have been filled by a substitute, but that's not necessarily the same as a teacher.  And while they were on suspension, they still had a right to their jobs.  So we couldn't replace them with someone who would be qualified at that time.  So, unfortunately, students had, you know, like, random subs in there.  And, you know, we couldn't -- if -- at any point, if anybody who was suspended got the vaccination, they were entitled to come right back to their job.  So we kind of just filled in for a while and -- until someone either made the determination to leave.

Q. Did the students' education suffer as a result of that, not knowing whether a teacher was coming back or not?

MS. LINNANE:  Objection.

You can answer.

A. I would assume that there would be some sort of effect on students if

K. G. RODI

you're not clear as to, like, the status of your teacher.

Q. So the -- going back to the exhibit, the plaintiff's application, which is Exhibit B, was dated September 10, 2021, and the denial of the accommodation was dated September 21, 2021?

A. Uh-hum.

Q. In those 11 days, was that when the decision was made to -- by the general committee to deny all exemptions?

MS. LINNANE: Objection.

You can answer.

A. Again, I don't recall the exact date, but that would -- I would assume it would be sometime in that period.

MR. GRAFF: Exhibit D is --
I mean, Exhibit C would be the email?

Exhibit D is the Julie Torrey arbitration decision.

(Plaintiff's Exhibit D,

K. G. RODI

Julie Torrey Arbitration Decision, was marked for identification.)

Q. Do you recognize this document? Do you need me to make it bigger?

A. No, I can see it.

Q. Okay.

A. I mean, I've seen other arbitration decisions. I don't know that I've necessarily seen this one.

Q. Did you participate in the arbitration proceedings with the Scheinman Arbitration Mediation Service?

A. I did not.

Q. Who participated on behalf of the Department of Education in these arbitrations?

MS. LINNANE: Objection.

You can answer.

A. No one.

Q. So it was simply the application and the arbitrator?

MS. LINNANE: Objection.

K. G. RODI

You can answer.

A. Yes.

Q. Was there any communications between the department of education and the individual arbitrators regarding the general committee's decision to deny all exemptions?

MS. LINNANE:  Objection.

You can answer.

A. Not to my knowledge.

Q. Were they aware -- were the arbitrators aware of the decision by the general committee to deny all exemptions?

MS. LINNANE:  Objection.

You can answer.

A. I have no idea.

Q. Do you know how many applications for exemptions were granted through the arbitration process?

MS. LINNANE:  Objection.

You can answer.

A. I don't recall.

K. G. RODI

Q. Do you know what criteria the arbitrator used to determine whether to grant or deny an exemption?

MS. LINNANE:  Objection.

You can answer.

A. I have no idea.

Q. I'll show you what's going to be marked as Exhibit E. Do you recognize this document?

(Plaintiff's Exhibit E, Renewed application, was marked for identification.)

A. No.

Q. Were you -- did you have any role in the City of New York reasonable accommodations appeals panel?

MS. LINNANE:  Objection.

You can answer.

A. No.

Q. Are you aware of the appeals panel process?

MS. LINNANE:  Objection.

You can answer.

A. I'm aware of the panel.  I'm

K. G. RODI

aware that we supported the process by -- by, like, allowing people to submit part of it through SOLAS. But that's where our involvement ended. We had nothing else to do with it.

Q. Was there anyone from the Department of Education on the appeals panel?

MS. LINNANE: Objection.

You can answer.

A. I have no idea.

Q. I show you what's marked Exhibit F. Do you recognize this document?

(Plaintiff's Exhibit F, Position Statement, was marked for identification.)

A. I recognize that it's a position statement. I don't, like, recognize it unique to your client.

Q. Do you know when this document was created?

A. No idea.

Q. Did you participate in the drafting of the document?

K. G. RODI

MS. LINNANE:  Objection.
I'm going to direct the witness not to answer with respect to any work that you did in your role as an attorney with the DOE due to attorney-client privilege.

BY MR. GRAFF:

Q. And due to the attorney-client privilege, you're not answering the question, correct?

A. Correct.

Q. Do you know what the purpose of this document was created for?

A. I would assume that if a person was appealing a determination by this agency, that we had the right to submit a position statement about our position.  So that's what I would conclude.

Q. Do you know if this document was submitted to the appeals panel?

MS. LINNANE:  Objection.
You can answer.

A. I have no idea.

K. G. RODI

Q. Do you know if this is the same document that was submitted for anyone requesting a religious exemption except for the top four lines of the document?

MS. LINNANE:  Objection.

You can answer.

A. I have no idea.

Q. So, in this document, it talks about "the DOE granting an exemption to this employee would create an undue hardship for the DOE for the following reasons."  And that's the bottom of the first page, and it has three bullets on to -- the second page.

Were these the reasons why the general committee believed it was an undue burden --

MS. LINNANE:  Objection --

Q. -- to grant the exemption?

MS. LINNANE:  Apologies.  I didn't -- I thought you were done.

Objection.

You can answer.

K. G. RODI

MR. GRAFF: It's fine. No problem.

A. Let's see. "It would result in the inability of an employee to perform the essential functions of the job." Yeah. I mean, that's one of the reasons. "State law --

(Reporter requested clarification.)

A. Sorry, I'm just reading these paragraphs. So the first paragraph would be -- I'll speak in generalities, rather.

The first paragraph is consistent with our perspective. The second is consistent with our limitations. And the third is consistent with the concern that we have regarding the numbers, the ability to find space, the ability to hire appropriate staff, and the cost that it would have that would negatively impact schools.

MS. LINNANE: Can we just mark for the record before you go

K. G. RODI

to the next question that this is the bullets on -- it's Bates stamped DEFS 000554.

MR. GRAFF: There's no S in it, but it's DEF as in Frank.

MS. LINNANE: DEF. Sorry. DEF.

MR. GRAFF: That's fine.

BY MR. GRAFF:

Q. So with respect to the first bullet, it says, "other mitigation measures provide insufficient protection particularly when transmission rates remain high."

Was there any analysis by the Department of Education regarding other mitigation measures regarding COVID-19?

MS. LINNANE: Objection.

You can answer.

A. There was constant conversations with the Department of Health. We would have consulted with the Department of Health and, again, they were not permitted in the building. It

K. G. RODI

doesn't matter.  Even if you said that if they wore a cone on their head that that would stop, the policy said if you were not vaccinated, you could not enter a school building.  Period.  So it didn't matter if there were other mitigation measures.

Q. So it was the policy of the City and then the Department of Education that no matter what religion, religious objection, anything, a person was not going to be able to work in a school building?

MS. LINNANE:  Objection.

You can answer.

A. The policy of the Department of Health was that a person who was not vaccinated was not permitted in a building, whether they worked there or were a parent or were -- they cleaned the basement.  They were not permitted in a school building.  Period.

Q. And it didn't matter if they had a religious objection or not?

K. G. RODI

MS. LINNANE: Objection.

You can answer.

A. Again, if they were not vaccinated. Period.

Q. Were you involved in any conversations with the Department of Health regarding the mandate after -- strike that.

Were you involved in any conversations with the Department of Health regarding the vaccine mandate?

MS. LINNANE: Objection. I'm going to caution the witness not to disclose any information that could be considered privileged due to attorney-client privilege in your role as an attorney with the DOE.

MR. GRAFF:

Q. Are you not answering?

A. Correct.

Q. Was there an analysis by the Department of Education regarding the science behind other mitigation

K. G. RODI

measures?

MS. LINNANE: Objection.

You can answer.

A. Again, we have a Department of Health and health advisers that we were in regular contact with.

Q. The second bullet says that "state law and applicable collective bargaining agreements, including the operation of seniority systems, generally limit DOE's ability to transfer staff between schools except in limited circumstances not applicable here." Do you see that?

A. In the second bullet or the third bullet?

Q. Second bullet.

A. Oh, yeah. Yeah, yeah.

Q. Was there any effort by the DOE to negotiate with the UFT to grant the DOE flexibility to transfer staff?

MS. LINNANE: Objection.

You can answer.

A. I don't know.

K. G. RODI

Q. Do you know how many out of the approximately 3,300 applicants for religious exemption actually had a bona fide religious objection?

MS. LINNANE: Objection.

You can answer.

A. We didn't make that determination.

Q. Were some of the students learning remotely during the '21, '22 school year?

MS. LINNANE: Objection.

You can answer.

A. I believe there were students in special ed programs that remained working remotely -- I mean, studying remotely.

Q. And how was it determined who would teach those special ed students studying remotely?

MS. LINNANE: Objection.

You can answer.

A. They had their same teachers that -- just some of the teachers would

K. G. RODI

come into school and -- because the --

some of the kids -- it would depend on

the kid and if a kid was vulnerable

with their health.  But maybe, like,

the teacher had ten kids in their

class, and three had health

vulnerabilities.  The teacher was still

teaching the other seven kids and then

was working with the three kids who

could not come into the buildings.

Q. Were any teachers teaching

remotely during the '21, '22 school

year?

MS. LINNANE:  Objection.

You can answer.

A. Yes, a few.

Q. Were those because of

accommodations for health reasons?

MS. LINNANE:  Objection.

You can answer.

A. Yes.

Q. How was it decided who received

remote teaching positions?

A. Each person would apply for an

K. G. RODI

accommodation.  They would -- then we would do the interactive process, and if the school could manage them working remotely, that that was a reasonable accommodation for them, then the school would make a decision that they would work remotely.  It would depend on the school; it would depend on the level.  It would depend on the job; it would depend on, you know -- in certain situations, the person might be teaching English and social studies in a middle school with a co-teacher.  So that might work.  But then you'd have somebody, say, like, first graders with special needs.  That wouldn't be possible.

So it was wholly dependent on the person's program and whether or not the school could figure out a remote accommodation.  And, of course, whether they were -- there was a medical reason that they couldn't come in, not -- that was already determined.

K. G. RODI

Q. Was that -- were those medical accommodation -- accommodations, were they made at the school level, or were they done in your office?

MS. LINNANE: Objection.

You can answer.

A. They were done at the school level.

Q. The medical accommodation requests, both accommodations and exemptions, were there more of them than religious exemptions --

MS. LINNANE: Objection.

You can answer.

A. No.

Q. -- requests to medical accomodation?

A. No.

(Reporter requested clarification.)

Q. Do you know how many medical accomodation or exemption requests were made?

MS. LINNANE: Objection.

You can answer.

K. G. RODI

A. I don't know.  I believe it was, like, half.  In terms of requests, I don't know how many were granted.

Q. The second paragraph of page DEF 000554, at the bottom of the paragraph saying "allowing such employees to remain in school settings unvaccinated even with other safeguards like masking and testing were presented unacceptable risk to school children, staff, and others."  What is the basis for that statement?

MS. LINNANE:  Objection.

You can answer.

A. I don't know.  I mean we had -- they -- they weren't permitted in the building.  And, I mean, you could also say that they -- that, you know -- the argument then was that we had unvaccinated kids.  And we didn't want anyone who wasn't vaccinated around the kids.

Q. But why address safeguards like masking and testing would present an

K. G. RODI

unacceptable risk when it didn't matter

if they were masking and testing?

MS. LINNANE:  Objection.

You can answer.

A. Because they were vaccinated.

Q. The letter explains -- this

letter explains why the plaintiff was

denied an exemption.  And one of the

reasons that is in this letter is that

safeguards like masking and testing

would present an unacceptable risk to

school children, staff, and others.

Did the Department of Education do any

research regarding masking and testing

and how it would affect school

children, staff, and others?

MS. LINNANE:  Objection.

You can answer.

A. I can't speak to that.

Q. Are you aware of any studies

done regarding masking and testing in

schools?

MS. LINNANE:  Objection.

You can answer.

K. G. RODI

A. I'm not.

Q. Are you aware that all other school districts in New York State had masking and testing policies?

MS. LINNANE:  Objection.

You can answer.

A. I didn't -- I'm not familiar with other school policies.

Q. The first line on this last paragraph on 554 says, "Our experience in providing exemptions in accordance with the arbitration award has only confirmed that creating such alternative assignments poses an undue hardship."  Do you see that?

A. Yes.

Q. The Department of Education didn't provide any exemptions, correct?

MS. LINNANE:  Objection.

You can answer.

A. Correct.

(Reporter requested clarification.)

Q. So you had no experience in providing exemptions, correct?

K. G. RODI

MS. LINNANE: Objection.

You can answer.

A. No, not correct. Because by the time it got to the central committee or the central appeals board or whatever it was, we had already had -- the arbitrator had already approved some that we had denied. So we were already scrambling to find places for people to be.

Q. Was there one particular arbitrator who granted exemptions?

MS. LINNANE: Objection.

You can answer.

A. No. I saw several arbitrators sign off.

Q. Do you know the names of those arbitrators?

MS. LINNANE: Objection.

You can answer.

A. I do not.

Q. The top of page DEF 000555 says, "There was simply limited work available for employees to support

K. G. RODI

their schools long term from outside the school building."  Do you see that?

A. Yes.

Q. There was work for these employees, though, correct?

MS. LINNANE:  Objection.

A. No.  No.

Q. It says "limited work," so there must have been some kind of work, correct?

MS. LINNANE:  Objection.

You can answer.

A. Again, as I referenced before, it wholly depended on what the person was doing.  So if a person was, like, say, a guidance counselor, and they were a guidance counselor on the high school level, and they had to write high school recommendations for college, yeah, they would have limited work to do outside.  But if you take someone who's, like, a kindergarten teacher, what are they doing outside of a school?  Nothing.  They have to be in

K. G. RODI

the school.

So, yeah, was there limited work for certain titles?  Sure.  But not -- it doesn't say each employee has limited work.  It's like there is simply limited work available for employees.

Q. So, for example, the guidance counselor that you cited --

A. Yeah.

Q. -- why wasn't a guidance counselor granted an exemption if there was limited work that they could do?

MS. LINNANE:  Objection.

You can answer.

A. Because on the whole, we needed as many staff as possible, because we had to run a school.  And a guidance counselor, while they may have limited work, that's not their job to just do that.  They have to be available for students.  They have to be available to meet students.  They have to be available to work with students.  They

K. G. RODI

have to be able to have confidential conversations with students. They have -- the essential functions of their job may -- some of their work may be able to be done remotely but not all of their work. That's the nature of their job.

Q. The second paragraph on page 555 at the bottom, it says, "Accordingly, additional resources have been diverted to train the exempted employees and assign supervisors to oversee their work." What type of training did exempted employees receive?

MS. LINNANE: Objection.

You can answer.

A. I know that we had a few employees that were exempted who had jobs that were not office-based jobs, so we would have to train them in, like -- like, let's say they -- we had a number of the exempted people supporting the -- I forget the name of it. There was this team of people that

K. G. RODI

were -- that were basically like a COVID hotline for principals. And a bunch of exempted teachers -- I mean, employees were trained to answer those calls. So I know that they set up a small phone bank to support that for the people that we had to find work for, because none of their work could be remote.

Q. Did -- when an employee was granted an exemption through the arbitration process, was there an explanation given to the DOE why this particular employee was granted an exemption?

MS. LINNANE: Objection.

You can answer.

A. I never saw one.

MR. GRAFF: All right. I'm going to mark this part of the transcript "Confidential," because this particular exhibit is confidential. So we're going to separate this part of the

K. G. RODI

transcript out when you produce it.  Please produce it separately and apart from the rest of the transcript.  Is that acceptable?

MS. LINNANE:  We're going to note our objection.  I don't think it's essential to produce it in any respect.  But I will -- I know what you're going to show on the screen given your discussions.  But we will note our objection, due to the confidential nature of this document, that it shouldn't be shown or produced.

MR. GRAFF:  And, Ms. Lazar, you've signed the confidentiality agreement?

THE REPORTER:  Yes.

(The following pages 82 through 87 have been designated confidential.)

K. G. RODI

CONFIDENTIAL IN SPARATE BOOKLE

K. G. RODI

CONFIDENTIAL IN SPARATE BOOKLE

K. G. RODI

K. G. RODI

CONFIDENTIAL IN SPARATE BOOKLE

K. G. RODI

CONFIDENTIAL IN SPARATE BOOKLE

K. G. RODI

K. G. RODI

CONFIDENTIAL IN SPARATE BOOKLE

(Conclusion of confidential portion)

MR. GRAFF: Let's go to this exhibit. I guess this is Exhibit H --

Q. Are you aware that SAMS' arbitrator granted 164 COVID exemptions based on religious reasons?

MS. LINNANE: Objection.

You can answer.

A. I was not aware of the number.

Q. Are you aware that the Department of Education has disclosed that only 145 employees received a religious exemption?

MS. LINNANE: Objection.

You can answer.

A. I would not know the numbers. To note that the -- the SAMS saying --

K. G. RODI

there were SAMS, and then there was the panel. So I don't know if anyone got them from the panel too.

Q. When SAMS granted an accommodation -- an exemption, excuse me -- who's role was it to place the person into a position?

MS. LINNANE: Objection.

You can answer.

A. When they received an exemption, their names would be sent to the central -- the team that was handling the placements. And they would then figure out where they lived, figure out what would be the right place for them to be. They would call their school and say, hey, this person has an exemption, so they're going to remain on your table of organization. And you're going to keep doing their attendance and all of that.

And then, at that point, if the school said, oh, we have work for them, they would -- they would arrange that.

K. G. RODI

But it was all -- there was a central group in the office that handled it.

Q. Were you involved in that process?

A. I was not.

Q. Do you know if any classroom teacher received a religious exemption?

MS. LINNANE: Objection.

You can answer.

A. I believe so.

Q. And that was one of the either school-based or DOE office-based accommodations?

MS. LINNANE: Objection.

You can answer.

A. Yes.

Q. Do you know if any DOE central office employees received a religious exemption?

MS. LINNANE: Objection.

You can answer.

A. I -- I can't say for sure, because some titles are education titles, but they work in a central

K. G. RODI

office.  I will say that, at one point, I saw, like, a list of everybody who had gotten an accommodation, and it was all over the place.  It was teachers, guidance counselors, food service workers, like, custodians, central -- like, it was -- but it could be -- for example, it could be, like, a teacher assigned got an exemption.  But a teacher assigned works in a central office, so I couldn't -- I mean, it was -- I looked at the list briefly.

MR. GRAFF:  Okay.  I'm going to take a five- minute break.  I think I'm almost done.  But I'm going -- right now, it's 11:54. Let's come back at, like, 12:05.

MS. LINNANE:  That's fine. Ten minutes is great.

MR. GRAFF:  All right.  See you in a few minutes.

MS. LINNANE:  All right. Thanks.

(A recess was taken.)

K. G. RODI

MR. GRAFF:  I just have one other question.

BY MR. GRAFF:

Q. Ms. Rodi, do you know if any religious exemptions were granted by the appeal panel?

MS. LINNANE:  Objection.

You can answer.

A. I have no idea.

MR. GRAFF:  I don't have any other questions.

(Time noted: 12:06 p.m. )

K. G. RODI

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

                    K. G. RODI

              A C K N O W L E D G E M E N T

STATE OF NEW YORK)

                    :SS

COUNTY OF _____)

   I, KATHERINE G. RODI, hereby certify

that I have read the transcript of my

testimony taken under oath on

March 25, 2025, that the transcript is a

true, complete and correct record of

what was asked, answered and said during

my testimony under oath, and that the

answers on the record as given by me are

true and correct, except for the

corrections or changes in form or

subsTtance, if any, noted in the

attached Errata Sheet.

                    _____

                         KATHERINE G. RODI


Signed and subscribed to

before me, this _____ day

of _____, _____.

_____

     Notary Public

                    K. G. RODI

                I   N   D   E   X



EXAMINATION                        6

BY MR. GRAFF:



(Plaintiff's Exhibit A,        8

Notice of Deposition, was

marked for identification.)


(Plaintiff's Exhibit B,        51

Document dated September 10,

2021, was marked for

identification.)


(Plaintiff's Exhibit C,        51

Email dated September 21, 2021,

was marked for identification.)


(Plaintiff's Exhibit D,        58

Julie Torrey Arbitration

Decision, was marked for

identification.)

K. G. RODI

(Plaintiff's Exhibit E,                61
Renewed application, was marked
for identification.)

(Plaintiff's Exhibit F,                62
Position Statement, was marked
for identification.)

(Pages 82 through 87 have been
designated confidential)

C E R T I F I C A T E

I, CEITA LAZAR, a stenographic reporter and Notary Public within and for the State of New York, do hereby certify:

That the witness(es) whose testimony is hereinbefore set forth was duly sworn by me, and the foregoing transcript is a true record of the testimony given by such witness(es).

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

_____

CEITA LAZAR
Dated:  April 9, 2025

Errata Sheet

NAME OF CASE: LORRAINE MASCIARELLI -against- NEW YORK CITY DEPARTMENT OF EDUCATION

DATE OF DEPOSITION: 03/25/2025

NAME OF WITNESS: KATHERINE G. RODI

Reason Codes:

1. To clarify the record.

2. To conform to the facts.

3. To correct transcription errors.

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

Page _____ Line _____ Reason _____

From _____ to _____

_____

**Exhibits**

**Ex A -**
 **Katherine Rod**
**i deposition no**
**tice_marked**
 8:22,23 94:9

**Ex B - Plainitff'**
**s Application_**
**marked** 51:3,4
 58:6 94:13

**Ex C - 9-21-**
**21 Denial of Ac**
**commodation_**
**marked** 51:15,
 17 58:21 94:18

**Ex D -**
 **Torrey Arb aw**
**ard_marked**
 58:20,23,25
 94:22

**Ex E - 5 - 11-**
**19-2021 -**
 **Renewed appli**
**cation_marked**
 61:9,11 95:3

**Ex F -**
 **NYC DOE Posi**
**tion Statement**
**-- 553-555_**
**marked** 62:13,
 14,15 95:6

**Ex G -**
 **Redact Confid**
**ential List (**
**just page 1)_**
**marked**

**0**

**000554** 66:4
 74:6

**000555** 77:23

**1**

**10** 45:3,20 50:25
 51:5 58:7

**11** 58:11

**11201** 5:21

**11:54** 90:17

**12:05** 90:18

**145** 87:20

**164** 87:13

**18** 9:13 13:11

**1990** 11:25

**1994** 12:6

**1995** 10:21

**1998** 10:25

**2**

**2,000** 17:5

**2003** 12:14

**2012** 9:19

**2018** 15:6

**2019** 15:6

**2020** 15:6,7

**2021** 10:7,11
 18:21 45:4,20
 51:2,6,16,19
 58:7,9

**2022** 29:6

**21** 10:7 15:13
 51:16,18 58:9
 70:11 71:13

**22** 70:11 71:13

**3**

**3,300** 70:3

**5**

**554** 76:11

**555** 80:9

**6**

**65** 5:20

**8**

**82** 82:21

**87** 82:22

**A**

**A** 90:25

**ability** 19:21
 24:11 65:19,20
 69:12

**able** 19:14 24:6
 39:2,16 40:2
 50:13 53:7,9,10
 54:4 56:6 67:13
 80:2,6

**absolutely**
 24:17

**Academy** 11:21

**acceptable**
 82:5

**access** 37:11

**accommodatin
g** 39:13

**accommodatio
n** 14:22 25:2
 26:7 33:7 35:6,7
 36:3,4,25 37:3,
 6,10,20 38:2,17,
 21,25 39:6,18
 43:9 52:24 53:4,
 12,16 58:8 72:2,
 6,22 73:3,10
 88:6 90:4

**accommodatio
ns** 10:3 13:22
 25:15 33:12
 34:20,23,24
 36:13 61:17
 71:19 73:3,11
 89:14

**accomodation**
 73:18,22

**accordance**
 76:12

**Accordingly**
 80:10

**across** 16:18

**act** 29:3

**actually** 6:2
 14:25 31:15
 70:4

**ADA** 37:7

**additional**
 80:11

**address** 5:20
 6:3 74:24

**addressed** 8:3

**advised** 31:20,
 23

**advisers** 69:6

**affect** 30:11
 75:16

**after** 11:7,13
 29:6 53:23 68:8

**again** 27:15
 29:11 43:13
 58:17 66:24
 68:4 69:5 78:14

**agency** 16:13
 24:23 27:17
 29:21 56:4,9
 63:17

**agreement**
 28:18 29:2
 82:19

**agreements**
 69:10

**all** 6:19 8:16
 13:23 19:23
 20:3,9 23:11
 30:6 34:24
 40:15 45:16
 46:3 53:8,9
 54:14 55:23
 58:13 60:8,14
 76:3 80:6 81:20
 88:22 89:2 90:5,
 21,23

**allowed** 25:12

**allowing** 62:3
 74:7

**almost** 90:16

**already** 16:25
 17:18 18:5,7
 72:25 77:7,8,9

**also** 4:24 14:20
 17:9 31:14 37:7
 74:18

**alternate** 38:7
 39:15 54:16

**alternative**
 76:15

**Amendment**
 14:18

**American** 11:17
 12:8,10,13

**an** 6:12 16:12,19
 17:8,11,23
 19:16 20:4,10
 21:16,19,24
 22:7,17,24
 23:11 24:22,25
 25:6,24 26:7,13
 28:9 29:2,21
 30:18,23 31:5
 34:14 36:24,25
 37:2,3,6,9,13,
 20,23,24 38:2,6,
 16,20,22 39:14,
 17 43:2,8,18
 45:12 46:4,10,
 11 53:15,16
 54:7,16,22 56:2,
 8 61:4 63:6
 64:10,11,17
 65:5 68:19,23
 71:25 74:25
 75:9,12 76:15
 79:13 81:11,12,
 13,15 88:5,6,11,
 18 90:4,10

**analysis** 53:23
 55:7 56:2 66:16
 68:23

**Andrea** 5:13

**another** 37:25

**answer** 6:12
 8:15 11:4,11
 12:22 13:3
 18:23 19:18
 22:14 23:6 25:5,
 17,23 26:11,17,
 23 27:6 28:16
 29:10,19 30:14
 31:3 32:15,21
 33:9,18 34:3,11,
 17,22 35:13,19,
 24 36:6,11,16,

22 37:5,22 38:5, 12,19 40:7,14 41:5,9,14 42:24 43:12 45:23 46:6,14 47:15 50:3,12,19 52:10 53:6 54:3, 11 55:12 56:16, 23 57:23 58:16 59:21 60:2,10, 17,24 61:6,19, 24 62:11 63:4, 24 64:7,25 66:20 67:16 68:3 69:4,24 70:7,14,23 71:16,21 73:7, 15,25 74:15 75:5,19,25 76:7, 21 77:3,15,21 78:13 79:16 80:17 81:5,18 87:16,23 88:10 89:10,16,22

**answering** 52:15 63:10 68:21

**any** 6:25 7:12 12:19,24 13:5 14:4,10,11 22:16,20 25:24 27:14 30:15,16 32:25 33:15 34:7 35:21 36:13 41:6 44:23 46:25 47:22 48:5,10 49:6,18 52:2,10 53:23 57:11 60:4 61:15 63:4 66:16 68:6,10, 15 69:20 71:12 75:14,21 76:19 82:9 89:7,18

**anybody** 57:12

**anymore** 40:17

**anyone** 7:9 28:24 30:21 33:16 42:21 43:13 62:7 64:3 74:22 88:3

**anything** 16:5 27:10 45:10 67:12

**apart** 46:21 82:4

**Apologies** 64:21

**appealing** 63:16

**appeals** 61:17, 21 62:8 63:22 77:6

**applicable** 69:9,14

**applicant** 17:10

**applicants** 22:18,23 23:11 70:3

**application** 16:21 17:19 22:17 28:9 30:18,23 31:6, 16 32:12 42:4 43:2,4 44:20,24 45:13,15,18 53:14 58:5 59:23 61:12

**applications** 16:24,25 17:6 18:2,8 19:7,24 20:4,15,17 22:5 23:21 33:22 35:11 41:17 42:2,12,18 45:9 46:11 60:20

**applied** 17:14 31:10 34:25 52:2

**apply** 16:10 28:5 71:25

**approach** 16:24 18:7 46:20

**appropriate** 31:24 65:21

**appropriately** 17:13 29:3 31:10

**approve** 34:4

**approved** 34:8 35:17,22 36:9, 14 77:8

**approximately** 70:3

**arbitration** 26:3,8 37:19 56:19 58:24 59:2,10,13,14 60:21 76:13 81:13

**arbitrations** 59:19

**arbitrator** 25:25 26:2 38:14 40:10,25 59:24 61:3 77:8,13 87:13

**arbitrators** 60:6,13 77:16, 19

**area** 31:11

**argument** 74:20

**around** 39:7,8 56:7 74:22

**arrange** 88:25

**arrest** 10:4

**ask** 4:21 6:9 7:18 44:10

**asking** 33:13

**asks** 37:14

**assign** 80:13

**assigned** 90:10,11

**assignments** 76:15

**assistant** 23:24

**assume** 57:24 58:18 63:15

**at** 6:25 7:8 11:17 14:22 17:20 20:14,19 23:15 24:7 27:7,24 28:12 29:20,24 30:8 39:22 42:19 45:25 47:8,19 50:5,6 54:8 55:14,19 56:21 57:8,11 73:4,8 74:6 80:10 88:23 90:2,13,18

**athletes** 30:10

**attached** 42:8

**attendance** 88:22

**attended** 13:12, 14

**attorney** 4:6 6:8 12:15 52:13 63:6 68:19

**attorney-** 47:24 68:17

**attorney-client** 47:4 48:12 49:8, 20 63:7,9

**attorneys** 48:5

**Austin** 5:6 6:8 43:21

**automatically** 30:25 45:11

**available** 77:25 79:7,22,23,25

**award** 56:20 76:13

**aware** 18:12,15 60:12,13 61:21, 25 62:2 75:21 76:3 87:12,17, 18

**away** 7:19 28:21

**B**

**back** 11:14,16 23:13,16 28:6 57:14,20 58:4 90:18

**bank** 81:7

**bargaining** 69:10

**based** 16:20 17:17 46:4 53:4 87:14

**basement** 67:22

**basically** 28:25 81:2

**basis** 23:8 26:6 74:12

**Bates** 66:3

**because** 6:20 23:12 24:7,12 25:6 27:15,17 30:4 31:16 36:23 38:20,21 52:15 71:2,18 75:6 77:4 79:17, 18 81:9,23 89:24

**become** 56:8

**been** 5:18 10:13 22:3 24:22 26:21 28:7 29:15 40:24 44:12 57:2 78:10 80:11 82:22

**before** 8:13 22:6 28:22 46:8 65:25 78:14

**begin** 11:8

**behalf** 59:17

**behind** 68:25

**being** 29:7

**belief** 6:15 22:11 32:13,19, 25

**beliefs** 29:14

**believe** 8:2 12:23 26:20 70:15 74:2 89:11

**believed** 17:9 64:17

**benefits** 29:7, 25

**Bernstein** 20:19 21:2,11 50:20

**best** 4:23 29:20 38:24

**between** 37:2 60:5 69:13

**bias** 27:14

**bigger** 43:22 59:6

**blank** 31:17,22

**board** 16:19 77:6

**bona** 32:12,18 70:4

**BOOKLE** 83:5 84:5 85:5 86:5 87:5

**boss** 20:19

**both** 9:7 16:22 38:15 73:11

**bottom** 28:12 64:13 74:6 80:10

**break** 6:25 7:3 90:15

**briefly** 90:13

**bring** 27:18

**Brooklyn** 5:21 40:18

**building** 27:18 53:10 55:6 56:7 66:25 67:6,14, 20,23 74:18 78:3

**buildings** 24:6, 7,10,13 25:10, 12 29:23 43:15, 18 71:11

**bullet** 66:12 69:8,16,17,18

**bullets** 64:14 66:3

**bunch** 81:4

**burden** 16:12 17:8,23 20:5,11 21:25 22:8 23:11 24:22 46:4,11 53:18 56:8 64:18

**burdens** 16:18 18:20

**but** 7:16 17:25 19:24 20:2 27:17,22 31:12 38:9,25 39:3 40:17 50:15 57:3 58:18 62:4

66:6 71:5 72:15 74:24 78:22 79:4 80:6 82:9, 12 89:2,25 90:8, 10,16

**C**

**call** 88:17

**calls** 81:6

**came** 23:16 30:23 43:24 45:2,6,19

**can** 4:23 7:20 8:6,7 11:4,11 12:22 13:3 18:23 19:18 22:14 23:6 25:5, 17,23 26:11,17, 23 27:6 28:13, 16 29:10,19 30:14 31:3 32:15,21 33:9, 18 34:3,11,17, 22 35:13,19,24 36:6,11,16,22 37:5,22 38:5,12, 19 40:7,14 41:5, 9,14 42:24 43:12,21 45:23 46:6,14 47:15 50:3,12,19 51:13 53:6 54:3, 11 55:12 56:16, 23 57:23 58:16 59:7,21 60:2,10, 17,24 61:6,19, 24 62:11 63:24 64:7,25 65:24 66:20 67:16 68:3 69:4,24 70:7,14,23 71:16,21 73:7, 15,25 74:15 75:5,19,25 76:7, 21 77:3,15,21 78:13 79:16 80:17 81:18 87:16,23 88:10 89:10,16,22

**can't** 6:12 7:19 24:14,15,16 27:19 40:16 75:20 89:23

**cannot** 6:21

**case** 5:12 7:13

**Catholic** 22:17, 23

**caution** 46:24 47:21 48:9 49:5, 17 68:14

**ceita** 4:15 5:19

**cell** 7:15

**central** 77:5,6 88:13 89:2,18, 25 90:7,11

**certain** 30:2 72:11 79:4

**cetera** 46:20

**chancellor's** 15:25

**changed** 30:9

**charge** 15:9

**check** 31:11

**chief** 21:9

**children** 23:16 54:25 74:11 75:13,17

**choice** 30:7

**circumstances** 69:14

**cited** 79:10

**City** 4:19 5:10, 14 7:25 9:5,6, 10,12 11:9 20:23 29:16 30:9 50:6 61:16 67:9

**clarification** 41:2 65:9 73:20 76:23

**clarify** 52:20

**class** 71:7

**classes** 12:20, 25 14:18,19

**classroom** 10:13 23:19 89:7

**classrooms**

30:5

**cleaned** 67:21

**clear** 58:2

**client** 47:25 54:13,17 62:20 68:18

**close** 4:22

**co-teacher** 72:14

**collective** 69:9

**college** 12:2,3 78:21

**come** 28:6 29:22 57:14 71:2,11 72:24 90:18

**coming** 57:20

**committee** 15:21,23 16:7, 20 17:21 18:9, 11,14,17 20:7 21:24 22:4 24:24 45:21 46:9,22 47:13 49:15 58:13 60:14 64:17 77:5

**committee's** 23:9 60:7

**communicate** 7:20

**communicatio ns** 60:4

**completely** 37:14

**comprised** 33:20

**concern** 65:18

**conclude** 63:20

**conclusion** 87:8

**cone** 67:3

**confidential** 5:24 80:2 81:22, 24 82:14,23 83:5 84:5 85:5 86:5 87:5,8

**confidentiality** 82:18

**confirm** 43:7 50:15

**confirmed** 76:14

**consider** 17:3 24:25

**consideration** 32:17

**considered** 17:13 43:8 47:2, 23 48:11 49:7, 19 68:16

**consistent** 65:15,16,18

**constant** 66:21

**consulted** 66:23

**contact** 69:7

**conversation** 46:16

**conversations** 66:21 68:7,11 80:3

**copy** 4:4,8

**correct** 15:17 26:5 52:17 56:14 63:11,12 68:22 76:19,22, 25 77:4 78:6,11

**cost** 55:18 65:21

**could** 27:14,18 28:20 29:21 30:2 31:21,24 39:24 47:2,23 48:11 49:7,19 50:14 53:9,11 56:25 67:5 68:16 71:11 72:4,21 74:18 79:14 81:9 90:8, 9

**couldn't** 27:7, 10 46:7 50:15 57:6,11 72:24 90:12

**counsel** 5:2 47:12,16 48:16,

21,23 49:2,13 50:21

**counsel's** 46:17

**counselor** 78:17,18 79:10, 13,20

**counselors** 90:6

**course** 72:22

**courses** 13:13 14:21

**court** 4:15 5:20 6:20 53:21

**courtesy** 4:8

**cover** 55:23

**COVID** 15:10 39:7 81:3 87:13

**COVID-19** 19:11 66:18

**create** 64:11

**created** 62:22 63:14

**creating** 76:14

**criteria** 52:23 53:3 61:2

**current** 9:14,15

**currently** 7:6 9:2 20:22 21:4 48:6,23

**custodians** 23:23 30:5 90:7

---

**D**

**date** 58:18

**dated** 50:25 51:5,18 58:6,8

**days** 58:11

**decide** 19:15 56:12

**decided** 11:5 22:6 71:23

**decision** 16:18, 20,23 17:17 20:3,9 22:2,3

23:9 53:22,23 58:12,24 59:3 60:7,13 72:7

**decisions** 16:4, 6,8 59:10

**DEF** 66:6,7,8 74:5 77:23

**defendant** 5:11, 15

**DEFS** 66:4

**denial** 58:7

**denied** 19:25 21:19 22:12 30:25 32:8 34:9, 15 46:4 75:9 77:9

**deny** 19:3,16 21:13 23:3 30:18 31:8 33:24 53:13 58:13 60:8,14 61:4

**department** 4:20 5:11,14 7:25 9:5,9,12 11:9 15:4 20:20, 24 21:4 25:8 26:14,19 29:17 30:11 46:17 47:12,17,18 48:3,7,17,18 49:2,13 50:7,8 55:9 56:11 59:18 60:5 62:8 66:17,22,24 67:10,17 68:7, 11,24 69:5 75:14 76:18 87:19

**depend** 42:3 71:3 72:8,9,10, 11

**depended** 56:24,25 78:15

**dependent** 72:19

**depends** 28:17 29:11

**deposition** 4:7, 17 7:23 8:4,8, 10,18,24

**deputy** 20:18,21

**described** 49:15

**deserved** 17:10

**designated** 82:22

**determination** 16:11,13 18:19 21:23 31:8 38:13 57:17 63:16 70:9

**determinations** 21:12

**determine** 17:22 22:23 30:17 35:4,6 61:3

**determined** 23:10 46:2,10 54:6,12,14 56:3 70:19 72:25

**determining** 16:16 19:3

**development** 13:13 14:21

**didn't** 24:11 25:10 32:6 38:8 43:15 45:8,9 64:22 67:7,24 70:8 74:21 75:2 76:8,19

**difference** 37:2

**different** 11:6 28:19 33:5,15 49:14 54:8 56:3

**difficult** 54:18

**direct** 52:9 63:3

**directed** 39:14

**director** 9:16 15:8

**disability** 10:2 35:4

**discipline** 13:21,24

**disclose** 46:25 47:22 48:10 49:6,18 68:15

**disclosed** 87:19

**discrimination** 14:13,16,19,22 15:2 37:8

**discussing** 19:23 20:14,16

**discussion** 22:20

**discussions** 22:16 47:3 82:12

**disqualify** 45:12

**districts** 76:4

**diverted** 80:11

**doctor** 34:9,13

**doctors** 33:21, 23

**document** 8:12 42:7 44:7,16 45:2 50:25 51:5, 9,21,24,25 52:25 59:5 61:10 62:14,21, 25 63:14,21 64:3,5,9 82:15

**documentation** 31:25

**documents** 7:12 44:18 45:17

**DOE** 13:15 14:24 25:20 40:17 41:18,19 52:12,13 53:18, 25 56:21 63:6 64:10,12 68:19 69:20,22 81:14 89:13,18

**DOE's** 69:12

**does** 15:22 21:3

**doesn't** 67:2 79:5

**doing** 55:4 56:2 78:16,24 88:21

**don't** 6:11 17:24 19:21 26:24

28:6 30:15 36:7, 12 39:17,20,21 41:15 44:22 54:5 58:17 59:10 60:25 62:19 69:25 74:2,4,16 82:7 88:3

**done** 64:23 73:5,8 75:22 80:6 90:16

**drafted** 52:4

**drafting** 52:7 62:25

**due** 18:2 19:22 48:12 49:20 63:6,9 68:17 82:13

**duly** 5:18

**duplicate** 45:8

**during** 15:10 18:4 30:8 38:3 70:11 71:13

**duties** 9:20 10:10

---

**E**

**each** 17:10 42:11,13,15 71:25 79:5

**early** 18:3

**East** 10:19

**ed** 70:16,20

**education** 4:20 9:6,9,12 11:9 20:24 21:5 24:19 26:14,19 29:17 30:12 48:18 50:7,8 55:10,21 56:5, 11 57:18 59:18 60:5 62:8 66:17 67:10 68:24 75:14 76:18 87:19 89:24

**Education's** 15:4

**effect** 30:15 57:25

**effort** 69:20

**either** 21:19 37:10 57:16 89:12

**elementary** 54:22

**elements** 13:24,25 16:14 39:7

**else** 7:9 42:22 45:10 55:6 62:6

**email** 51:16,18 58:22

**employed** 9:2,7

**employee** 9:16, 25 10:6 45:8 64:11 65:5 79:5 81:11,15

**employees** 13:16,20 14:7 16:9 25:13 26:7 27:2 29:4,22 53:8,9 56:10 74:7 77:25 78:6 79:8 80:12,15, 19 81:5 87:20 89:19

**employer** 9:4

**employment** 12:25 15:5,9,15 27:4 28:13 29:16 37:12

**ended** 11:13 62:5

**English** 10:17 72:13

**enter** 53:10 67:6

**entertainers** 30:10

**entire** 53:13

**entities** 9:8

**entitled** 33:2 38:10 57:13

**equal** 14:23 15:4,9,15

**essential** 54:19 55:3 65:6 80:4 82:8

**essentially** 55:14

**et** 46:20

**even** 32:6 34:13 39:9 54:18 55:4 67:2 74:9

**eventually** 17:5

**ever** 10:13

**every** 17:19 23:21 42:7

**everybody** 28:18 90:3

**everyone** 4:21 55:13

**exact** 40:16 58:17

**exactly** 17:24

**examination** 6:5 32:10

**examined** 5:21

**examining** 22:17

**example** 39:4 79:9 90:9

**except** 64:4 69:13

**excuse** 88:6

**executive** 9:15

**exempted** 80:12,15,19,23 81:4

**exemption** 16:14 18:2 19:16 20:4 21:16,20 22:7, 24 25:25 30:19, 24 31:6,12,13 33:3,6,16,19,24 34:14 35:11,16 36:20,25 37:3, 13,20,23,24 38:16,17 44:21 46:10 52:3 61:4 64:4,10,20 70:4 73:22 75:9 79:13 81:12,16 87:21 88:6,11, 19 89:8,20

90:10

**exemptions** 16:10,12,17 17:7,22 19:4,7, 10,11 20:10 21:13 22:6 23:4, 10 25:14 33:10, 15 34:8 35:16, 22 37:18 39:12 40:5,22,25 41:7, 17 43:10 46:3 56:9 58:14 60:8, 15,20 73:12,13 76:12,19,25 77:13 87:13

**exhibit** 8:22,23 51:3,4,15,17 58:5,6,20,21,23, 25 61:9,11 62:13,15 81:23 87:10

**experience** 76:11,24

**explains** 75:7,8

**explanation** 81:14

**extensive** 14:25

---

**F**

**face** 39:10

**fact** 24:2

**fail** 53:2

**failed** 52:23

**familiar** 40:15 76:8

**few** 11:15 71:17 80:18 90:22

**fewer** 47:8

**fide** 32:12,18 70:5

**figure** 72:21 88:15

**fill** 56:14

**filled** 56:20 57:2,15

**final** 21:15,17, 18,22

**financial** 23:2

**find** 38:24 39:14 54:16,18 55:22, 24 57:2 65:20 77:10 81:8

**fine** 4:10 65:2 66:9 90:19

**fired** 29:15

**Firm** 5:7

**first** 5:18 14:18 16:22 43:25 45:5,6 64:14 65:11,14 66:11 72:16 76:10

**five-** 90:15

**flexibility** 69:22

**FMLA** 14:2

**folks** 56:6

**following** 64:12 82:21

**follows** 5:22

**food** 23:23 24:17 30:6 90:6

**forever** 27:20

**forget** 80:24

**former** 50:20

**forms** 28:20

**found** 39:24 56:13

**four** 64:5

**Frank** 66:6

**Friedman** 48:22 50:23

**from** 5:7 15:6,24 17:2 19:11 21:23 23:21,22, 23,24,25 25:7, 25 26:8 27:3,13 28:2,10,11 29:5, 15,16 37:14 43:2 45:12 46:21 47:18 48:2 49:14 56:2 62:7 78:2 82:4 88:4

**front** 7:13,16

**functions** 54:20 55:3 65:6 80:4

**further** 7:19

---

**G**

**G-R-O-F-F** 53:22

**general** 15:21, 23 17:21 18:9, 11,14,17 20:6 21:23 22:4 23:9 24:24 45:21 46:9,17,22 47:11,13,16 48:16,21,23 49:2,13,15 50:21 58:13 60:7,14 64:17

**generalities** 65:12

**generally** 69:12

**genuine** 29:14

**gestures** 6:22

**get** 37:9

**getting** 55:20

**given** 35:3,5 42:12,13 81:14 82:11

**go** 11:14,16 12:2 24:6 45:5 65:25 87:9

**going** 6:9 8:5,21 18:6 22:11 44:9 46:3,18,23 47:21 48:9 49:4, 16 51:2,14 52:9 58:4 61:8 63:3 67:13 68:14 81:21,24 82:6, 10 88:19,21 90:14,17

**Good** 6:7

**got** 27:21 57:12 77:5 88:3 90:10

**gotten** 90:4

**graders** 72:16

**grades** 23:18

**graduate** 11:19, 23 12:5,12

**Graff** 4:10,13 5:6 6:6,8 8:21 43:23 44:4,5,14, 15 47:10 48:4, 15 49:11,22 50:24 51:14 52:14,19,21 58:20 63:8 65:2 66:5,9,10 68:20 81:20 82:17 87:9 90:14,21

**grant** 19:3,15 21:13,16 30:18 31:8 33:24 61:4 64:20 69:21

**granted** 17:7 21:19 23:3 25:15,21 40:9, 24 60:21 74:4 77:13 79:13 81:12,15 87:13 88:5

**granting** 64:10

**great** 90:20

**Groff** 53:22

**group** 15:24 20:5,6 28:23 39:16 52:5 89:3

**guess** 87:10

**guidance** 78:17,18 79:9, 12,19 90:6

**gym** 54:23

**H**

**Hadley** 12:4

**hadn't** 17:12

**half** 42:4,20 74:3

**hand** 6:21

**handled** 34:20, 24 89:3

**handling** 88:13

**hard** 55:2

**hardship** 53:17, 24 54:7 55:8

64:12 76:16

**has** 64:14 76:13 79:5 87:19 88:18

**having** 5:18 17:5

**he** 48:23

**head** 6:21 67:3

**health** 9:25 15:25 25:8 66:22,24 67:18 68:8,12 69:6 71:5,7,19

**Heart** 11:21

**held** 46:8

**Hempstead** 11:22

**her** 5:20 6:2 44:24

**here** 69:15

**hey** 88:18

**high** 10:17,19 11:20,23 66:15 78:18,20

**hire** 27:14 30:3 65:20

**hiring** 13:22

**history** 10:17

**Holyoke** 12:3

**home** 7:8

**hotline** 81:3

**house** 7:10

**how** 4:8 7:22 9:11,17 10:22 16:9,13,14,23 18:6 19:22 21:18 25:14 30:11 34:20 35:10,15 36:2,8 41:11,16,25 46:18,19 51:23 53:2 54:6 55:21, 23 60:19 70:2, 19 71:23 73:21 74:4 75:16

**Howard** 48:22 50:22,23

**However** 17:9

**HR** 15:25

**human** 13:6,9, 10,17 14:3 21:9

**I**

**I'LL** 6:15 61:8 65:12

**I'VE** 8:9 13:12 14:19 59:9,11

**idea** 26:12 60:18 61:7 62:12,23 63:25 64:8

**identification** 8:25 51:7,20 59:4 61:13 62:17

**identified** 8:17

**identify** 44:11

**ie** 53:17

**immediately** 11:8 31:20,23

**immunocompr omised** 39:5

**impact** 65:22

**implementatio n** 15:11,19 49:25 50:9

**implemented** 35:8

**important** 54:24

**impose** 53:16

**inability** 65:5

**incentive** 23:2

**included** 31:17

**including** 9:23 69:10

**individual** 17:11 28:24 29:12 42:2 60:6

**individualized** 16:19

**individually**

17:20

**information** 46:25 47:22 48:10 49:6,18 68:15

**insufficient** 66:13

**interactive** 35:5 36:18,24 38:23 72:3

**interruptions** 4:25

**into** 24:6,9 27:18 29:23 45:2,6 71:2,11 88:8

**Investigation** 9:24

**involved** 41:16 55:14,25 68:6, 10 89:4

**involvement** 62:5

**issues** 10:4 14:5,8

**its** 30:9

**J**

**job** 10:10 24:2 54:20 55:4,5 57:14 65:6 72:10 79:21 80:5,8

**jobs** 23:20 27:22 57:6 80:20

**joined** 16:3

**judge** 32:6

**Julie** 58:23 59:2

**just** 7:18 9:8 16:14 28:21 32:7 33:25 40:16 42:6,8 43:7,23 45:16 50:24 52:19 57:15 65:10,24 70:25 79:21

**K**

**Katherine** 4:17 5:17

**Kathleen** 5:9

**keep** 27:20 88:21

**kept** 29:24

**kid** 71:4

**kids** 23:13,14 24:13,15,18 71:3,6,9,10 74:21,23

**kind** 57:15 78:10

**kindergarten** 78:23

**knew** 17:2

**know** 6:14 23:25 26:6 27:23 32:5 36:2 39:10,25 40:17 41:11,15 43:19,24 44:19, 22 50:5,16,17 51:8 54:17 55:20 57:9,11 59:10 60:19 61:2 62:21 63:13,21 64:2 69:25 70:2 72:11 73:21 74:2,4,16,19 77:18 80:18 81:6 82:10 87:24 88:3 89:7, 18

**knowing** 43:3 44:23 57:19

**knowledge** 60:11

**L**

**labor** 12:20

**language** 52:4

**large** 39:25 40:2

**larger** 51:12

**last** 39:19 76:10

**law** 5:7,10,14 7:25 11:17 12:10,19,20,24, 25 14:17 20:20 37:8 46:16 47:12,17,18 48:3,7,25 49:12 65:8 69:9

**laws** 14:2

**lawyers** 48:2 52:5

**Lazar** 4:15 5:19 82:17

**learning** 24:14 70:11

**least** 42:19

**leave** 11:2 45:10 56:13,19 57:17

**leaves** 13:25

**left** 28:14,18

**legal** 16:3 48:17

**let** 6:14 43:19 51:8

**let's** 13:21 33:14 65:4 80:22 87:9 90:18

**letter** 75:7,8,10

**level** 23:18 28:12 34:5 72:9 73:4,9 78:19

**licensed** 12:15, 17

**like** 4:3 5:23 28:25 34:24 39:15 40:18 44:17 46:18 57:10 58:2 62:3, 19 71:5 72:16 74:3,9,24 75:11 78:16,23 79:6 80:21,22 81:2 90:3,7,8,9,18

**limit** 69:12

**limitations** 65:17

**limited** 69:14 77:24 78:9,21 79:3,6,7,14,20

**LINANNE** 12:21 28:15 29:9,18 32:14,20

**line** 52:25 76:10

**lines** 64:5

**Linnane** 4:2,5, 12 5:9,10,23 11:3,10 13:2 18:22 19:17 22:13 23:5 25:4, 16,22 26:10,16, 22 27:5 30:13 31:2 33:8,17 34:2,10,16,21 35:12,18,23 36:5,10,15,21 37:4,21 38:4,11, 18 40:6,13 41:3, 8,13 42:23 43:11,21 44:2,9 45:22 46:5,13, 23 47:14,20 48:8 49:4,16 50:2,11,18 52:8, 18 53:5 54:2,10 55:11 56:15,22 57:22 58:15 59:20,25 60:9, 16,23 61:5,18, 23 62:10 63:2, 23 64:6,19,21 65:24 66:7,19 67:15 68:2,13 69:3,23 70:6,13, 22 71:15,20 73:6,14,24 74:14 75:4,18, 24 76:6,20 77:2, 14,20 78:7,12 79:15 80:16 81:17 82:6 87:15,22 88:9 89:9,15,21 90:19,23

**list** 90:3,13

**literally** 39:14

**little** 24:15 43:22

**lived** 88:15

**located** 40:20

**locations** 40:11,16

**long** 6:25 9:11, 17 10:22 29:25

78:2

**longer** 15:13

**look** 28:25

**looked** 17:19 90:13

**looking** 31:13 32:23 37:9 55:14

**looks** 44:17

**Lorraine** 4:18 6:9 44:20

**lot** 14:3 27:21 56:2

**lower** 23:18

---

**M**

**made** 11:2 16:4, 20 18:14,20 21:25 22:2,3 31:9,14 33:25 36:4 43:5 45:7 57:16 58:12 73:4,23

**major** 12:7

**make** 6:19 16:7 17:11 31:7 32:3 42:8 43:22 45:16 51:11 59:6 70:8 72:7

**making** 16:23 20:2

**Mallory** 20:18, 21

**manage** 10:4 72:4

**mandate** 15:11, 12,20 19:11 23:3 25:7 27:11 44:21 49:25 50:10 68:8,12

**Manhattan** 40:19

**many** 25:14 35:10,15 36:2,8 41:11,16 44:17 60:19 70:2 73:21 74:4 79:18

**mark** 8:22 51:2, 15 65:25 81:21

**marked** 5:24 8:25 51:6,19 59:3 61:9,13 62:13,17

**Martin** 5:13

**Masciarelli** 4:19 6:9

**Masciarelli's** 44:20

**masked** 25:11 39:9 43:16

**masking** 24:25 43:7 74:9,25 75:3,11,15,22 76:5

**Massachusetts** 12:4

**matter** 4:18 22:12 25:11 43:16 67:2,7,11, 24 75:2

**matters** 8:2 10:6

**may** 57:2 79:20 80:5

**maybe** 39:8 50:14 71:5

**me** 6:13,14 7:17 8:6 43:19 51:8, 11 59:6 88:7

**mean** 15:22 28:2 30:20 38:21 58:21 59:9 65:7 70:17 74:16,18 81:4 90:12

**meaning** 21:21 26:2

**measures** 66:13,18 67:8 69:2

**Mediation** 26:3, 8 59:14

**medical** 31:13, 18 33:6,7,10,11, 14,16,19,20 34:5,8,9,19,23,

25 35:3,10,15, 16,21 36:3,13 37:10 38:22,25 40:5,8 41:6 45:6,7 72:23 73:2,10,17,21

**meet** 48:25 52:23 53:3 79:24

**meeting** 18:14, 17 45:21 46:2,8 49:3 55:3

**meetings** 18:11 45:24 47:9,11, 19 48:7 49:12, 14 50:8

**memory** 34:7

**mentioned** 41:23

**met** 7:25 18:5

**microphone** 4:22

**middle** 72:14

**might** 72:12,15

**mine** 21:14

**minimal** 4:25 53:17

**minute** 90:15

**minutes** 18:13 90:20,22

**mitigation** 66:12,18 67:8 68:25

**more** 14:3 17:5 42:21 53:17 54:18 73:12

**morning** 6:7

**Mount** 12:3

**move** 42:10

**Mr** 4:10,13 5:6 6:6 8:21 43:23 44:4,5,14,15 47:10 48:4,15 49:11,22 50:24 51:14 52:14,19, 21 58:20 63:8 65:2 66:5,9,10 68:20 81:20

82:17 87:9 90:14,21

**Ms** 4:2,5,12 5:9, 13,23 6:7 11:3, 10 12:21 13:2 18:22 19:17 21:11 22:13 23:5 25:4,16,22 26:10,16,22 27:5 28:15 29:9, 18 30:13 31:2 32:14,20 33:8, 17 34:2,10,16, 21 35:12,18,23 36:5,10,15,21 37:4,21 38:4,11, 18 40:6,13 41:3, 8,13 42:23 43:11,21 44:2,6, 9 45:22 46:5,13, 23 47:14,20 48:8 49:4,16 50:2,11,18 52:8, 18 53:5 54:2,10 55:11 56:15,22 57:22 58:15 59:20,25 60:9, 16,23 61:5,18, 23 62:10 63:2, 23 64:6,19,21 65:24 66:7,19 67:15 68:2,13 69:3,23 70:6,13, 22 71:15,20 73:6,14,24 74:14 75:4,18, 24 76:6,20 77:2, 14,20 78:7,12 79:15 80:16 81:17 82:6,17 87:15,22 88:9 89:9,15,21 90:19,23

**much** 41:25 55:22,24

**must** 78:10

**my** 4:5,14,25 6:7 7:8 9:15 20:18 34:6 50:20 60:11

**N**

**name** 4:14 5:3 6:7 23:25 24:2

50:14 80:24

**names** 50:17 77:18 88:12

**nature** 19:22 32:5 80:7 82:14

**nearby** 7:15

**necessarily** 56:17 57:3 59:11

**necessary** 24:18

**need** 6:13,24 35:7 51:11 55:16,22,24 59:6

**needed** 23:13, 15,18,20 24:3 30:4 39:6,8,9 43:24 79:17

**needs** 55:21 72:17

**negatively** 65:22

**negotiate** 69:21

**negotiations** 49:24

**never** 43:8 81:19

**new** 4:19 5:10, 14,21 7:24 9:5, 6,10,12 11:9,22 12:17 20:23 29:16 30:3 50:6 61:16 76:4

**next** 51:9 66:2

**no** 6:2 7:2,11,14, 20 11:12 15:6, 12,13 18:18 19:19 21:6,16, 17,18,21 22:9, 12,19,25 23:7 26:12,18 28:4 30:6 31:4 32:10, 16,17,22 33:4 36:18,23 37:15, 16 38:20 39:15 42:19 43:6 44:25 46:15 48:14,24 50:4 51:13 59:7,22

60:18 61:7,14, 20 62:12,23 63:25 64:8 65:2 66:5 67:11 73:16,19 76:24 77:4,16 78:8

**nods** 6:21

**none** 81:9

**not** 6:12 7:16 18:12,15 23:14 24:4,5,6,21 25:9,20 26:15, 20 27:2,18 29:22,23 32:11 35:14,20 36:25 40:15 43:13,14, 17,18 44:8,12 46:15,24 47:22 48:10 49:5,17 52:10,15 53:9, 10,11 55:20 56:6,12,17,20 57:3,19,21 58:2 59:16 60:11 63:4,10 66:25 67:5,12,18,19, 22,25 68:4,15, 21 69:14 71:11 72:20,24 76:2,8 77:4,22 79:4,21 80:6,20 87:17, 24 89:6

**Notary** 5:19

**notations** 43:4

**note** 82:7,12 87:25

**notes** 18:10,16

**nothing** 17:12, 15 42:9 62:6 78:25

**Notice** 8:8,17,24

**now** 34:19 90:17

**number** 31:11 55:15 80:23 87:17

**numbers** 17:18 65:19 87:24

**numerous** 13:12,14 14:20

**O**

**objection** 11:3, 10 12:21 13:2 18:22 19:17 22:13 23:5 25:4, 16,22 26:10,16, 22 27:5 28:15 29:9,18 30:13 31:2 32:14,20 33:8,17 34:2,10, 16,21 35:12,18, 23 36:5,10,15, 21 37:4,21 38:4, 11,18 40:6,13 41:4,8,13 42:23 43:11 45:22 46:5,13 47:14, 20 48:8 50:2,11, 18 52:8 53:5 54:2,10 55:11 56:15,22 57:22 58:15 59:20,25 60:9,16,23 61:5, 18,23 62:10 63:2,23 64:6,19, 24 66:19 67:12, 15,25 68:2,13 69:3,23 70:5,6, 13,22 71:15,20 73:6,14,24 74:14 75:4,18, 24 76:6,20 77:2, 14,20 78:7,12 79:15 80:16 81:17 82:7,13 87:15,22 88:9 89:9,15,21

**objections** 25:3

**occasionally** 20:20

**October** 18:21

**off** 28:14 77:17

**offboarding** 10:5 13:23

**office** 9:16,23, 24 10:2 14:23 15:5,16,25 16:2, 3 45:3,7,14 46:18 73:5 89:3, 19 90:2,12

**office-based** 80:20 89:13

**officer** 21:10

**offices** 9:23

**oh** 39:23 69:19 88:24

**Okay** 8:5,20 15:18 19:14 31:5 43:19 44:4 51:11,14 52:19 59:8 90:14

**on** 8:17 14:4,7, 16 15:21 16:23 17:4,17 19:15 21:15 23:17 27:20 28:17,22 29:2,11,25 34:4 42:3,10 43:24 45:3,19 48:6 53:18,24 55:9 56:8,13,18,24, 25 57:5,25 59:17 62:8 64:14 66:3 67:3 71:3 72:8,9,10, 11,19 76:10,11 78:15,18 79:17 80:9 82:11 87:14 88:20

**onboarding** 10:5 13:22

**Once** 45:2

**one** 7:20 9:8 14:22 16:8,10 21:17,18,21 29:6 33:12 40:18,19 42:13 49:2 50:14,17 59:11,22 65:7 75:9 77:12 81:19 89:12 90:2

**ones** 40:9

**online** 24:14

**only** 27:12 76:13 87:20

**open** 45:15

**operation** 69:11

**operations** 53:18

**opinion** 26:13

**opportunity**

14:24 15:10

**option** 25:6 27:12,24 29:20 37:16 43:18

**options** 37:16

**order** 37:11

**organization** 88:20

**other** 10:4 27:14,22 28:21 30:7 32:2 37:16 41:22 59:9 66:12,17 67:7 68:25 71:9 74:9 76:3,9

**others** 74:12 75:13,17

**our** 27:22 29:23 33:20 45:14 62:5 63:18 65:15,16 76:11 82:7,13

**out** 32:8 38:24 42:16 70:2 72:21 82:2 88:15

**outlined** 37:6,7

**outside** 78:2,22, 24

**over** 7:18 17:6 49:24 50:9 90:5

**overall** 17:17

**overlooked** 17:16

**oversaw** 14:23

**oversee** 9:22 15:3 80:13

**overseeing** 15:14,15

**own** 28:22

**P**

**page** 64:14,15 74:5 77:23 80:9

**pages** 42:5 82:21

**panel** 61:17,22, 25 62:9 63:22 88:3,4

**paper** 31:17,23 32:7 42:5

**paragraph** 65:11,14 74:5,6 76:11 80:9

**paragraphs** 65:11

**parent** 67:21

**part** 48:6 62:4 81:21,25

**participate** 49:23 52:6 59:12 62:24

**participated** 59:17

**particular** 77:12 81:15,23

**particularly** 23:17 44:8 54:21 66:14

**parties** 4:16

**parts** 13:25

**past** 13:11

**pending** 7:2 45:10

**people** 15:24 22:5 23:20 24:5, 12,20,21 26:15, 20 27:21 28:19, 21,22 29:13 30:3 31:11,16 37:17 40:4,19, 24 41:16,21,22 42:4,5 47:8 54:15 55:15,17, 18,25 56:3,21 62:3 77:10 80:23,25 81:8

**perform** 65:5

**performed** 55:7,18

**period** 18:4 27:9 29:7 43:15 58:19 67:6,23 68:5

**permitted** 24:9 25:10 29:24 43:14,17 66:25 67:19,22 74:17

**person** 21:21 22:11 24:2,20 31:9 32:11 33:5 34:25 37:9,13 38:15 39:2 52:2 54:22 63:15 67:12,18 71:25 72:12 78:15,16 88:8,18

**person's** 16:21 17:19 72:20

**Personnel** 9:24

**perspective** 65:15

**phone** 7:15 81:7

**physically** 19:25 24:13

**piece** 31:22 32:7

**place** 16:15 17:14 27:12 31:19,22 38:2,7 40:2 42:10 54:7 88:7,16 90:5

**placed** 40:12 53:24 55:9 56:13

**placement** 55:16

**placements** 88:14

**places** 24:12 77:10

**plaintiff** 5:8 52:22 53:2 54:8, 13 75:8

**plaintiff's** 8:23 51:4,17 58:5,25 61:11 62:15

**plastic** 39:8

**play** 15:18 19:2

**please** 4:21 5:2, 25 6:14,19 47:5 82:3

**plumbing** 24:16

**point** 6:25 14:23 27:9,19 30:2,8 57:12 88:23 90:2

**policies** 14:2 76:5,9

**policy** 67:4,9,17

**pope's** 22:21

**portion** 42:13, 14,15 87:8

**poses** 76:15

**position** 26:25 62:16,18 63:18, 19 88:8

**positions** 71:24

**possible** 4:24 35:9 72:18 79:18

**practice** 4:9

**pre-k** 54:23

**prepare** 7:22

**prepared** 7:24 8:15

**present** 4:16 74:25 75:12

**presented** 74:10

**primary** 55:21

**principals** 23:24,25 81:3

**privilege** 47:4, 25 48:13 49:9, 20 52:16 63:7, 10 68:18

**privileged** 47:2, 24 48:12 49:7, 19 68:17

**probably** 18:24 42:17,19,25 47:7,8 52:5

**problem** 7:2 65:3

**proceedings** 59:13

**process** 16:9, 15 30:9 35:5

36:19,24 38:23 45:4 60:22 61:22 62:2 72:3 81:13 89:5

**produce** 82:2,3, 8

**produced** 82:16

**professional** 13:12 14:20

**program** 72:20

**programs** 70:16

**progressive** 13:23

**proper** 26:25

**protect** 23:15

**protection** 66:14

**provide** 4:23 53:11,15 56:5,9 66:13 76:19

**provided** 30:16 37:25 38:6

**providing** 16:11,17 17:22 22:7 23:10 46:10 76:12,25

**Public** 5:19

**purchase** 4:3

**purpose** 63:13

**pursuant** 56:19

**put** 7:19 24:12

**Q**

**qualified** 57:8

**Queens** 40:19

**question** 6:14, 16 7:2 26:24 63:11 66:2

**questions** 6:10 8:16 52:10

**R**

**random** 57:10

**rates** 66:15

**rather** 65:13

**reach** 7:16

**reading** 65:10

**realized** 17:4

**really** 21:17 31:13 55:2

**reapply** 31:21

**reason** 19:20 38:22 39:4 72:23

**reasonable** 61:16 72:5

**reasons** 37:11 64:13,16 65:8 71:19 75:10 87:14

**reassignments** 10:3

**recall** 30:15 36:7,12 54:5 58:17 60:25

**receive** 37:19 80:15

**received** 22:24 23:21,22 25:24 26:7 31:5 35:11 37:17,23,24 38:16 71:23 87:20 88:11 89:8,19

**receiving** 29:7

**recent** 53:21

**recess** 90:25

**recognize** 44:6, 16 51:21,23 59:5 61:9 62:14, 18,19

**recognized** 44:13

**recommendati ons** 33:25 78:20

**recommended** 34:14

**record** 5:25 52:20 65:25

**referenced** 78:14

**regarding** 8:9, 16 14:11,12,19, 21 16:4 18:10, 16,19 22:21,22 26:14 30:10,17 53:24 55:8 60:6 65:19 66:17,18 68:8,12,24 75:15,22

**regardless** 22:10

**regular** 69:7

**rehired** 28:24

**reinstated** 28:20

**related** 7:13 10:5 14:2 15:2 16:5 45:17

**relations** 9:16 10:2,6

**religion** 67:11

**religious** 14:12, 16 15:2 20:3,10 22:10 25:3,18, 19 29:14 30:24 31:6,12 32:5,13, 19,25 33:3 36:19 37:8,11, 18 40:8 43:10 46:3 52:3 53:12 64:4 67:11,25 70:4,5 73:13 87:14,21 89:8, 19

**religious-** 53:3

**religious- based** 52:24

**remain** 66:15 74:8 88:19

**remained** 70:16

**remember** 17:24 35:10,15 36:8 40:16

**remote** 24:12 71:24 72:21 81:10

**remotely** 4:16

24:16,17 70:11, 17,18,21 71:13 72:5,8 80:6

**removed** 37:14

**Renewed** 61:12

**rented** 40:17,21, 23

**repeat** 6:13

**rephrase** 6:13

**replace** 57:7

**reporter** 4:2,14, 15 6:20 41:2 65:9 73:20 76:23 82:20

**represent** 5:3

**representation** 52:12

**represented** 50:7

**representing** 5:8

**request** 32:9 36:19

**requested** 41:2 65:9 73:20 76:23

**requesting** 64:4

**requests** 36:3,4 45:19 73:11,17, 22 74:3

**requirement** 36:23 37:15

**research** 75:15

**resign** 27:13

**resignation** 28:5,23

**resigned** 27:25 28:8,11,22 29:5

**resource** 21:9

**resources** 13:6, 9,11,17 14:3 24:5 80:11

**respect** 16:16 34:19 52:11 63:4 66:11 82:9

**respond** 6:15

**responses** 6:19

**rest** 82:4

**result** 57:19 65:4

**return** 24:18,19 28:10

**review** 17:3,11 19:6 22:5 30:25 31:7 42:7,11 46:15,19 55:13

**reviewed** 8:2 20:13 32:3 33:21 34:6 35:3 42:17 43:3 44:19,24 46:12

**reviewing** 16:24 41:17 42:2,6

**right** 17:10,14 31:10,21 33:23 34:4 57:6,14 63:17 81:20 88:16 90:17,21, 23

**risk** 74:11 75:2, 12

**Rockaway** 10:19

**Rodi** 4:1,18 5:1, 17 6:1,7 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1,6 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1

72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1

**role** 15:18 19:2 21:11 56:4,24 61:16 63:5 68:18 88:7

**roles** 55:16,17, 23 56:14,20

**rules** 30:9

**run** 23:13 24:3 27:16,17 29:21 79:19

---

**S**

**Sacred** 11:21

**safeguards** 74:9,24 75:11

**Safety** 9:25

**said** 12:9 20:13, 15 21:3,7 41:3 67:2,4 88:24

**same** 10:8 57:4 64:2 70:24

**SAMS** 87:25 88:2,5

**SAMS'** 87:12

**saw** 77:16 81:19 90:3

**say** 18:21 21:15, 17,18,22 27:25 48:16 55:2 72:16 74:19 78:17 79:5 80:22 88:18 89:23 90:2

**saying** 74:7 87:25

**says** 52:22 53:15 66:12 69:8 76:11 77:23 78:9 80:10

**Scheinman**

26:3,8 37:18 59:14

**Scher** 5:7

**school** 10:17,19 11:14,16,17,20, 24 12:10,19,24 14:17 23:12,14, 17,23 24:3,5,7, 9,16,19 27:16 30:5 38:3 67:6, 13,23 70:12 71:2,13 72:4,6, 9,14,21 73:4,8 74:8,11 75:13, 16 76:4,9 78:3, 19,20,25 79:2, 19 88:17,24

**school-based** 89:13

**schools** 27:16 65:23 69:13 75:23 78:2

**schoolteacher** 54:22

**science** 68:25

**scrambling** 77:10

**screen** 8:6,7 43:20,25 82:11

**scroll** 44:10

**second** 52:25 64:15 65:16 69:8,16,18 74:5 80:9

**see** 7:19 8:6,7 13:21 43:19 44:2 51:8,10,13 53:19 59:7 65:4 69:15 76:16 78:3 90:21

**seen** 8:12 59:9, 11

**seniority** 69:11

**sent** 45:13 52:2 53:8 88:12

**separate** 46:21 48:17 81:25

**separately** 82:3

**September**

10:7,11 18:3,20, 25 29:6 45:3,20 50:25 51:5,16, 18 58:7,9

**series** 6:10

**served** 8:9

**service** 26:4,9 37:19 59:15 90:6

**set** 81:6

**settings** 74:8

**seven** 71:9

**several** 9:22 18:7 45:24 77:16

**shares** 4:7

**she** 20:22 21:3, 7,8,15

**sheet** 42:5

**sheets** 31:17

**shield** 39:11

**should've** 26:21 29:15

**shouldn't** 82:15

**show** 8:5 61:8 62:13 82:10

**shown** 82:16

**sign** 77:17

**signed** 28:18,19 29:12 82:18

**similar** 10:11 21:14

**simply** 59:23 77:24 79:7

**Since** 9:19 10:7

**sincere** 29:14

**site** 39:15,22 54:9,16,19

**sites** 39:25 40:3

**sitting** 55:5

**situated** 7:7

**situations** 72:12

**small** 81:7

**social** 72:13

**SOLAS** 20:2 35:2 62:4

**some** 8:16 19:20 28:19,21 30:8 31:16 39:6 42:4,5 47:8 57:25 70:10,25 71:3 77:8 78:10 80:5 89:24

**somebody** 72:16

**someone** 21:19 28:10 32:18 33:2,25 54:24 57:7,16 78:23

**someplace** 55:6

**something** 6:11 11:5 19:20 31:15 32:4 37:15 39:11

**sometime** 18:4, 24 58:19

**sorry** 31:4 50:6 65:10 66:7

**sort** 39:6 57:25

**sought** 22:6 25:14 33:6,16 43:9

**South** 12:3

**space** 40:18 55:24 65:20

**SPARATE** 83:5 84:5 85:5 86:5 87:5

**speak** 65:12 75:20

**special** 70:16, 20 72:17

**specific** 19:6

**specifically** 40:21,23

**spend** 41:25

**staff** 55:22 56:13 65:21

69:13,22 74:11 75:13,17 79:18

**staffing** 24:4

**stamped** 66:4

**start** 10:20 17:2 28:12,13 33:14

**started** 15:13

**state** 5:2 65:8 69:9 76:4

**statement** 62:16,19 63:18 74:13

**statements** 22:21

**stating** 5:19

**status** 58:3

**stay** 4:22

**still** 25:12 27:11 34:15 39:6 57:5 71:8

**stop** 10:24 67:4

**stopped** 11:7

**Street** 5:20

**strike** 30:22 32:24 68:9

**students** 54:21 55:19 56:7 57:9, 25 70:10,15,20 79:23,24,25 80:3

**students'** 57:18

**studies** 12:8 72:13 75:21

**studying** 70:17, 21

**submit** 31:24 62:4 63:17

**submitted** 31:15 32:4 44:18 63:22 64:3

**submitting** 32:11 45:12

**subs** 57:10

**subsequently**

35:8

**substitute** 57:3

**such** 53:11 74:7 76:14

**suffer** 57:19

**Sullivan** 20:18, 22

**superintendent 's** 16:2

**supervisor** 21:3,8 50:21

**supervisors** 80:13

**support** 32:4 77:25 81:7

**supported** 62:2

**supporting** 80:24

**Supreme** 53:21

**sure** 7:21 17:11 31:9,14 32:3 42:8 44:14 45:7, 16 79:4 89:23

**suspended** 27:8 29:8 57:12

**suspension** 27:20 57:5

**swear** 5:4

**sworn** 5:18

**system** 23:12 24:3 27:13 28:2, 11 29:5 35:2

**systems** 69:11

T

**table** 88:20

**take** 4:17 6:15, 21,24 12:19,24 16:15 18:16 26:15,20 27:2 38:9 39:2 56:12 78:22 90:15

**taken** 14:20 18:10 90:25

**taking** 4:7 7:3

**talk** 19:9

**talked** 18:6

**talking** 19:10

**talks** 64:9

**teach** 10:16,18, 22 54:21 70:20

**teacher** 10:14 54:17,23 57:4, 20 58:3 71:6,8 78:24 89:8 90:9, 11

**teachers** 23:19, 22 27:15 30:4 41:7,12 56:18, 25 70:24,25 71:12 81:4 90:5

**teaching** 10:20, 24 11:2,7,13 71:9,12,24 72:13

**team** 10:4 33:20 34:6 80:25 88:13

**tell** 8:6 30:21 46:7

**ten** 71:6 90:20

**tenure** 13:24

**term** 78:2

**terminate** 28:2

**terminated** 26:21 27:3 28:7

**terms** 19:25 20:2 27:23 55:20 74:3

**tested** 25:11 43:16

**testified** 5:22

**testing** 24:25 43:8 74:10,25 75:3,11,15,22 76:5

**than** 32:2 42:21 53:17 73:13

**Thank** 4:12 41:5 47:6

**Thanks** 90:24

**that's** 4:8,10 57:3 62:5 63:19 64:13 65:7 66:9 79:21 80:7 90:19

**their** 5:3 23:20 27:3 28:22,25 29:15 31:15 32:9 37:12 53:13 54:19,20 55:4,5,21 56:20 57:6,14 67:3 70:24 71:5,6 78:2 79:21 80:5, 7,8,13 81:9 88:12,17,21

**them** 17:3,4 19:25 20:13 25:21,24 27:11, 13,18,20,25 28:3,6,8 29:2,25 31:20,23 38:24 39:9,13,21 40:2 45:12 46:19 53:11 54:19 57:7 72:4,6 73:12 80:21 88:4,16,24

**then** 5:4 27:9 29:3 31:18 32:2, 3,8 33:11 34:5 35:7 38:6 42:10 45:13 48:21 55:23 56:8 67:10 71:9 72:2, 6,15 74:20 88:2, 14,23

**there** 7:9 15:7, 24 17:12,15 18:10,13 19:19 21:22 22:16,20 23:2 25:7 26:13 27:9 30:2 32:10, 17,25 33:10,11 35:21 36:18,23 39:15 42:8,9 43:3,4 44:23 47:7 48:17 53:22 56:13 57:10,24 60:4 62:7 66:16,21 67:7,20 68:23 69:20 70:15 72:23 73:12 77:12,24 78:5,9 79:3,6,13 80:25

81:13 88:2 89:2

**there's** 6:11,25 27:19 28:9 29:2 66:5

**therefore** 53:13

**these** 21:24 55:23,25 56:5 59:18 64:16 65:10 78:5

**they** 5:3 8:2 17:13 22:6 25:7 27:7,8 28:5,8, 12,13,14,18,20 29:11 31:12,14, 20,24 32:3,8 33:24 34:4,14 35:2,3,4,5,6 37:19,23,24,25 38:6,8,9 39:3,5, 7,9 40:12 42:7 43:16,17 45:9 46:19 54:25 57:4,5,13 60:12 66:24 67:3,20, 21,22,24 68:4 70:24 72:2,7,23, 24 73:4,5,8 74:17,19 75:3,6 78:17,19,21,24, 25 79:14,20,22, 23,24,25 80:3, 22 81:6 88:11, 14,15,17,25 89:25

**they're** 55:2,4,5 88:19

**they've** 28:7

**thing** 39:19 44:11

**think** 18:3 19:22 29:13 42:22 82:8 90:16

**third** 65:17 69:17

**those** 17:7 23:16 25:2 26:6, 14 29:4 33:21 34:5 37:17 40:2, 4 43:9 47:19 50:16 55:17,18 56:9,10,14 58:11 70:20 71:18 73:2

77:18 81:5

**though** 28:7,8 34:13 39:10 78:6

**thought** 64:22

**thousand** 17:6 18:8 24:21 25:14,18 42:16, 17 54:15

**thousands** 16:25

**three** 10:23 17:6 24:20 25:13,18 39:25 41:20,21 42:16 54:14 64:14 71:7,10

**through** 35:2 37:18 44:10 60:21 62:4 81:12 82:22

**time** 18:5 20:14, 19 23:15 24:8 27:7,24 29:20, 24 41:25 57:8 77:5

**title** 9:14,15,18, 21,22 10:8 14:5, 8 21:8 23:21

**titles** 79:4 89:24,25

**today** 6:10 8:3

**today's** 7:22

**together** 16:3

**too** 88:4

**took** 14:17,18

**top** 64:5 77:23

**topics** 8:17 13:19

**Torrey** 58:24 59:2

**train** 80:12,21

**trained** 13:16, 19 14:7 81:5

**training** 13:5,8 14:4,10,12,15, 25 30:16 80:14

**trainings** 13:14

**transcript** 4:24 81:22 82:2,5

**transfer** 69:13, 22

**transmission** 66:15

**treat** 28:6,8 39:16,21

**treated** 28:4

**try** 11:5

**turn** 7:18

**two** 39:25 41:22 50:14,17

**type** 13:8 14:15 16:6 80:14

_____

**U**

**UFT** 49:24 50:5, 9 69:21

**Uh-hum** 58:10

**unacceptable** 74:10 75:2,12

**under** 6:15 9:10 37:7,8 47:24 49:8

**understand** 6:11,17,22 7:3 19:12 26:24

**understanding** 4:6 27:22

**understood** 6:16

**undue** 16:12,17 17:8,23 18:20 20:5,10 21:24 22:8 23:11 24:22 46:4,11 53:16,24 54:7 55:8 56:8 64:11, 18 76:15

**unfortunately** 57:9

**unilaterally** 19:15

**unique** 62:20

**University** 11:18 12:10,13

**unmasked** 39:17,21,23

**until** 46:15 57:16

**unvaccinated** 29:22 74:8,21

**up** 81:6

**upon** 8:9 16:21 46:4

**used** 22:22 61:3

**usually** 4:9

---

**V**

---

**vaccinated** 23:14 24:8 25:9 39:3 43:14 67:5, 19 68:5 74:22 75:6

**vaccination** 57:13

**vaccine** 15:10, 12,19 16:5 22:22 23:3 26:15,21 27:3 38:9 39:3 44:21 49:25 50:10 56:12 68:12

**varied** 48:2

**Various** 48:2

**verbal** 6:20

**versus** 4:19

**very** 28:23

**Vicki** 20:19 21:2,25 50:20

**VII** 14:5,8

**vitally** 54:24

**vulnerabilities** 71:8

**vulnerable** 71:4

---

**W**

---

**walked** 28:21

**wall** 39:8

**want** 52:20 74:21

**wasn't** 21:25 25:6 39:13 54:12 74:22 79:12

**way** 28:19 43:3 44:23

**we're** 81:24 82:6

**well** 14:11 30:21 33:14

**went** 11:17 12:9 14:17 27:21 33:19 56:18

**were** 10:10 15:8 16:17,23 18:2,6, 10,13 19:14,23 20:10,14,16 21:24 23:14 25:9,13 27:8 29:5 30:16 31:12 32:23 33:10,11 34:5,7, 8,14,23 35:2,3, 5,11,16,21 36:4, 8,13 37:25 38:6, 9 39:3,5,14,16 40:2,9,11,12 41:6,11,16 42:12 43:4,16, 17 44:18 45:17 46:3,11,19 47:7 48:5 49:13 53:10 56:6,12, 20 57:5,13 60:12,20 61:15 64:16,22 66:25 67:5,7,21,22 68:4,6,10 69:6 70:10,15 71:12, 18 72:23 73:2,3, 4,8,12,22 74:4, 10 75:3,6 77:9 78:18 80:19,20 81:2,5 88:2 89:4

**weren't** 24:8,9 25:12 74:17

**what** 9:14,20 10:16 11:2,19, 23 12:5,7,12 13:8,19 14:15 15:18,22 16:6

21:8,11 22:10, 12 23:8 26:6 28:17 29:4,11 30:20 31:7 32:6, 23 35:6 38:24 39:19 40:11 45:4 46:19 50:16 56:25 61:2 63:13,19 67:11 74:12 78:15,24 80:14 82:10 88:16

**what's** 37:2 61:8 62:13

**whatever** 39:4 77:6

**when** 8:6 10:20, 24 15:3 16:4,22 17:21,24 19:9 22:16 27:25 30:23 31:5 37:13,24 43:19 45:20,25 48:16 51:8 58:11 62:21 66:14 75:2 81:11 82:2 88:5,11

**where** 7:6 10:18 11:16,19 12:2 18:4 27:10,19 28:13 30:3 37:9 40:11 45:4 46:2, 9 54:24 62:5 88:15

**whether** 19:3, 15 21:12,16 22:23 30:17 31:8 32:11,18 44:12 57:20 61:3 67:20 72:20,22

**which** 33:12,20 39:17 47:11 55:16,17,19 58:6

**while** 17:16 57:4,15 79:20

**who** 5:3 9:4 21:2 22:5 25:2,21 26:15,20 27:2 28:10,11 29:13 33:6 37:17 39:2 40:24 43:3,9,13 44:23 46:18

47:18 48:20 50:5 52:2,4 54:15 55:7,15 56:11 57:7,12 59:17 67:18 70:19 71:10,23 74:22 77:13 80:19 90:3

**who's** 20:16 78:23 88:7

**whole** 17:4 44:11 79:17

**wholly** 28:17 72:19 78:15

**why** 36:18 64:16 74:24 75:8 79:12 81:14

**with** 7:10,20 13:10 16:16 24:15 27:10 29:25 31:15 33:14 34:19 37:15,16 38:23 39:12,17 40:4,8, 15 45:21 46:9, 16 47:16 48:25 49:12,24 50:9 52:10 53:12 54:25 55:13 56:7 57:7 59:13 62:6 63:4,6 65:15,16,18 66:11,22,23 68:7,11,19 69:7, 21 71:5,10 72:14,16 74:9 76:9,13 79:25 80:3

**within** 7:16 11:15 13:15 14:24 26:13 48:18

**without** 27:13 30:25

**witness** 5:5 46:24 47:21 48:9 49:5,17 52:9 63:3 68:14

**wore** 67:3

**work** 6:2 21:4 27:8 28:10 38:2, 7,10 52:11 54:8 55:25 63:5

67:13 72:8,15 77:24 78:5,9,10, 22 79:3,6,7,14, 21,25 80:5,7,14 81:8,9 88:24 89:25

**worked** 9:11 13:10 38:23 67:20

**workers** 23:23 90:7

**working** 11:8 20:23 24:22 70:17 71:10 72:4

**works** 90:11

**would** 4:3 5:23 8:3 16:9,12,15 17:3,8 18:21 20:4 31:11 35:7 38:21,24,25 42:3,6,7,10 45:11,15,16 46:20 48:25 53:16 54:7,15, 18,20 55:8,15, 19,22,24 56:8 57:7,24 58:18, 19,21 63:15,19 64:11 65:4,12, 22 66:23 67:4 70:20,25 71:3, 25 72:2,3,7,8,9, 10 74:25 75:12, 16 78:21 80:21 87:24 88:12,14, 16,17,25

**would've** 24:22 33:2

**wouldn't** 72:17

**write** 78:19

**wrong** 31:19 42:9

**wrote** 32:8

---

**Y**

---

**yeah** 43:23 44:2 50:23 65:7 69:19 78:21 79:3,11

**year** 11:23 12:5,
12 29:6 38:3
70:12 71:14

**years** 9:13
10:23 11:15
13:11

**yes** 6:18,23 7:5
8:11,14,19 9:3
10:9,12,15
11:15 12:11,16,
18,23 13:4,7,18
14:6,9,14 19:5,
8,13,19 20:8,12,
25 21:15 22:15
26:5 33:19
34:12,18 35:25
36:17 41:10,24
48:19 49:10,21
51:22 52:18
53:20 60:3
71:17,22 76:17
78:4 82:20
89:17

**York** 4:19 5:10,
14,21 7:24 9:5,
6,10,12 11:9,22
12:17 20:23
29:16 50:6
61:16 76:4

**you'd** 72:15

**you're** 50:12
53:6 54:3 58:2
63:10 82:10
88:21

**you've** 82:18

**your** 6:19 7:15
9:4,14,20 10:10
11:13 12:7
20:21 21:3,7
26:25 34:7 45:3
52:11 54:13,17
58:3 62:20 63:5
68:18 73:5
82:11 88:20

**Z**

**Zoom** 48:6